**No. 21-15667**

## In the

# United States Court of Appeals
## For the Ninth Circuit

WILLIAM KIVETT, BERNARD BRAVO, and LISA BRAVO,

*Plaintiffs-Appellees,*

v.

FLAGSTAR BANK, FSB,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
The Honorable William H. Alsup
Case No. 3:18-cv-05131

**OPENING BRIEF OF APPELLANT FLAGSTAR BANK, FSB**

David C. Powell
Carolee A. Hoover
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111

Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4746
*bschmalzbach@mcguirewoods.com*

*Counsel for Defendant-Appellant Flagstar Bank, FSB*

September 24, 2021

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Flagstar Bank, FSB, a federally chartered savings bank, is wholly owned by Flagstar Bancorp Inc., a publicly traded entity incorporated and validly existing under the laws of the State of Michigan. According to schedules filed with the Securities and Exchange Commission (SEC), BlackRock, Inc., and The Vanguard Group are holders of 10% or more of the stock of Flagstar Bancorp Inc., and are therefore indirect holders of an equity interest of 10% or more in Flagstar Bank, FSB.

Dated:  September 24, 2021        */s/ Brian D. Schmalzbach*
                                   Brian D. Schmalzbach

                                   *Counsel for Appellant Flagstar Bank, FSB*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................... i

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ..................................................3

ISSUES PRESENTED ..........................................................4

PERTINENT STATUTES ........................................................5

STATEMENT OF THE CASE ...................................................5

I.    Statutory and Regulatory Background ..............................5

    A.    Congress and the designated regulator of national banks preempt state laws under the National Bank Act and the Home Owners' Loan Act ...............................5

    B.    Dodd-Frank harmonized NBA and HOLA preemption and codified the *Barnett Bank* standard ...........................9

    C.    Courts broadly interpret *Barnett Bank*'s "prevent or significantly interfere" standard in favor of finding state laws preempted. ...............................11

    D.    *Lusnak* broke with the longstanding view in holding that § 2954.8 was not preempted ...............................12

II.    Statement of Facts ...............................................13

    A.    Flagstar originates, sells, and services California mortgages using escrow accounts to mitigate the risk of borrower default, foreclosure, and property loss while reducing borrowing costs ...............................13

    B.    Flagstar established an escrow account to pay Plaintiffs' property taxes and insurance. ...............................15

III.    Procedural History ...............................................16

    A.    The Smiths filed *Smith I*. ...............................16

    B.    After *Smith I* was dismissed, the Smiths filed *Smith II*. ............17

C. The District Court certified a class of borrowers whose mortgages were originated more than four years before *Smith II* was filed. ...........................................................18

D. The district court granted summary judgment to Plaintiffs. ...................................................................19

SUMMARY OF ARGUMENT ................................................20

ARGUMENT ...........................................................................23

I. Flagstar was entitled to summary judgment because Section 2954.8 significantly interferes with Flagstar's ability to make, originate, service, and sell mortgage loans. ...........................................23

   A. *Lusnak* does not excuse the need to determine in fact whether § 2954.8 creates significant interference with a particular national bank's operations. ...........................................24

   B. There is no genuine dispute on this record that § 2954.8 significantly interferes with Flagstar's banking operations. ........................................................27

      1. Escrow account costs drive risk calculations and pricing decisions. ...................................................28

      2. The costs of maintaining escrow accounts hinder Flagstar's ability to contract with MSR owner clients, threatening decreased revenue and diminished credit for new borrowers. ...............................30

II. Flagstar was entitled to summary judgment because *Lusnak* was wrongly decided. ........................................................31

   A. *Lusnak* ignored the effect of § 2954.8 and the OCC's expert reasoning reflected in extensive regulatory guidance. ..............32

   B. *Lusnak's* vague and unworkable approach to preemption of interest requirements creates uncertainty in the mortgage industry. ........................................................37

III. The district court erred in extending the class period by applying tolling based on a previously dismissed class action. ..........39

A.  Plaintiffs correctly conceded that the previous class action does not toll the statute of limitations here. ................................41

B.  The previous class action was correctly dismissed. ...................44

    1.  The Smiths failed to provide the required notice and opportunity to cure. ............................................................45

    2.  The Smiths' claims were properly dismissed as preempted anyway. ..............................................................49

CONCLUSION ..............................................................................................52

STATEMENT OF RELATED CASES ...............................................................52

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Aguayo v. U.S. Bank*,
  653 F.3d 912 (9th Cir. 2011) .................................................................8

*Albano v. Shea Homes Ltd. Partnership*,
  634 F.3d 524 (9th Cir. 2011) ...............................................................43

*Am. Bankers Ass'n v. Lockyer*,
  239 F. Supp. 2d 1000 .........................................................................25

*Animal Legal Def. Fund v. U.S. Food & Drug Admin.*,
  836 F.3d 987 (9th Cir. 2016) .......................................................... 23-24

*Ass'n of Banks in Ins. v. Duryee*,
  270 F.3d 397 (6th Cir. 2001) ...............................................................11

*Atherton v. F.D.I.C.*,
  519 U.S. 213 (1997) ..............................................................................5

*Bank of Am. v. City & Cty. of San Francisco*,
  309 F.3d 551 (9th Cir. 2002) .................................................................6

*Barnett Bank of Marion Cnty. v. Nelson*,
  517 U.S. 25 (1996) ..................................................................... 7, 9-11

*Blake v. JP Morgan Chase Bank NA*,
  927 F.3d 701 (3d Cir. 2019) ................................................................42

*Campidoglio LLC v. Wells Fargo*,
  870 F.3d 963 (9th Cir. 2017) .................................................................8

*Carmel v. Mizuho Bank, Ltd.*,
  2019 WL 10186488 (C.D. Cal. Nov. 14, 2019) ..................................43

*In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*,
  915 F.3d 1 (1st Cir. 2019) ...................................................................43

*China Agritech, Inc. v. Resh*,
    138 S. Ct. 1800 (2018)..................................................................... 2, 22, 41-43

*Fierro v. Landry's Rest. Inc.*,
    32 Cal. App. 5th 276 (2019) ............................................................ 41, 43-44

*Flagg v. Yonkers Sav. & Loan Ass'n, FA*,
    396 F.3d 178 (2d Cir. 2005) .............................................................. 9, 35

*Giotta v. Ocwen Loan Servicing, LLC*,
    706 F. App'x 421 (9th Cir. 2017) ...................................................... 47-48

*Gutierrez v. Wells Fargo Bank, NA*,
    704 F.3d 712 (9th Cir. 2012) .............................................................. 29

*Hayes v. Wells Fargo Bank, N.A.*,
    2014 WL 3014906 (S.D. Cal. July 3, 2014) ........................................ 35

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ............................................................................ 10

*Lair v. Bullock*,
    798 F.3d 736 (9th Cir. 2015) .............................................................. 32

*Lusnak v. Bank of Am., N.A.*,
    883 F.3d 1185 (9th Cir. 2018) ....................................................... *passim*

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
    439 U.S. 299 (1978) ............................................................................ 6

*McShannock v. JP Morgan Chase Bank, N.A.*,
    354 F. Supp. 3d 1063 (N.D. Cal. 2018) .............................................. 48

*McShannock v. JP Morgan Chase Bank NA*,
    976 F.3d 881 (9th Cir. 2020) ...................................................... 24, 32-33

*Monroe Retail v. RBS Citizens, N.A.*,
    589 F.3d 274 (6th Cir. 2009) ......................................................... 10, 11

*Polich v. Burlington N., Inc.*,
    114 F.3d 122 (9th Cir. 1997) .............................................................. 26

vi

*Porter v. S. Nevada Adult Mental Health Servs.*,
  788 F. App'x 525 (9th Cir. 2019) ....................................................40

*Silvas v. E*Trade Mortg. Corp.*,
  514 F.3d 1001 (9th Cir. 2008) ...........................................................8

*Smith v. Flagstar Bank, FSB*,
  2019 WL 631537 (N.D. Cal. Feb. 14, 2019) ...................................11

*South Dakota v. Wayfair, Inc.*,
  138 S. Ct. 2080 (2018) .....................................................................37

*In re TD Bank, N.A.*,
  150 F. Supp. 3d 593 (D.S.C. 2015) ..................................................11

*Torres v. Wells Fargo Bank*,
  2018 WL 6137126 (C.D. Cal. Aug. 28, 2018) .................................43

*United States v. 1.377 Acres of Land*,
  352 F.3d 1259 (9th Cir. 2003) .........................................................49

*Watters v. Wachovia Bank, N.A.*,
  550 U.S. 1 (2007) ...............................................................................6

*Weitzner v. Sanofi Pasteur Inc.*,
  909 F.3d 604 (3d Cir. 2018) ............................................................43

*Wilde v. Flagstar Bank FSB*,
  2019 WL 1099841 (S.D. Cal. Mar. 8, 2019)............................... 46-48

## Statutes

12 U.S.C. § 24..................................................................................6, 33

12 U.S.C. § 25b .........................................................................7, 25, 36

12 U.S.C. § 371(a) ...........................................................................6, 33

12 U.S.C. § 1462(3) ................................................................................7

12 U.S.C. § 1462a...................................................................................9

12 U.S.C. § 1465 ....................................................................................11

12 U.S.C. § 5412(b) .................................................................................9

12 U.S.C. § 5553 ........................................................................ 17, 50-51

Cal. Bus. & Prof. Code § 17208 ...........................................................39

Cal. Civil Code § 2954.8 ................................................................*passim*

Conn. Gen. Stat. § 49-2a .......................................................................39

Minn. Stat. § 47.20 .................................................................................39

Wis. Stat. § 138.051(5) ...........................................................................39

## Rules and Regulations

12 C.F.R. § 34.3(a) ...................................................................................6

12 C.F.R. § 34.4 *et seq.* ..................................................... 7, 8, 33-34

12 C.F.R. § 541.11 ....................................................................................7

12 C.F.R. § 560.2 *et seq.* ................................................... 7-9, 33

24 C.F.R. § 203.550 ...............................................................................29

69 Fed. Reg. 1904 (Jan. 23, 2004) .......................................................35

76 Fed. Reg. 43,549 (July 21, 2011) .....................................................35

## Other Authorities

Bank Policy Institute Amicus Br. in Support of Certiorari,
    2018 WL 4464737 (U.S.) ........................................................... 38-39

Fed. Deposit Ins. Corp., *National Rate on Non-Jumbo Deposits (less
    than $100,000): 12 Month CD,* available at
    https://fred.stlouisfed.org/series/CD12NRNJ .........................39

Federal Reserve Bank of St. Louis, *Effective Federal Funds Rate,*
    available at https://fred.stlouisfed.org/series/DFF .................39

FHLBB Amicus Br.,
1982 WL 608500 (Feb. 24, 1982) .......................................................................34

Lusnak Br. in Opposition to Petition for a Writ of Certiorari,
2018 WL 5078025 (9th Cir. 2018) ....................................................................25

OCC Amicus Br. in Support of Rehearing En Banc,
2018 WL 3702582 (9th Cir. 2018) ..................................................... 2, 12, 34-35

OCC Amicus Br. in Support of Rehearing En Banc,
2019 WL 4888123 (E.D.N.Y. Nov. 7, 2019) .............................................. 34-35

OCC, Corporate Decision No. 99-06,
1999 WL 74103 (Jan. 29, 1999) .......................................................................33

OCC, Interp. Ltr. 1041,
2005 WL 3629258 (Sept. 28, 2005) ...................................................................6

## INTRODUCTION

The congressionally designated regulators of federal thrifts and national banks have consistently found that state laws requiring them to pay interest on mortgage escrow accounts are preempted. That preemption is necessary, in the expert judgment of the Office of the Comptroller of the Currency ("OCC"), to protect against intrusive regulation by the States that would significantly interfere with the federal banking power to extend and service real estate loans. Yet the district court entered a nearly $10 million judgment against this federal thrift under California's interest-on-escrow law, California Civil Code § 2954.8. That was error: the ample summary judgment record here shows beyond genuine dispute that California Civil Code § 2954.8 significantly interferes with Flagstar Bank's federal banking powers. This Court should reverse with instructions to enter judgment for Flagstar because § 2954.8 is preempted as to Flagstar.

The district court's five-line order granting summary judgment against Flagstar ignored Flagstar's evidence of significant interference because the court wrongly considered the preemption question foreclosed by *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185 (9th Cir. 2018). That panel had considered a facial preemption challenge to California's interest-on-escrow

1

requirement. But *Lusnak* did not—and *could not*—consider any admissible evidence of § 2954.8's significant interference with federal banking powers because the defendant in that motion-to-dismiss case disclaimed any intent to rely on such evidence. *Lusnak* thus did not answer whether § 2954.8 significantly interferes with federal banking operations as applied to Flagstar—and certainly does not answer that question on the conclusive record here. Rather, the evidence Flagstar offered here shows that California's interest-on-escrow requirement significantly interferes with Flagstar's national banking power to manage escrow accounts for loans secured by real estate. *See* OCC Amicus Br. in Support of Rehearing En Banc, *Lusnak v. Bank of Am., N.A.*, 2018 WL 3702582, at *15 (9th Cir. 2018). So the district court should have granted judgment as a matter of law to Flagstar.

The district court also erred in extending Flagstar's liability past the statute of limitations based on a previous class action raising § 2954.8 claims. But even Plaintiffs conceded that "class tolling did not arise from . . . the prior related case." 2-ER-295. Plaintiffs correctly identified that *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018), and its California equivalent, forbid class-action tolling based on the pendency of a previous class action. Yet that is precisely what the district court permitted here.

That tolling decision was also wrong on its own terms. The district court believed it could apply class action tolling because its decision dismissing the previous class action was in error. According to the district court's collateral attack on its own judgment, the previous plaintiffs need not give Flagstar notice of their claim and an opportunity to cure. In fact, the court's dismissal was correct, since the plain terms of the previous plaintiffs' deed of trust required that opportunity. But the district court also ignored that in *this* action, it dismissed those same plaintiffs' claims on other grounds not appealed here. Since dismissal was proper one way or the other, there is no basis for using that dismissed class action to extend the limitations period here.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (1) the class consists of over 100 members, 1-ER-42; (2) the amount in controversy exceeds $5 million exclusive of costs and interest, 1-ER-2–3; and (3) minimal diversity exists because the class includes citizens of California and Flagstar is a federal savings bank with its principal place of business in Michigan. The district court entered final judgment on March 17, 2021. *Id*. Flagstar timely

filed a notice of appeal on April 16, 2021. 2-ER-50–52. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.   In *Lusnak*, this Court held on the pleadings that a large bank failed to carry its burden of showing that California Civil Code § 2954.8 significantly interferes with its national banking powers. The district court held that *Lusnak* precludes Flagstar's preemption defense on this summary judgment record showing, as a matter of fact, significant interference with Flagstar's exercise of its banking powers. Did the district court err in holding that § 2954.8 is not preempted as to Flagstar?

II.  *Lusnak* held that § 2954.8 was not preempted based on its conclusion that the OCC's determination that state interest-on-escrow laws are preempted is entitled to no deference. That conclusion conflicts with bedrock agency review principles, ignores the OCC's extensive regulatory guidance, and has created an unworkable standard for interest-on-escrow preemption. Should *Lusnak* be overruled?

III. The district court held that the statute of limitations for class claims were tolled based on the pendency of a different class action that was

dismissed on the pleadings. But both federal and California law forbid extending *American Pipe* tolling to class claims, and the earlier class action was correctly dismissed anyway. Did the district court err in tolling the statute of limitations for the class claims here?

## PERTINENT STATUTES

California Civil Code § 2954.8(a):

> Every financial institution that makes loans upon the security of real property containing only a one- to four-family residence and located in this state or purchases obligations secured by such property and that receives money in advance for payment of taxes and assessments on the property, for insurance, or for other purposes relating to the property, shall pay interest on the amount so held to the borrower. The interest on such amounts shall be at the rate of at least 2 percent simple interest per annum. Such interest shall be credited to the borrower's account annually or upon termination of such account, whichever is earlier.

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Background

#### A. Congress and the designated regulator of national banks preempt state laws under the National Bank Act and the Home Owners' Loan Act.

Consistent with the principles of federalism, the United States has a "dual banking system." *See, e.g., Atherton v. F.D.I.C.,* 519 U.S. 213, 221-23 (1997). In 1864, Congress enacted the NBA "to facilitate . . . a national

banking system," and to "protect national banks against intrusive regulation by the States." *Bank of Am. v. City & Cty. of San Francisco*, 309 F.3d 551, 561 (9th Cir. 2002); *see Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 315 (1978); *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 13-14 (2007) (finding that the NBA was designed to prevent "[d]iverse and duplicative" regulation of national banks by multiple states' laws). Congress established the OCC to charter, regulate, and supervise these national banks. *Lusnak*, 883 F.3d at 1188.

The NBA authorizes national banks to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate." 12 U.S.C. § 371(a). Such banks may also exercise "all…incidental powers as shall be necessary to carry on the business of banking." *Id.* § 24. OCC regulations specify that those incidental powers include establishing and maintaining escrow accounts. 12 C.F.R. § 34.3(a); OCC Interp. Ltr. 1041, 2005 WL 3629258, at *2 (Sept. 28, 2005) (citing Interp. Ltr. (May 13, 1975)). Both the OCC and its counterpart regulator for federal thrifts, the Office of Thrift Supervision ("OTS"), have consistently provided that federally chartered institutions, including thrifts, may exercise their lending authority to make real estate loans "without regard to state law limitations concerning" "risk

mitigants," "terms of credit," "[e]scrow accounts, impound accounts, and similar accounts." 12 C.F.R. § 34.4(a)(2), (4), (6); *see also* 12 C.F.R § 560.2(b)(4), (6), (10).

When determining whether the NBA preempts a state law, a court must identify the federal banking power at issue and analyze how the state law affects the exercise of that power. Using "ordinary legal principles of pre-emption," based on decades of NBA preemption precedent, the Supreme Court clarified that the NBA preempts state laws that "prevent or significantly interfere with [a] national bank's exercise" of its federal banking powers. *Barnett Bank of Marion Cnty. v. Nelson*, 517 U.S. 25, 27-28, 33, 37 (1996); 12 U.S.C. § 25b(b)(1)(B) (codifying the *Barnett Bank* preemption standard).

Since 1933, federal thrifts were regulated under the Home Owners' Loan Act.[1] Like the NBA for national banks, HOLA allowed for the chartering of savings associations that would be subject only to uniform

---

[1] "Federal savings associations," as the term appears in preemption regulations, refers to both federal savings associations and "federal savings bank[s]," like Flagstar. 12 C.F.R. § 541.11; *see* 12 U.S.C. § 1462(3). For simplicity, both federal savings associations and federal savings banks are called "federal thrifts."

federal law. *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008). "Through HOLA, Congress gave the [OTS] broad authority to issue regulations governing thrifts." *Id*. at 1005; *Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 971 (9th Cir. 2017) (HOLA "empowered the regulatory body, which became the OTS, to authorize the creation of federal savings and loan associations, to regulate them, and, by its regulations, to preempt conflicting state law.").

The OTS issued regulations for federal thrifts that, unlike the regulations governing national banks under the NBA [*see*, *e.g.*, 12 C.F.R. § 34.4], explicitly "occupie[d] the entire field of lending regulation…." 12 C.F.R. § 560.2(a) ("OTS hereby occupies the entire field of lending regulation for federal savings associations"); *Aguayo v. U.S. Bank*, 653 F.3d 912, 921-22 (9th Cir. 2011) ("The OTS, unlike the OCC, has explicit full field preemption.").[2] The OTS recognized that field preemption was necessary "to enable [thrifts] to conduct their operations in accordance with best

---

[2] Field preemption, "the pinnacle of federal preemption," is "so pervasive that Congress must have intended to leave *no room* for the states to supplement it." *Aguayo*, 653 F.3d at 921; *see Lusnak*, 883 F.3d at 1196 ("Unlike the OTS, the OCC does not enjoy field preemption over the regulation of national banks").

practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden)," 12 C.F.R. § 560.2(a), and courts have recognized the OTS's interest in "consistent, nationwide regulations affecting lending practices[.]" *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 183 (2d Cir. 2005).[3]

### B. Dodd-Frank harmonized NBA and HOLA preemption and codified the *Barnett Bank* standard.

For years, the OCC and OTS applied different preemption standards to their supervised banks. But in 2011, Congress transferred the OTS' regulatory authority to the OCC in the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). *See* 12 U.S.C. § 5412(b)(2)(B); 12 U.S.C. § 1462a. Among other things, Dodd-Frank codified the preemption standard first articulated in *Barnett Bank,* stating that state consumer financial laws are preempted only if:

> [I]n accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25 (1996), the State consumer financial law prevents or significantly interferes with the

---

[3] Like the NBA, the HOLA expressly preempted state laws purporting to impose requirements for "terms of credit," "escrow accounts," and the "[p]rocessing…servicing, sale or purchase of, or investment or participation in, mortgages." 12 C.F.R § 560.2(b)(4), (6), (10).

> exercise by the national bank of its powers; and any preemption determination under this subparagraph may be made by a court, or by regulation or order of the Comptroller of the Currency on a case-by-case basis, in accordance with applicable law[.]

*Id.* § 25(b); *Lusnak* 883 F.3d at 1188 ("[W]ith respect to NBA preemption, [Dodd-Frank] merely codified the existing standard established in *Barnett Bank*…"). No authority provides a "yardstick" for measuring when a state law "significantly interferes with," "impairs the efficiency of," "encroaches on," or "hampers" the exercise of national banks' powers, which is why Dodd-Frank required preemption determinations to be made on a "case-by-case basis." *See Barnett Bank*, 517 U.S. at 33-34; *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) ("[N]one of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick."). But "the level of 'interference' that gives rise to preemption under the NBA is not very high." *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009).

Besides codifying *Barnett Bank*, Dodd-Frank harmonized HOLA and NBA preemption standards by stating, "'any regulation or order prescribed under this chapter shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of state

10

law.'" *Smith v. Flagstar Bank, FSB*, 2019 WL 631537, at *3 (N.D. Cal. Feb. 14, 2019) (citing 12 U.S.C. § 1465). In other words, *Barnett Bank's* "prevent[s] or significantly interfere[s]" preemption standard now applies to federal thrifts and national banks alike. *Lusnak*, 883 F.3d at 1193.

## C. Courts broadly interpret *Barnett Bank's* "prevent or significantly interfere" standard in favor of finding state laws preempted.

Courts, including in *Barnett Bank*, have broadly interpreted the "prevent or significantly interfere" preemption standard. *Barnett Bank* examined the conflict between the state restrictions on the one hand, and the national bank's exercise of its powers under the federal banking laws on the other, holding that the NBA "ordinarily" preempts state laws. *Barnett Bank*, 517 U.S. at 33. Other courts have reiterated this expansive principle. *See, e.g.*, *Monroe Retail*, 589 F.3d at 283; *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 611-12 (D.S.C. 2015) ("[T]he reasoning of the Ninth Circuit is clear: where state law claims operate to limit a national bank's exercise of its properly appointed discretion, the state law poses significant interference with the bank's powers and is preempted."); *Ass'n of Banks in Ins., Inc. v. Duryee*, 270 F.3d 397, 409 (6th Cir. 2001) (a state law need not "effectively thwart" national banking powers to be preempted). For example, the Supreme Court

11

in *Franklin National Bank of Franklin Square v. New York* held that a state law prohibiting banks from using the words "saving" in their advertising was preempted because it interfered with national banks' incidental power to advertise, showing that significant interference with national bank powers can be established even by ostensibly narrow state limitations on national bank practices. *See Franklin*, 347 U.S. 373, 378-79 (1954); OCC Amicus Br., 2018 WL 3702582, at *8.

### D. *Lusnak* broke with the longstanding view in holding that § 2954.8 was not preempted.

*Lusnak v. Bank of America, N.A.* nevertheless held that the NBA does not preempt the application of § 2954.8 to national banks. 883 F.3d at 1194. In ruling on the propriety of an order granting a motion to dismiss, the panel was confined by the pleadings and the defendant's legal arguments without any factual record of the burdens § 2954.8 would create, either generally or for that defendant. *Id.* at 1194 n.6. Instead, *Lusnak* stated that "*large corporate banks like Bank of America, can comply with state escrow interest laws without any significant interference with their banking powers,*" noting that "mortgage servicers are typically '*large* corporations' who 'may . . . earn income from the float from escrow accounts they maintain for borrowers to

12

cover the required payments for property insurance on the loan.'" *Id.* at 1195-96 (emphasis added). And *Lusnak* held that "no *legal* authority establishes that state escrow interest laws prevent or significantly interfere with the exercise of national bank powers," and Congress itself, in enacting Dodd-Frank, has indicated that "such laws would not *necessarily*" do so. *Id.* at 1194, 1197 (emphasis added). In the process, *Lusnak* disregarded the OCC's reasoned analysis that § 2954.8 is preempted, stating that the OCC's "conclusion" with respect to preemption was "entitled to little, if any, deference." *Id.* at 1193-94.

## II. Statement of Facts

### A. Flagstar originates, sells, and services California mortgages using escrow accounts to mitigate the risk of borrower default, foreclosure, and property loss while reducing borrowing costs.[4]

Flagstar is a federal thrift that originates, purchases, sells, and services mortgage loans in all 50 states. 2-ER-206. In doing so, Flagstar uses escrow accounts to collect money from borrowers before their respective property tax and insurance bills come due. *Id.* Flagstar maintains escrow accounts to

---

[4] Plaintiffs did not contest these facts with contrary evidence, but asked the district court to strike Flagstar's evidence. 2-ER-136. The district court did not grant that request and addressed the merits of Plaintiffs' claims only. 1-ER-34.

relieve borrowers of the obligation to manage property tax and insurance payments themselves. 2-ER-207. The benefits of an escrow account to borrowers and banks alike are well documented, as they reduce the risk of loss to the property securing the mortgage loan from a tax lien, foreclosure, property damage, and loan default. *Id*. An escrow account affects the payment a borrower must pay each month to ensure that the borrower does not default on the loan. *Id*.

At loan origination, Flagstar relies on escrow accounts to reduce the risk levels associated with an individual borrower. 2-ER-207. By maintaining the funds to pay for taxes and insurance, an escrow account provides stability to a borrower, reduces their risk of default, and reduces the risk of foreclosure for failure to pay property taxes or property loss for failure to pay insurance premiums. *Id*. An escrow account, as a risk mitigation tool, thus allows Flagstar to offer lower interest rates and extend more credit. *Id*.

Upon servicing a mortgage loan originated by other lenders, Flagstar calculates the pricing associated with servicing the loan, including the risk of loss, by relying on whether the loan has, or authorizes, an escrow account. 2-ER-207. Thus, an escrow account, or the authority to create such an

14

account, is a consideration for Flagstar when determining whether to purchase the servicing rights for a mortgage loan. 2-ER-231.

## B. Flagstar established an escrow account to pay Plaintiffs' property taxes and insurance.

Flagstar loaned Plaintiff William Kivett around $400,000 to finance his real estate purchase in 2012. 2-ER-209, 211–216, 337. As security for the loan, Kivett executed a deed of trust which provides for Flagstar's establishment of an escrow account for the payment of property taxes and insurance premiums and other potential charges related to the property in accordance with the Real Estate Settlement Procedures Act. 2-ER-209, 337–38. Flagstar accordingly established an escrow account for the payment of Kivett's property taxes and insurance premiums and other charges. 2-ER-209.

Having mitigated the risk of loss to the loan through an escrow account, Flagstar charged Kivett a 3.649% interest rate on his loan. 2-ER-209. If Kivett did not obtain an escrow account for his Loan, Flagstar may have increased Kivett's interest rate to an amount greater than 3.649%, charged Kivett a higher origination fee to attempt to offset the risk of loss, or decided not to offer Kivett the $400,610 mortgage loan. 2-ER-209–10. Flagstar

serviced Kivett's loan from September 2012 through April 2015 when he refinanced with another financial institution.  2-ER-338.

In 2017, Bernard and Lisa Bravo obtained a mortgage loan from California Financial Real Estate Center, Inc. and entered into a corresponding promissory note and deed of trust.  2-ER-337; 2-ER-63.  Like Kivett's deed of trust, the Bravos' deed of trust provided for an escrow account.  2-ER-63.  Flagstar has maintained that escrow account for the Bravos since it started servicing their loan in 2018.  2-ER-63–64.  In accordance with their respective deeds of trust, neither Kivett nor the Bravos accrued interest on funds in their escrow accounts.  2-ER-337–38.

## III.    Procedural History

### A.    The Smiths filed *Smith I.*

On April 18, 2018, Lowell and Gina Smith filed a class action complaint in the U.S. District Court for the Northern District of California premised on violations of California Civil Code § 2954.8.  4-ER-433–39.  The district court dismissed *Smith I* on August 21, 2018 based on the Smiths' failure to provide Flagstar with notice of their interest-on-escrow claim and a chance to cure, as required by their deed of trust.  4-ER-426, 432.  The Smiths did not appeal.

### B. After *Smith I* was dismissed, the Smiths filed *Smith II*.

Instead, the Smiths "commence[d] a new judicial action," 4-ER-424, in the same district the next day. 3-ER-396. They later amended the pleadings to add William Kivett as a class representative. 3-ER-379. Their amended class action complaint asserts, on behalf of a California class, both breach of contract and California Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.* ("UCL"), based on alleged violations of § 2954.8. *Id.*

Flagstar moved to dismiss the § 2954.8-based claims as preempted. 3-ER-343–44. The Smiths "conceded that HOLA field preemption applied pre-Dodd Frank," 3-ER-344, so the district court had to determine "whether Dodd-Frank's contract preservation provision, 12 U.S.C. § 5553, applied to the Smiths' contract." *Id.* That contract preservation provision in turn "preserved the application of the original HOLA field preemption scheme that existed prior to the enactment of Dodd-Frank for '*any contract entered into* on or before July 21, 2010 *by national banks*.'" *Id.* The court converted Flagstar's motion into a motion for summary judgment and allowed discovery to determine whether the Smiths fit that bill. *Id.* After discovery, the district court held that the Smiths' 2004 mortgage was covered by § 5553.

17

3-ER-349. So "[t]he claims brought by the Smiths [we]re dismissed," *id.,* and only Kivett's claims remained.

### C. The District Court certified a class of borrowers whose mortgages were originated more than four years before *Smith II* was filed.

Kivett moved to certify damages and injunctive-relief classes under Federal Rule of Civil Procedure 23(b)(2) and (b)(3). 1-ER-38. Two months later, he moved to amend the complaint to add current customers Bernard and Lisa Bravo as class representatives for purposes of the Rule 23(b)(2) class, since Kivett was not a current customer. 2-ER-333–40; 3-ER-403.

The Court certified a Rule 23(b)(3) class of Flagstar's California customers on or after April 18, 2014, with mortgage loans on 1-4 unit residential properties, who paid Flagstar money to hold in escrow for the payment of taxes and assessments on the property, but did not receive interest on the amounts held by Flagstar in their escrow accounts. 1-ER-47. That class definition excluded those whose mortgage loans originated on or before the Dodd-Frank contractual preservation date, July 21, 2010. *Id.*[5]

---

[5] The district court later modified that class definition to include

> [a]ll persons who at any time on or after April 18, 2014 through September 30, 2019 had mortgage loans serviced by Flagstar Bank, FSB ("Flagstar") on 1–4 unit residential properties in

**D. The district court granted summary judgment to Plaintiffs.**

The parties then cross-moved for summary judgment, with Plaintiffs moving as to liability only. *See* 2-ER-179–80, 146. The district court granted Plaintiffs' motion and denied Flagstar's. 1-ER-34. Its reasoning (in its entirety) was that "*Lusnak* applies to the claim in this case, and that exceptions proposed by Flagstar are not persuasive, including the 'small bank vs. large bank' distinction." *Id*.

Plaintiffs again moved for summary judgment, this time seeking a money judgment for restitution under the UCL. 1-ER-4. The district court granted that motion. 1-ER-32. In that order, the court also certified a Rule 23(b)(2) subclass, appointed the Bravos as class representatives, and granted Plaintiffs' request for a permanent injunction requiring Flagstar to pay interest on escrowed funds to the Subclass going forward. *Id*. The district

---

California and paid Flagstar money in advance to hold in escrow for the payment of taxes and assessments on the property, for insurance, or for other purposes relating to the property, but did not receive interest on the amounts held by Flagstar in their escrow accounts (excluding, however, any such persons (a) whose mortgage loans originated on or before July 21, 2010 or (b) who would be owed less than $1 in interest-on-escrow as of September 30, 2019 if plaintiffs' allegations are proven).

2-ER-111.

court later extended the end date for the monetary restitution award period and the effective date of the permanent injunctive relief to the date of entry of judgment. 2-ER-58–59. The court entered a final judgment of $9,262,769.24 on March 17, 2021. 1-ER-3. Flagstar timely appealed on April 16, 2021. 2-ER-50–52.

## SUMMARY OF ARGUMENT

I.     The district court erred in holding that § 2954.8 is not preempted as to Flagstar on this record. The court's truncated inquiry did not ask—as it should have—whether the evidence shows that § 2954.8 significantly interferes with Flagstar's exercise of its federal banking powers. Instead, the district court essentially held that *Lusnak* foreclosed any argument that § 2954.8 is preempted. That was error because *Lusnak* addressed whether the state law was preempted based only on a motion-to-dismiss in which the defendant bank disclaimed any attempt to introduce evidence of significant interference, and the operative complaint alleged that there was no significant interference. The lack of evidence to support a finding of significant interference to the defendant on the record in *Lusnak* thus says nothing about whether Flagstar has proved significant interference on the ample summary judgment record here. The district court's failure to address

20

that record is reason enough to reverse the grant of summary judgment to Plaintiffs.

In fact, that record establishes that *Flagstar* is entitled to summary judgment because there is no genuine dispute that § 2954.8 causes significant interference with Flagstar's operations. In particular, California's interest-on-escrow requirement compromises Flagstar's ability to mitigate lending risk with appropriate contractual mechanisms. Section 2954.8 also impedes Flagstar's ability to service loans, which in turn reduces its access to the capital needed to continue making loans. The law further impairs the marketability of Flagstar-originated loans on the secondary market for mortgages. In each respect, § 2954.8 imposes more significant burdens on smaller federal banks like Flagstar than on the "large corporate bank" this Court analyzed in *Lusnak*.

II. If the district court were right that *Lusnak* forecloses all preemption arguments against § 2954.8—no matter how compelling the factual proof of interference with banking operations—then *Lusnak* should be overruled. So interpreted, *Lusnak* would be unjustifiably overbroad since it would foreclose consideration of factual evidence of interference that the panel could not have considered on the motion to dismiss in that case. Yet

21

*Lusnak* itself recognizes that a hypothetical "punitively high" interest-on-escrow requirement could be preempted (although that vague and unworkable standard also justifies overruling the decision). Further, *Lusnak* erred in holding that it owed no deference to what it saw as mere conclusory decisions of the primary national bank regulator. Far from conclusory, the OCC's longstanding regulatory guidance is extensively reasoned and warrants the deference withheld in *Lusnak*.

III. The district court also erred in extending the statute of limitations for this case more than four years before the complaint was filed based on its conclusion that the Smiths' previous putative class action was wrongly dismissed. First, *Smith I* cannot toll the statute of limitations here under blackletter law that "does not permit the maintenance of a follow-on class action past expiration of the statute of limitations." *China Agritech*, 138 S. Ct. at 1804. Plaintiffs actually conceded that *China Agritech* barred tolling here, but the district court applied tolling anyway.

*Smith I* was correctly dismissed in any event. The Smiths' deed of trust required them to give Flagstar advance notice of any claim and an opportunity to cure if the claim "arises from [Flagstar's] actions pursuant to" that deed of trust. Since that deed of trust explicitly authorized Flagstar not

to pay interest on escrow accounts, the district court was right the first time that the Smiths were obligated to provide notice and an opportunity to cure. And the district court correctly dismissed the Smiths from *this* class action because their claim is preempted under applicable law—a dismissal Plaintiffs do not appeal. So for either reason, *Smith I* would have been dismissed, and thus provides no basis for tolling the statute of limitations here.

## ARGUMENT

### I. Flagstar was entitled to summary judgment because Section 2954.8 significantly interferes with Flagstar's ability to make, originate, service, and sell mortgage loans.

In a five-line order, the district court held that Plaintiffs' interest-on-escrow claims are not preempted under *Lusnak*. 1-ER-34; *see also* 2-ER-178–95 (raising this issue in Flagstar's motion for summary judgment); 2-ER-146–63 (in opposition to Plaintiffs' motion for partial summary judgment). This Court reviews that summary judgment order de novo, "view[ing] the evidence in the light most favorable to the nonmoving party, determin[ing] whether there are any genuine issues of material fact, and decid[ing] whether the district court correctly applied the relevant substantive law." *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 989 (9th Cir.

2016); *see also McShannock v. JP Morgan Chase Bank NA*, 976 F.3d 881, 887 (9th Cir. 2020) ("Questions of statutory interpretation are reviewed de novo… as are questions of preemption.").

The summary judgment order should be reversed for two reasons. First, the district court misconstrued *Lusnak* as a one-size-fits-all ruling that makes factual evidence of § 2954.8's significant interference with Flagstar's banking operations *irrelevant* to preemption. Second, the district court erred in failing to recognize that, on this record, there is no genuine dispute that § 2954.8 significantly interferes with Flagstar's banking operations.

### A. *Lusnak* does not excuse the need to determine in fact whether § 2954.8 creates significant interference with a particular national bank's operations.

The central preemption inquiry here is whether § 2954.8 *in fact* significantly interferes with Flagstar's national banking operations. The district court refused to make that inquiry. Instead, it transformed *Lusnak* into a blanket ban on preemption of § 2954.8, no matter how grievously that interest-on-escrow requirement affects a particular national bank. 1-ER-34. That was error.

*Lusnak* recognized that some hypothetical set of facts could render § 2954.8 preempted, *see* Section II.B *infra*, but it did not resolve the factual

24

grounds for preemption of § 2954.8 on a once-and-for-all-national-banks basis because it addressed only a motion to dismiss with no evidentiary record. 883 F.3d at 1194-95 & n.6. A national bank bears "the burden of proving its preemption defense" under the National Bank Act. *Id.* at 1191; *cf.* 12 U.S.C. § 25b(b)(1)(B), (c) (requiring "case-by-case" preemption determinations supported by "substantial evidence, made on the record of the proceeding"). But as Lusnak himself argued in opposing certiorari, "[b]y presenting its defense as a motion to dismiss, Bank of America necessarily failed to provide the courts below with any factual support for its preemption argument." Lusnak Br. in Opposition to Petition for a Writ of Certiorari, 2018 WL 5078025, at *12; *compare, e.g.*, *Am. Bankers Ass'n v. Lockyer*, 239 F. Supp. 2d 1000, 1017 (holding based on summary judgment evidence that a California credit card billing disclosure law was preempted by the National Bank Act).[6] And the operative complaint in *Lusnak* alleged to the

---

[6] Lusnak's brief opposing certiorari confirms that the panel decided that case without the "factual record" needed to answer the "factual question regarding the real-world impact of the state law in question and the ability of the bank to exercise its powers while abiding by the law." *See* 2018 WL 5078025, at *11.

contrary that "the payment of interest on these escrow accounts does not rise to the level of preventing or significantly interfering with BofA's ability to offer mortgages to borrowers." First Am. Complaint, Dkt. 22 at 4, No. 2:14-cv-01855-GW-GJS (C.D. Cal. June 27, 2014).

This Court in *Lusnak* thus could only address "Bank of America's arguments [that] are purely legal and do not depend on resolution of any factual disputes over the effect of California law on the bank's business." 883 F.3d at 1194 n.6; *see also Polich v. Burlington N., Inc.*, 114 F.3d 122, 124 (9th Cir. 1997) ("The current factual record differs from the record on the earlier appeal. We could not have expressed an opinion on any preemption question that might be raised in connection with the current record."). And that decision could not (and did not) address any factual evidence of significant interference of the sort that Flagstar developed below.

*Lusnak* accordingly framed the "operative question" as "whether section 2954.8(a) prevents *Bank of America* from exercising its national bank powers or significantly interferes with *Bank of America's* ability to do so." 833 F.3d at 1194 (emphases modified). And it framed its holding as to Bank of America as well: "we hold that California Civil Code § 2954.8(a) is not preempted because it does not prevent or significantly interfere with *Bank of*

*America's* exercise of its powers." *Id.* (emphasis added). The panel reinforced that Bank of America-specific holding by noting that, under its interpretation of the Dodd-Frank legislative history, "*large corporate banks like Bank of America* [] can comply with state escrow interest laws without any significant interference with their banking powers." *Id.* at 1196.

But § 2954.8's effect on "large corporate banks like Bank of America" does not control its effect on much smaller banks like Flagstar. The *Lusnak* panel had no basis in a factual record to find significant interference with *any* national bank's operations, and certainly not Flagstar's. The district court's assumption that Flagstar's evidence of significant interference on this summary judgment record is shackled by a decision based on the lack of facts in a different bank's record was wrong.

### B. There is no genuine dispute on this record that § 2954.8 significantly interferes with Flagstar's banking operations.

Rather, the district court should have examined, on *this* summary judgment record, whether § 2954.8 significantly interferes with *Flagstar's* exercise of its national banking powers. On this record, there is no genuine dispute that § 2954.8 causes significant interference with Flagstar's operations because it both (1) harms Flagstar's ability to originate mortgage

loans and set pricing and risk terms; and (2) impairs Flagstar's ability to service new or existing loans for which it holds mortgage servicing rights ("MSR"). Thus, the district court should have entered judgment as a matter of law that the claims against Flagstar are preempted.

> 1. **Escrow account costs drive risk calculations and pricing decisions.**

First, § 2954.8 significantly interferes with Flagstar's ability to price loans. The establishment of an escrow account is a critical risk mitigation tool used in Flagstar's pricing decisions at loan origination. *See* 2-ER-207–08. An escrow account provides stability to a borrower and reduces the risk of loss to the property securing the mortgage loan from tax liens, foreclosure due to property tax defaults, and property loss due to failure to pay insurance premiums. 2-ER-207. An escrow account, as a risk mitigation tool, allows Flagstar to offer lower interest rates and extend more credit to its borrowers. *Id*. During the underwriting and origination of a mortgage loan, Flagstar calculates the borrower's relative risk levels in part based on Flagstar's understanding of the risk reduction provided by an escrow account and the costs associated with providing an escrow account. *Id*. If escrow accounts become more costly to provide to a borrower—the natural

result of requiring Flagstar to pay interest on escrowed funds—Flagstar may be forced to charge *higher* interest rates, assess *larger* origination fees, or extend *less* credit, to mitigate the additional risk of loss, and it would severely inhibit Flagstar's desire to participate in originating agency loans, as such agency loans have stringent escrow requirements.[7] *Id.* Thus, the requirement of crediting interest on escrow on mortgage loans will significantly interfere with Flagstar's ability to originate, make, and price mortgage loans. That interference could in turn cause negative effects for consumers, who may be unable to obtain loans or able to obtain loans only at higher rates and prices.

This Court has embraced the common-sense conclusion that laws that interfere with a federal bank's "pricing decision" for loans are preempted by the NBA. *See Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 725 (9th Cir. 2012) ("The district court is not free to disregard the OCC's determinations of what constitutes a legitimate pricing decision, nor can it apply state law in a way that interferes with this enumerated and incidental power of

---

[7] For example, a mortgagee must open an escrow account when a mortgagor obtains a Federal Housing Administration loan. *See* 24 C.F.R. § 203.550. The FHA requirements include strict rules regarding escrow disbursements, fees and penalties, and the methods of collection and accounting. *Id.*

national banks."). Thus, § 2954.8 prevents or significantly interferes with Flagstar's ability to originate mortgage loans and set related pricing terms, a critical federal banking power that affects its core banking operations.

> **2.** **The costs of maintaining escrow accounts hinder Flagstar's ability to contract with MSR owner clients, threatening decreased revenue and diminished credit for new borrowers.**

Second, § 2954.8 significantly interferes with Flagstar's ability to service loans. Upon servicing a mortgage loan originated by other lenders, Flagstar calculates the pricing associated with serving the loan, including the risk of loss, by relying on whether it has, or authorizes, an escrow account. 2-ER-230. Thus, an escrow account, or the authority to create an escrow account, is a consideration for Flagstar when determining whether to purchase the servicing rights for a mortgage loan. 2-ER-231. If a mortgage loan does not have an escrow account, Flagstar will likely request or require that a premium be added to the base price for the loan due to the unmitigated risk of loss. 2-ER-208. But if a mortgage loan had an escrow account created at loan origination, Flagstar relies on this risk mitigation protection to assess the borrower's mitigated risk level. If the maintenance of the escrow account would now impose a further cost on Flagstar (due to

the payment of interest), Flagstar may have to seek an additional premium that was neither calculated nor assessed at loan origination to compensate for these additional costs. *Id.* Those additional costs are significant because servicing revenue recently made up around 11 percent of Flagstar's total revenue and contributed to about $1.8 billion in custodial deposits. 2-ER-206.

\* \* \*

Flagstar's uncontested summary judgment record shows that § 2954.8 exerts pressure to reduce Flagstar's available mortgage loan portfolio or to exit the mortgage lending and servicing industry altogether. There is thus no genuine dispute that the law significantly interferes with Flagstar's national banking powers, and Flagstar is entitled to judgment as a matter of law that these claims are preempted.

## II. Flagstar was entitled to summary judgment because *Lusnak* was wrongly decided.

If, however, the Court determines that *Lusnak* eliminates all preemption defenses to § 2954.8 claims without regard to the unrefuted proof that the law significantly interferes with Flagstar's national banking operations, then *Lusnak* should be overruled. This Court reviews this

question of preemption and statutory interpretation de novo. *McShannock*, 976 F.3d at 887. *See* 2-ER-196–202, 164–68 (raising this issue); 1-ER-34 (ruling that "*Lusnak* applies to the claim in this case").

If so interpreted, *Lusnak* should be overruled for at least two reasons. First, it was wrong. *Lusnak* does not reckon with compelling evidence that § 2954.8 significantly interferes with the exercise of national banking powers and wrongly withheld deference to the OCC's determination that interest-on-escrow laws are preempted. Second, *Lusnak* created troubling uncertainty by crafting an unworkable new approach for preemption of interest-on-escrow laws.[8]

## A. *Lusnak* ignored the effect of § 2954.8 and the OCC's expert reasoning reflected in extensive regulatory guidance.

On the central question of whether § 2954.8 significantly interferes with a national bank's exercise of its federal banking power, *Lusnak* was wrongly decided.

---

[8] Flagstar recognizes that "three-judge panels are normally bound by the decisions of prior three-judge panels," *Lair v. Bullock*, 798 F.3d 736, 745 (9th Cir. 2015), and so presents this argument in part to preserve the issue for further review.

First, *Lusnak* glossed over how § 2954.8 actually interferes with national banking powers. As Flagstar showed above—and *Lusnak* could not have considered such evidence at the 12(b)(6) stage—the interest-on-escrow requirement affects Flagstar's ability to price loans and inflates costs for escrow accounts. *See supra* at Section I.B.2. That interference strikes at the heart of national banks' powers to "make, arrange, purchase or sell" loans on real estate, 12 U.S.C. § 371(a), as well the incidental powers necessary to perform those express powers, *id.* § 24 (Seventh); OCC, Corporate Decision No. 99-06, 1999 WL 74103, at *2 (Jan. 29, 1999) (real estate lending powers include the power "to provide . . . escrow services"). And this Court has recognized that such interference is real in the related context of federal savings associations. *See McShannock*, 976 F.3d at 893 ("[E]nforcing California's interest-on-escrow law would reduce the value of the loans and reduce lending by savings associations, particularly to high-risk borrowers.").

Second, *Lusnak* erred in quashing the deference owed to the OCC, which (like other federal bank regulators) has consistently concluded that state laws imposing requirements on escrow accounts, like interest-on-escrow laws, are preempted. *See, e.g.*, 12 C.F.R. § 560.2(b)(4), (6); *id.* §

34.4(a)(2), (4), (6).[9]  According to *Lusnak*, since the OCC's interpretation of 12 C.F.R. § 34.4(a) was merely the "articulation of its legal analysis," and it did not provide "further analysis" in later regulations or guidance, the OCC's interpretation on preemption is entitled to "little, if any, deference."  883 F.3d at 1193-94.  But that conclusion ignores the OCC's extensive regulatory guidance and cogent analysis why laws like § 2954.8 are preempted.

---

[9] *See also* OTS Op. Letter P-2003-7 (Oct. 6, 2003) (providing extensive reasoning and analysis for its conclusion that federal law preempts a New York state law requiring the payment of interest on escrow accounts); OTS Op. Letter P–2003–5 (July 22, 2003) (citing extensive analysis of state laws restricting the servicing of loans while cautioning that such laws may "interfere with the ability of federal savings associations to sell mortgages," and  create a "hodgepodge of conflicting and overlapping state lending requirements," all of which will "undermine the federal objective to allows thrifts to "deliver low-cost credit to the public free from undue regulatory duplication and burden."); OTS Op. Assistant Chief Counsel (Nov. 17, 1998) (enclosing prior legal analysis supporting position that state laws requiring imposing interest requirements on escrow accounts are preempted by HOLA); OTS Op. Chief Counsel (Jan. 3, 1991) (concluding "[f]ederal law preempts state laws purporting to regulate mortgage escrow accounts of federal savings associations."); Op. FHLBB General Counsel (Sept. 24, 1984); FHLBB Amicus Br., 1982 WL 608500 at *17 n.12 (Feb. 24, 1982).  The OCC reaffirmed its preemption analysis in recent legal briefs. *See* OCC Amicus Br., 2018 WL 3702582, at *5, *10 (9th Cir. Apr. 23, 2018) (the OCC's "judgments concerning state provisions that interfere with national bank powers are grounded in its supervisory judgment regarding the potential effect of those interactions on bank activities."); OCC Amicus Br., 2019 WL 4888123, at *4-8 (E.D.N.Y. Nov. 7, 2019) (addressing the OCC's reasoning for its conclusion that state laws like Section 2954.8 are preempted by the NBA).

A review of the OCC's regulatory guidance, opinions, and legal analysis shows that the OCC, and its predecessors, have provided extensive reasoning supporting its preemption determination. *See, e.g.*, 76 Fed. Reg. 43,549, 43,557; OTS Op. Letter, P–2003–7; OCC Amicus Br., 2019 WL 4888123, at *4-8; OCC Amicus Br., 2018 WL 3702582, at *5, 10; *Hayes v. Wells Fargo Bank, N.A.*, 2014 WL 3014906, at *5-6 (S.D. Cal. July 3, 2014); *Flagg*, 396 F.3d at 182. These preemption determinations relied, in part, on the role of federal banking institutions within the dual-banking regulatory structure in the United States and, in part, on the prior, extensive analysis, litigation experience, and supervisory judgment on the effect and impact of *Barnett Bank*.[10] The OCC—the uniquely qualified, substantive expert on chartering, supervision, and regulation of virtually every aspect of the operation of national banks and federal thrifts, including real estate lending and the

---

[10] *See* 2018 WL 3702582, at *10 (noting that the OCC's judgment was "grounded in its supervisory judgment regarding the potential effect of those interactions on bank activities."); *see* Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904, 1911 (Jan. 23, 2004) ("As we have learned from our experience supervising national banks, . . . by the extent of litigation in recent years . . . national banks' ability to conduct operations…has been curtailed . . . ."); 76 Fed. Reg. 43,549, 43,557 (July 21, 2011) (noting that preemption regulations are "based on the OCC's experience with the potential impact of such laws on national bank powers and operations.").

establishment and maintenance of escrow accounts—has provided its preemption analysis, which takes a position confirmed by jurisprudence across the United States. In the expert view of the OCC and other federal regulators, escrow accounts, which protect both the borrower and lender from the risk of loss from tax liens, property damage, loan default, and foreclosure, are critical risk mitigants that have a direct effect on the value of the property and the protection of the collateral. 2-ER-207. Thus, it is the OCC's view that federally chartered institutions' lending authority cannot be mitigated by state laws governing escrow accounts. *Lusnak* disregarded this position.

*Lusnak* also discarded the OCC's analysis based on the notion that Dodd-Frank gutted deference to the OCC's preemption determinations, 883 F.3d at 1191-95, but that was an erroneous understanding of the Dodd-Frank amendment by which Congress merely codified the level of deference the OCC's preemption determinations already received under the then-controlling *Barnett Bank* standard. *See* 12 U.S.C. § 25b(b)(5)(A). Indeed, Dodd-Frank clarified that the OCC's preemption determinations are entitled to deference under *Skidmore*. *See id.* ("[a] court reviewing any determinations made by the Comptroller regarding preemption of a State law…shall assess

36

the validity of such determinations, depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision.").

### B. *Lusnak*'s vague and unworkable approach to preemption of interest requirements creates uncertainty in the mortgage industry.

*Lusnak* also should be overruled because its approach to preemption for interest-on-escrow laws is "unworkable," a problem shown by this case. *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2097 (2018). Despite the district court's application below, the *Lusnak* panel disclaimed the notion "that a state escrow interest law can never be preempted by the NBA." 883 F.3d at 1195 n.7. The panel recognized, as one "example," that "a state law setting punitively high rates banks must pay on escrow balances may prevent or significantly interfere with a bank's ability to engage in the business of banking." *Id.* But *Lusnak* provided no rationale or standard to allow a determination of what type of law could be preempted, including (for example) what would constitute "punitively high rates." *Id.*

37

As noted by many industry trade organizations in *Lusnak*, the panel "effectively replaced the settled standard for preemption (significant interference)." *See* Bank Policy Institute Amicus Br. in Support of Certiorari, 2018 WL 4464737, at *20 (U.S.). Yet *Lusnak* (at least on the district court's apparent interpretation) forecloses consideration of the facts supporting preemption under *Lusnak*'s new approach. For example, to find a state law "punitive" and thus preempted under *Lusnak*, a court would need to review factual evidence of the statutory interest rate compared to current market rates, the size, structure, and capital of the financial institution paying the interest rate, and whether said financial institution earns interest on the funds it holds in escrow to offset the cost of paying out interest on such funds. While *Lusnak* apparently believed that § 2954.8 was not "punitively high" as applied to the large bank in that case, 883 F.3d at 1195 n.7, factual evidence is necessary to properly analyze the law's impact on other, smaller financial institutions. Demonstrating why factual evidence is critical in this assessment, when concluding that a state law requiring an interest payment to borrowers of 2% of the funds in their escrow account is not "punitive," *Lusnak* ignored that a 2% interest rate is "six times higher than the long-run average of .32% paid by FDIC-insured U.S. depository institutions on

certificates of deposit,"[11] and that other benchmark rates, like the federal funds rate, increased by more than 1,500 percent (from ~.08% to ~ 1.42%) between the time Bank of America moved to dismiss and the time the Ninth Circuit reversed.[12]  Without a workable legal standard, *Lusnak*'s makeshift approach creates significant industry uncertainty.[13]

## III. The district court erred in extending the class period by applying tolling based on a previously dismissed class action.

Because Plaintiffs' claims are subject to a four-year statute of limitations, Cal. Bus. & Prof. Code § 17208, no class period can begin more than four years before August 22, 2018, when this action was filed.  Yet the district court extended the class period by four months to include "[a]ll persons who on or after *April 18, 2014* had mortgage loans serviced by

---

[11] *See* Bank Policy Institute Amicus Br., 2018 WL 4464737, at *12 (relying on Fed. Deposit Ins. Corp., *National Rate on Non-Jumbo Deposits (less than $100,000): 12 Month CD*, available at https://fred.stlouisfed.org/series/CD12NRNJ.

[12] *See* Federal Reserve Bank of St. Louis, *Effective Federal Funds Rate*, available at https://fred.stlouisfed.org/series/DFF.

[13] For example, under the *Lusnak* standard, it is impossible to determine whether the NBA or HOLA would preempt any of the following state laws that impose interest requirements for funds held in escrow.  *See*, *e.g.*, Conn. Gen. Stat. § 49-2a ("not less than the deposit index"); Minn. Stat. § 47.20, subd. 9 (3% minimum interest rate); Wis. Stat. § 138.051(5) (5.25% minimum interest rate).

Flagstar Bank FSB" in California. 1-ER-47 (emphasis added). The basis for that extension was the district court's rethinking of a *previously dismissed* putative class action brought by the Smiths: "since the dismissal of the [*Smith I*] claim had been erroneous, the tolling of the class claims begins from April 18, 2018, when the Smiths filed their first complaint—not August 22, 2018, when the Smiths filed their second complaint." 1-ER-41.

For at least two reasons, that application of class action tolling via collateral attack on a previous judgment was error, which this Court reviews de novo. *See Porter v. S. Nevada Adult Mental Health Servs.*, 788 F. App'x 525 (9th Cir. 2019) (unpublished); *see also* 2-ER-234–39, 327–30 (Flagstar raising this issue). First, whatever the proper disposition of *Smith I*, Plaintiffs *conceded* that Supreme Court precedent forbids tolling a subsequent class action based on the pendency of a previous class action. Second, *Smith I* was properly dismissed. The Smiths failed to provide Flagstar with notice of their claim before filing *Smith I* as required by the Deed of Trust. And the district court ultimately dismissed the Smiths' claims as preempted anyway.

## A. Plaintiffs correctly conceded that the previous class action does not toll the statute of limitations here.

The district court assumed without explanation that a hindsight collateral attack on the dismissal of an earlier class action would toll the statute of limitations for purposes of that later action. 1-ER-41 ("[T]he prior *Smith* order erred when it dismissed the statutory claim under the deed of trust's notice-and-cure provision. . . The tolling of class claims therefore began from April 18, 2014."). But Kivett conceded exactly that point:

> Plaintiff concedes that the statute of limitations cut-off for the proposed Class should be August 22, 2014 (four years before the filing of this action) instead of April 18, 2014 (four years before the filing of the prior related action) because class tolling did not arise from the April 2018 class action filing by the Smiths in the prior related case.

2-ER-295. (citing *China Agritech*, 138 S. Ct. at 1800 and *Fierro v. Landry's Rest. Inc.*, 32 Cal. App. 5th 276 (2019)).

That concession was correct: controlling authority bars extending the tolling period for a subsequent class action based on a previous class action.[14]

---

[14] Plaintiffs later tried to ignore that concession. 2-ER-247 ("If the dismissal of the prior Smith action is deemed erroneous, then the statute of limitations should relate back to the filing of the prior Smith action and the class definition should be as originally requested by Plaintiffs in their opening brief." (citing no authority)). But neither Plaintiffs nor the district court

The Supreme Court held in *China Agritech* that "*American Pipe* tolls the statute of limitations during the pendency of a putative class action, allowing unnamed class members to join the action individually or file individual claims if the class fails.  But *American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations."  138 S. Ct. at 1804.  *American Pipe* does not toll the statute of limitations for a follow-on *class action* (like this one) because "the time for filing successive class suits, if tolling were allowed, could be limitless."  *Id.* at 1809.  And since *American Pipe* "does not permit the maintenance of a follow-on class action past expiration of the statute of limitations," it logically does not permit *extending* the statute of limitations for follow-on class action, even if that successive action is timely filed.

Courts applying *China Agritech* confirm that the reason for the failure of the first class action is irrelevant.  Rather, "*China Agritech*'s rule" is that "a timely class action tolls its purported class members' individual claims, but *never* their class claims."  *Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701, 710 (3d Cir. 2019) (emphasis added); *China Agritech*, 138 S. Ct. at 1814

---

explained why *China Agritech* and *Fierro*—which Kivett conceded barred class action tolling during *Smith I*—suddenly allowed it.

(Sotomayor, J., concurring) (recognizing the majority's "blanket no-tolling-of-class-claims-ever rule"); *accord In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 16-17 (1st Cir. 2019); *Torres v. Wells Fargo Bank*, 2018 WL 6137126, at *3 (C.D. Cal. Aug. 28, 2018) (citing cases declining to extend class action tolling to subsequent class actions regardless of the reason for the first class action's failure).

Nor is the *China Agritech* rule limited to unnamed class members. There is "no logical reason for named plaintiffs—who have already brought a class action—to be permitted to bring successive class actions" with the benefit of tolling from their prior lawsuits. *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 610 n.8 (3d Cir. 2018).

Successive class action tolling is also forbidden under California law to the extent state tolling rules apply here. *See Albano v. Shea Homes Ltd. Partnership*, 634 F.3d 524, 530 (9th Cir. 2011). *Fierro v. Landry's Restaurant Inc.* held that "[a]s in federal court, in California, '*American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations.'" 32 Cal. App. 5th at 297 (quoting *China Agritech*, 138 S. Ct. at 1804); *Carmel v. Mizuho Bank, Ltd.*, 2019 WL 10186488, at *20 (C.D. Cal. Nov. 14, 2019) ("[P]er *Fierro*, California's equitable tolling doctrine is not available

to Plaintiffs' [class] claims")).  And like federal court, California law disallows class action tolling after the failure of an earlier class action "without any distinction on the basis or cause of the failure."  *Fierro,* 32 Cal. App. 5th 276 at 292.

As Kivett conceded, *China Agritech* and *Fierro* thus bar class tolling during *Smith I.*  2-ER-295.  *Smith I* failed because it was dismissed and the Smiths did not appeal that dismissal or seek to amend their complaint to address their pleading failure.  Instead, they "commence[d] a new judicial action."  4-ER-424.  The class claims in that new judicial action were not tolled while *Smith I* was pending, so it was error to certify a class all the way back to April 18, 2014.

### B.    The previous class action was correctly dismissed.

Even if one putative class action could toll another, the premise of the district court's extension of class action tolling to the beginning of *Smith I* was mistaken.  That premise was that "the dismissal of the [Smiths'] claim had been erroneous."  1-ER-41.  But *Smith I* was properly dismissed for two reasons.  First, as the district court originally (and correctly) held, the Smiths' failure to provide pre-suit notice required dismissal.  Second, the district court later (and correctly) dismissed the Smiths' claims as preempted.  So

even if the district court could exercise hindsight over a previous class action, that hindsight would confirm that *Smith I* was correctly dismissed and so offers no basis for extended class action tolling.

### 1. The Smiths failed to provide the required notice and opportunity to cure.

The original dismissal of the Smiths' first lawsuit because they "failed to comply with the notice-and-cure provision of the deed of trust" was correct. 4-ER-431. And the district court's untimely self-reversal was wrong on the merits. 1-ER-41.

The Smiths' Deed of Trust required them to provide pre-suit notice because their lawsuit "ar[ose] from [Flagstar's] actions pursuant to" that Deed of Trust:

> Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or member of a class) *that arises from the other party's actions pursuant to this Security Instrument* or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

4-ER-431. That notice-and-cure provision affords a lender "the opportunity to bring its policies into compliance with California state law, thus avoiding

expensive litigation like this." *Wilde v. Flagstar Bank FSB*, 2019 WL 1099841, at *2 (S.D. Cal. Mar. 8, 2019). But the Smiths withheld that notice of Flagstar's alleged breach before filing their original lawsuit. *Compare* 4-ER-433–39 *with* 3-ER-390.

The Smiths' lawsuit arose from Flagstar's actions pursuant to the Deed of Trust (and thus is subject to its notice requirement) because Flagstar exercised its express right under the Deed of Trust to maintain an escrow account without accruing interest. The Smiths themselves alleged that Flagstar maintained that escrow account "pursuant to [Section] 3 of the [Deed of Trust], and held [their] money in that escrow account." 4-ER-436. And Section 3 generally strikes a balance of entitling borrowers not to be charged for the escrow service while entitling Flagstar not to pay interest on money held in that account:

> Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.

3-ER-354–55.[15]  Because the Deed of Trust thus excused Flagstar from paying interest, "Flagstar's decision not to pay interest on the account was therefore a decision made 'pursuant to' the Deed of Trust."  *Wilde*, 2019 WL 1099841, at *2 (addressing the same deed of trust); *id.* at *3 ("[W]here the contract specifically speaks to the issue governed by statute, it is subject to the notice-and-cure provision.").

This Court affirmed the dismissal of a similar lawsuit based on an identical deed of trust provision in *Giotta v. Ocwen Loan Servicing, LLC*, 706 F. App'x 421, 422 (9th Cir. 2017) (unpublished).  Those plaintiffs alleged that a loan servicer violated consumer protection laws by billing for property inspection and valuation fees "without disclosing the profit structure of the third-party entity that conducted the services."  *Id.* at 422.  This Court concluded that because the "Deed of Trust authorized property inspections and valuations to protect the Lender's interest in the property and to pass the fees for those services on to the borrower," the lawsuit was "'a judicial action . . . that *arises from* the other party's actions *pursuant to* this Security

---

[15] As explained in section III.B.2 below, "Applicable Law" did *not* "require[] interest to be paid" on the Smiths' escrow account anyway.  *See* 3-ER-376, 344.

Instrument.'"  *Id.*  Because the Deed of Trust expressly addressed the challenged actions (billing inspection and valuation fees), pre-suit notice was required and dismissal was proper.  *Id.* at 423; *Wilde*, 2019 WL 1099841, at *2 ("Even if that decision was unlawful . . . or constituted a breach of the contract, it was a decision made 'pursuant to' terms of that contract.").

The district court erred by ignoring the dispositive question whether *Smith I* "ar[ose] from [Flagstar's] actions pursuant to this Security Instrument."  Instead, the court looked at only the distinct question whether Flagstar "breached any provision of, or any duty owed by reason of, this Security Instrument."  *See* 2-ER-274 ("[Section 20] pertains only to claims for breach of any provision of the deed of trust."); 1-ER-40 ("The duty to comply with the law did not originate from the deed of trust—it originated from Section 2954.8(a).").[16]  But the Deed of Trust phrases those two conditions in the disjunctive; as long as one of them applies to a lawsuit, notice is required. *See Giotta*, 706 F. App'x at 422 ("The Notice Provision clearly applies to: (1)

---

[16] *See also* 1-ER-39 (quoting § 20 and italicizing the latter provision but not the former); 1-ER-40 ("[*McShannock*, 354 F. Supp. 3d 1063, 1072 (N.D. Cal. 2018)] held that the provision did not apply to statutory claims because such claims did not arise 'pursuant' to the deed of trust and the duty to pay interest was not 'owed by reason of' the deed of trust.").

'any judicial action . . . that arises from the other party's actions pursuant to this Security Instrument;' *or* (2) 'any judicial action . . . that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument.'" (emphasis added)).  By limiting § 20 to claims and duties that arise from the Deed of Trust itself under the second clause, the district court effectively excised the first clause.  *See United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1265 (9th Cir. 2003) (Under California law, courts "'should give effect to every provision,' and 'an interpretation which renders part of the instrument to be surplusage should be avoided.'").

### 2. The Smiths' claims were properly dismissed as preempted anyway.

The Smiths' claims also were subject to dismissal—and were actually dismissed in *Smith II*—under the HOLA preemption regime that still applies to certain pre-Dodd-Frank mortgages.  *See* 3-ER-349 ("The claims brought by the Smiths are dismissed."); *see also* 2-ER-269 (Plaintiffs' counsel admitting that "for the Smiths, their claim was dismissed because the bank was able to enjoy the preexisting HOLA standard because that's what was in force when their contract was entered.").  Because *Smith I* would have ultimately been

49

dismissed on that independent ground anyway, there is no basis for tolling the class claims before August 22, 2018.

"It is undisputed that before the enactment of [Dodd-Frank], HOLA and 12 C.F.R. § 560.2 preempted Section 2954.8 of the California Civil Code." 3-ER-376, 344. Although the district court concluded that Dodd-Frank eliminated that preemption, *but see* Sections I-II *supra*, it recognized that Dodd-Frank "preserved the original HOLA field preemption scheme that existed prior to the enactment of Dodd-Frank for 'any contract entered into on or before July 21, 2010'" by national banks, Federal savings associations, or subsidiaries. 3-ER-376–77 (quoting 12 U.S.C. § 5553).

The district court ultimately granted Flagstar's converted motion to dismiss in this case because the Smiths' mortgage was originated in 2004, well before Dodd-Frank's enactment in 2010. 3-ER-344. The court held that the Smiths' mortgage contract was subject to preserved HOLA preemption because it was "entered into" before July 21, 2010 "by [a] national bank[]." 3-ER-347. In particular, Flagstar participated in the origination of the Smiths' loan through a Corresponding Lending Agreement. 3-ER-345. The loan was executed on a Flagstar form and its signatory line stated: "PAY TO THE ORDER OF: FLAGSTAR BANK, FSB WITHOUT RECOURSE." 3-ER-346.

Flagstar then purchased the loan from its lending correspondent and became the original servicer "less than one month after executing the mortgage." *Id*. The district court thus held that Flagstar (a national bank) entered into that mortgage contract with the Smiths, and their claims based on that pre-Dodd-Frank mortgage contract were subject to HOLA preemption under § 5553. 3-ER-347.

As a result, "[t]he claims brought by the Smiths [we]re dismissed" here in *Smith II* anyway. 3-ER-349. And Plaintiffs do not appeal that dismissal.[17] So even if the district court had not dismissed *Smith I* for lack of pre-suit notice, with the benefit of the hindsight it used to revisit that conclusion, it would have had to dismiss the claims as preempted anyway. That means the district court's conclusion that "the dismissal of the claim [in *Smith I*] had been erroneous" was itself in error. 1-ER-41. Because that erroneous premise was the foundation of the district court's extension of class action tolling back to April 18, 2018, at a minimum the class period should begin no sooner than August 22, 2018.

---

[17] Indeed, the Smiths are now excluded from the class definition because their "mortgage loans originated on or before July 21, 2010." 1-ER-47; *see also* 3-ER-389.

## CONCLUSION

For these reasons, the Court should reverse the judgment of the district court and remand with instructions to enter judgment as a matter of law for Flagstar. In the alternative, the Court should remand with instructions to apply the correct legal standard to Flagstar's motion for summary judgment. At a minimum, the Court should vacate the district court's class certification order with instructions to replace the reference to "April 14, 2018" in the class definition with "August 22, 2018" and to amend the judgment accordingly.

## STATEMENT OF RELATED CASES

Counsel are unaware of any cases that are related under 9th Cir. R. 28-2.6.

Dated: September 24, 2021       Respectfully submitted,

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4746
F: (804) 698-2304
bschmalzbach@mcguirewoods.com

David C. Powell
Carolee A. Hoover
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
T: (415) 844-1970
F: (415) 844-1912
dpowell@mcguirewoods.com
choover@mcguirewoods.com

*Counsel for Appellant Flagstar Bank, FSB*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the length limitations of 9th Cir. R. 32-1(a) and Fed. R. App. P. 32(a)(7) because it contains 10,930 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced Book Antiqua typeface using Microsoft Word, in 14 point size.

Dated:  September 24, 2021          */s/ Brian D. Schmalzbach*
                                    Brian D. Schmalzbach

                                    *Counsel for Appellant Flagstar Bank, FSB*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2021, I electronically transmitted this document to the Clerk's Office using the CM/ECF System, which will accomplish service on all counsel of record.

Dated: September 24, 2021      */s/ Brian D. Schmalzbach*
                                       Brian D. Schmalzbach

                                       *Counsel for Appellant Flagstar Bank, FSB*