No. 21-15667

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

WILLIAM KIVETT, BERNARD BRAVO, and LISA BRAVO,

*Plaintiffs-Appellees,*

v.

FLAGSTAR BANK, FSB,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of California, San Francisco Division
The Honorable William Alsup, District Judge
No. 3:18-cv-05131-WHA

_____

## PLAINTIFFS-APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD
_____

Peter B. Fredman (Cal. SBN #189097)
LAW OFFICE OF
  PETER FREDMAN PC
230 Domingo Avenue, #227
Berkeley, CA 94705
Tel: (510) 868-2626
peter@peterfredmanlaw.com

Thomas E. Loeser (Cal. SBN #202724)
HAGENS BERMAN
  SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
toml@hbsslaw.com

*Counsel for Plaintiffs-Appellees*
*WILLIAM KIVETT, BERNARD BRAVO, and LISA BRAVO*

# INDEX

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **VOLUME 1 of 1** | | | |
| Declaration of Peter Fredman in Support of Plaintiffs' Supplemental Brief | 01-24-2020 | 147 | SER-5 – 7 |
| Exhibit 2 to the Declaration of Peter Fredman in Support of Plaintiffs' Supplemental Brief (Chang Deposition Excerpts) | 01-24-2020 | 147-2 | SER-8 – 51 |
| Exhibit 4 to the Declaration of Peter Fredman in Support of Plaintiffs' Supplemental Brief (Mansell Deposition Excerpts) | 01-24-2020 | 147-4 | SER-52 – 93 |
| Amended Case Management Scheduling Order | 01-06-2020 | 142 | SER-94 – 95 |
| Declaration of Peter Fredman in Support of Plaintiffs' Opposition to Defendant Flagstar Bank, FSB's Motion for Summary Judgment | 12-30-2019 | 135 | SER-96 – 101 |
| Exhibit A to the Declaration of Peter Fredman in Support of Plaintiffs' Opposition to Defendant Flagstar Bank, FSB's Motion for Summary Judgment (Ryan Deposition Excerpts) | 12-30-2019 | 135-1 | SER-102 – 108 |
| Declaration of David C. Powell in Support of Defendant Flagstar Bank, FSB's Response to Order to Show Cause Why Declarations of Sean Mansell and Courtney Chang Should Not be Stricken | 12-20-2019 | 132-1 | SER-109 – 113 |

010748-11/1707196 V1

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| Exhibit A to Declaration of David C. Powell in Support of Defendant Flagstar Bank, FSB's Response to Order to Show Cause Why Declarations of Sean Mansell and Courtney Chang Should Not be Stricken (Flagstar Initial Disclosures) | 12-20-2019 | 132-1 (p. 6-12) | SER-114 - 120 |
| Exhibit B to Declaration of David C. Powell in Support of Defendant Flagstar Bank, FSB's Response to Order to Show Cause Why Declarations of Sean Mansell and Courtney Chang Should Not be Stricken (Flagstar Supplemental Disclosures) | 12-20-2019 | 132-1 (p. 13-47) | SER-121 – 131 |
| Declaration of Courtney E. Chang in Support of Defendant Flagstar Bank, FSB's Opposition to Plaintiffs' Motion for Partial Summary Judgment | 12-19-21 | 131-1 | SER-132 – 135 |
| Declaration of Sean Mansell in Support of Defendant Flagstar Bank, FSB's Opposition to Plaintiffs' Motion for Partial Summary Judgment | 12-19-21 | 131-2 | SER-136 – 142 |
| Amended Case Management Order and Order on Plaintiffs' Motion to Enlarge Time and Extend Deadlines | 12-18-2019 | 129 | SER-143 – 144 |
| Declaration of Thomas E. Loeser in Support of Plaintiff's Motion for Partial Summary Judgment | 12-05-2019 | 123 | SER-145 – 147 |

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| Exhibit A to the Declaration of Thomas E. Loeser in Support of Plaintiff's Motion for Partial Summary Judgment (Ryan Deposition Excerpts) | 12-05-2019 | 123-1 | SER-148 – 154 |

010748-11/1707196 V1

1    Thomas E. Loeser (SBN 202724)
     **HAGENS BERMAN SOBOL SHAPIRO LLP**
2    1301 Second Avenue, Suite 2000
     Seattle, WA 98101
3    Tel: (206) 623-7292
     toml@hbsslaw.com
4
     Peter B. Fredman (SBN 189097)
5    **LAW OFFICE OF PETER FREDMAN PC**
     2550 Ninth Street. Suite 111 (South Hall)
6    Berkeley, CA 94710
     Tel: (510) 868-2626
7    peter@peterfredmanlaw.com

8    *Attorneys for Plaintiffs WILLIAM KIVETT and*
     *BERNARD and LISA BRAVO, on behalf of themselves*
9    *and the certified Class*

10

                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                    SAN FRANCISCO DIVISION
13

14   WILLIAM KIVETT and BERNARD and LISA          No.  3:18-CV-05131-WHA (DMR)
     BRAVO, individually, and on behalf of others
15   similarly situated,                          **DECLARATION OF PETER FREDMAN
                                                   IN SUPPORT OF  PLAINTIFFS'
16                    Plaintiffs,                  SUPPLEMENTAL BRIEF**

17            vs.                                  <u>CLASS ACTION</u>

18   FLAGSTAR BANK, FSB, a federal savings bank,   Hearing Date:   January 29, 2019
     and DOES 1-100, inclusive,                    Time:           8:00 a.m.
19                                                 Courtroom:      12, 19th Floor
                      Defendant.
20                                                 Complaint Filed: August 22, 2018
                                                   FAC Filed: October 19, 2018
21
22                                                 Honorable Judge William Alsup

23

24

25

26

27

28

1    I, Peter Fredman, do hereby declare as follows:

2        1.    I am an attorney duly licensed to practice before all courts of the States of California

3    and before this Court.  I am co-counsel of record for Plaintiffs William Kivett, Lisa and Bernard

4    Bravo, and the certified Class (collectively "Plaintiffs") in the above-entitled action.  I have personal

5    knowledge of the matters stated herein and, if called to testify, I could and would competently testify

6    thereto.

7        2.    I submit this declaration in support of Plaintiffs' Supplemental Brief Re Undisclosed

8    Employee Declarations Submitted By Defendant Flagstar Bank, FSB In Cross-Motions For

9    Summary Judgment (Per Amended Case Management Scheduling Order, (Dkt. No. 142, ¶ 2)) (the

10   "Supplemental Brief").

11       3.    Attached hereto as Exhibit 1 is a true and correct copy of the Declaration of Courtney

12   Chang filed in this action on December 19, 2019 as Dkt. No. 131-1.

13       4.    Attached hereto as Exhibit 2 are true and correct excerpts from the transcript of the

14   Deposition of Courtney Chang as cited in the Supplemental Brief.

15       5.    Attached hereto as Exhibit 3 is a true and correct copy of the redacted version of the

16   Declaration of Sean Mansell filed in this action on December 19, 2019 as Dkt. No. 131-2.

17       6.    Attached hereto as Exhibit 4 are true and correct excerpts from the transcript of the

18   Deposition of Sean Mansell as cited in the Supplemental Brief.

19

20       I declare under penalty of perjury under the laws of the State of California that the foregoing

21   is true and correct and that this Declaration was executed on January 24, 2020, in Berkeley,

22   California.

23                                   */s/ Peter Fredman*
                                     PETER FREDMAN

24
                                     I, THOMAS LOESER, am the ECF User whose ID and password
25                                   are being used to file this document hereby attest that all
                                     signatories concur with this filing. /s/Thomas Loeser
26

27

28

DECL. OF PETER FREDMAN ISO PLTFS' SUPP. BRIEF RE UNDISCLOSED EMPLOYEE DECLS.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2020, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of Electronic Filing to all ECF registrants.

_/s/ Thomas E. Loeser_
THOMAS E. LOESER

DECL. OF PETER FREDMAN ISO PLTFS' SUPP. BRIEF RE UNDISCLOSED EMPLOYEE DECLS.

Case No.: 3:18-cv-05131-WHA (DMR)

# EXHIBIT 2

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5       WILLIAM KIVETT, individually,

6       and on behalf of others

7       similarly situated,

8                          Plaintiff,

9            -vs-      Case No. 3:18-cv-05131-WHA (DMR)

10      FLAGSTAR BANK, FSB, a federal

11      savings bank, and DOES 1-1000,

12      inclusive,

13                         Defendants.

14      _____/

15

16      Pages 1 - 107

17

18           THE DEPOSITION OF COURTNEY E. CHANG

19           Taken at 8800 Wickham Road

20           Romulus, Michigan

21           Commencing at 8:30 a.m.

22           Wednesday, January 15, 2020

23           Before Trisha Cameron, RDR, RMR, CRR, RPR, CSR

24

25

1   A.   It was regarding the origination practices of certain

2        types of loans.

3   Q.   Were you testifying as a corporate designee?  Do you

4        know what that is?

5   A.   I do not know what that is.

6   Q.   So you don't know if you were testifying as a

7        corporate designee?

8   A.   No.

9   Q.   I'll go -- since that was a long time ago, I'll very

10       briefly go over the rules of depositions.

11            First of all, what's happening is we are

12       going to -- I'm going to examine you, interview you.

13       Everything we say is going to be transcribed by the

14       court reporter, and it's going to be used potentially

15       either in court trial or court proceedings as

16       evidence.  Do you understand that?

17  A.   Yes.

18  Q.   So as a basic logistical matter, you've got to -- and

19       I have to try very hard to talk slowly, wait for the

20       other person to finish the question or answer before

21       the next question or answer comes.  Do you understand

22       that?

23  A.   Yes.

24  Q.   And another thing is we have to communicate audibly

25       so that the court reporter can take it down.  Do you

```
 1   A.    Yes.
 2   Q.    So if I were to ask you how many stairs I have in my
 3         house, since you've never been in my house, you have
 4         no way of answering that without speculating or
 5         guessing.  Do you understand?
 6   A.    Yes.
 7   Q.    I might not have a house, right?  On the other hand,
 8         if you've been to my house and seen the stairs, you
 9         could probably estimate how many stairs I have based
10         on what you've seen, plus bringing in your other
11         knowledge.  And that would not be a guess or
12         speculation if you remember.  It would be an
13         estimate.
14   A.    Yes.
15   Q.    Do you agree with that?
16   A.    Yes.
17   Q.    Do you know if you're appearing here today to testify
18         as a corporate representative of Flagstar?
19              MR. MARIENTHAL:  Object to form.
20              THE WITNESS:  I am unaware of what
21           that term means.
22   BY MR. FREDMAN:
23   Q.    Okay.  That brings up another point.  If you don't
24         know the answer to a question, please say so.  If you
25         don't understand the question, please say so.  You
```

```
 1        did a great job of doing that.
 2                Do you understand that you're here to
 3        testify on behalf of Flagstar?
 4   A.   Yes.
 5   Q.   Do you understand you're here to testify on behalf of
 6        Flagstar in some kind of representative capacity?
 7                MR. MARIENTHAL:  Object to form.
 8                THE WITNESS:  I'm unsure what that
 9            term means.
10   BY MR. FREDMAN:
11   Q.   Okay.  Do you understand that you're here to testify
12        on behalf of Flagstar as an expert?
13                MR. MARIENTHAL:  Object to form.
14            She's not a 30(b)(6) witness and --
15                MR. FREDMAN:  I'm just asking her.
16                THE WITNESS:  I do not know the
17            definition of an expert witness, so I'm
18            unable to answer that.
19   BY MR. FREDMAN:
20   Q.   You understand you're here to testify about a
21        declaration you submitted in this case?
22   A.   Yes.
23   Q.   Do you consider yourself to be an expert in the
24        subject matter of that declaration?
25                MR. MARIENTHAL:  Object to form.
```

```
 1            servicing right asset.
 2   BY MR. FREDMAN:
 3   Q.   I want to make sure I get my terminology straight.  A
 4        mortgage servicing right is also MSR?
 5   A.   Correct.
 6   Q.   And when you say asset, you're using singular.  Are
 7        you talking about many mortgage servicing right
 8        assets?
 9   A.   Correct.  When I refer to mortgage servicing right
10        asset, I'm referencing the portfolio of mortgage
11        servicing rights that make up the mortgage servicing
12        right asset on the balance sheet.
13   Q.   Got it.  Thank you.  Mortgage servicing rights are
14        sometimes called MSRs?
15   A.   Correct.
16   Q.   And help me -- what is -- what piece of a loan is the
17        MSR?  If you own MSR, what part of the loan do you
18        own?
19             MR. MARIENTHAL:  Object to form.
20   BY MR. FREDMAN:
21   Q.   You can answer that in a way you think may be using
22        better terminology.
23   A.   The MSR is an asset created when the loan is sold
24        into the secondary market.  The primary portion of
25        the loan is used to create a security.  There's a
```

```
 1        portion of the loan, the interest rate that is used
 2        by the investor or guarantor, for example, Freddie,
 3        Fannie, or Ginnie.  And then there is a portion that
 4        remains that is the income that the owner of the MSR
 5        receives in order to appropriately service that
 6        asset, meaning the collection of the payments, the
 7        remittance of the payments to the bondholders, as
 8        well as the -- all the routine servicing activities.
 9   Q.   Okay.  I want to make sure I understand.  So when
10        there's a single loan, it includes the MSR aspect and
11        sort of the beneficial ownership of the loan.  Is
12        that an appropriate way of describing it?
13   A.   Yes.  There would be the two pieces of it.  When you
14        sell it, you break it into multiple pieces.  One is
15        the beneficial ownership of the loan and the other
16        would be the income received to do the actual
17        servicing activities.  It is bifurcated into those
18        two pieces, and the one that is the service fee
19        creates the mortgage servicing right asset.
20   Q.   Got it.  And are those the only two pieces of the
21        loan that are created, or are there other pieces?
22   A.   Primarily those are the only two pieces of the loan.
23        It is broken into those two pieces of the loan.
24   Q.   And the owner of the MSR has the right to receive the
25        income but also has the obligation to pay most of it
```

Case 3:18-cv-05131-VC Document 95-2 Filed 01/24/20 Page 8 of 154

1     over to the investor?

2  A.  Exactly.

3  Q.  And that's pursuant to a contract that's created in

4     the securitization process?

5  A.  I don't know exactly where the contract is created.

6  Q.  Okay.

7  A.  Whether it's in the specific securitization process

8     or there's a master contract that governs all the

9     sales that happen.

10 Q.  Okay.  Where does Flagstar acquire its MSRs?

11          MR. MARIENTHAL:  Object to form.

12          THE WITNESS:  Flagstar does not

13       acquire MSRs.  Flagstar only acquires

14       loans.

15 BY MR. FREDMAN:

16 Q.  So Flagstar acquires loans and does that process

17     whereby it breaks off the investor piece and retains

18     the MSR piece.  Is that what you're saying?

19 A.  Correct.

20 Q.  And it sells the investor piece to a third party?

21 A.  Correct.

22 Q.  Does it sometimes retain the investor piece for

23     itself?

24 A.  No.

25 Q.  No?

1    A.    No.

2    Q.    For, like, the time it owns the investor piece.  But

3          its goal is to always sell the investor piece to a

4          third party?

5    A.    In general, we would only bifurcate the loan into the

6          two pieces when we're selling to the investor piece.

7          Otherwise, we would retain the loan as a whole loan

8          on our balance sheet.

9    Q.    Okay.  Does Flagstar carry a lot of whole loans on

10         its balance sheets as long-term assets?

11   A.    Flagstar does have a portfolio of held for investment

12         mortgage loans on its balance sheet.

13   Q.    And in those scenarios, is Flagstar also considered

14         the MSR holder, or there's just no MSR?

15   A.    There is no MSR.

16   Q.    And in those scenarios, the servicing of the loan is

17         conducted by Flagstar?

18   A.    Correct.

19   Q.    And is it considered servicing, not subservicing,

20         right?

21   A.    Correct.

22   Q.    Okay.  When Flagstar acquires a whole loan and breaks

23         off the investor piece, does it do that loan by loan

24         or in pools?

25   A.    That is completed in pools.

1    Q.    Okay.  Can you tell me a little more about how that

2          is typically set up?

3                  MR. MARIENTHAL:  Object to form.

4                  THE WITNESS:  The majority of the

5              loans that Flagstar purchases are eligible

6              for delivery into Fannie, Freddie, or

7              Ginnie.  Fannie, Freddie, and Ginnie have

8              specific pool criteria that are used to

9              create the pools, such as different

10             product types, a 30-year versus a 15-year.

11             And then also the primary other

12             distinction is the note rate of the loan.

13   BY MR. FREDMAN:

14   Q.    And so the loans are delivered into preexisting

15         pools?

16   A.    The market in general, the secondary market has

17         certain pool criteria that you deliver into, such as

18         a 30-year-fixed three coupon.

19   Q.    Okay.  And does that occur -- from Flagstar's point

20         of view, does that occur loan by loan, or does it

21         pool loans together before it delivers them into the

22         market?

23   A.    It pools the loans together in, like, pools and

24         delivers them into the market.

25   Q.    Okay.  So there's been some terminology used by other

1           Flagstar witnesses and Flagstar lawyers in this case

2           that has to do with situations where Flagstar is the

3           MSR owner.  Is that a different situation from when

4           Flagstar owned the whole loan?

5                     MR. MARIENTHAL:  Object to form.

6                     THE WITNESS:  In my opinion, yes,

7                because if Flagstar owns a whole loan,

8                there is not an MSR asset created.

9    BY MR. FREDMAN:

10   Q.    Uh-huh.

11   A.    It is a whole loan that is on Flagstar's balance

12         sheet.  And yes, we provide the servicing activities

13         for that loan, but there is not a separate mortgage

14         servicing right asset.

15   Q.    Okay.  And that's from your position -- perspective

16         as in treasury?

17   A.    Right.

18   Q.    Do you know if whole loans held by Flagstar are

19         treated with respect to interest on escrow in the

20         same manner as loans where Flagstar owns the MSR?

21   A.    To my knowledge, they are handled the same.

22   Q.    And that's different from when a third party owns the

23         MSR, correct, in terms of interest on escrow?

24   A.    If a third party owns the MSR and we are subservicing

25         on behalf of the third party, we follow their

```
 1        requirements as servicer.
 2   Q.   Okay.  When you say Flagstar acquires loans, does
 3        it -- it acquires loans through its own originations?
 4   A.   Yes.
 5   Q.   And tell me all the way Flagstar acquires loans in
 6        general.
 7   A.   Flagstar acquires loans through correspondent
 8        relationships, broker relationships.  We have a
 9        retail group where we have loan officers that
10        originate loans.  And we have a direct to consumer
11        group, which is very much like retail.  It's just
12        they are more of a call center based.
13   Q.   So those are all loans that more or less originate
14        with Flagstar money, right?
15   A.   Correct.
16   Q.   Does Flagstar acquire loans originated by third
17        parties?
18   A.   Yes.  Those would be the correspondent loans.  So
19        correspondent loans are closed with other people's
20        money, and then we subsequently purchase them.
21   Q.   But at the close, it's understood that Flagstar is
22        going to purchase that loan?
23   A.   Yes.
24   Q.   So I understand that.  Is there any -- is there
25        any -- does Flagstar just go out and buy pools of
```

Case 3:13-cv-05671-WHA Document 293-42, Filed 01/24/20 Page 18 of 44

```
 1        loans or sets of loans that -- in the secondary
 2        market?
 3   A.   Very rarely Flagstar will purchase pools of loans for
 4        some intended purchase, such as CRA.
 5   Q.   What's CRA?
 6   A.   The Community Reinvestment Act.
 7   Q.   Okay.  Explain to me that a little more.  Why would
 8        Flagstar purchase loans for the CRA?
 9   A.   To my knowledge, the CRA requires Flagstar to have
10        loans in certain regions based on our footprint of
11        our retail banking.
12   Q.   Uh-huh.
13   A.   And in some cases, we do not have a strong loan
14        presence in those areas.  Therefore, in order to meet
15        those requirements, we need to purchase loans in
16        those areas.
17   Q.   And give me an example of what that loan purchase
18        might look like.  Would you buy them from a whole
19        different bank maybe?
20   A.   Yes.  That would be the typical situation.
21   Q.   All right.  However Flagstar acquires the loans, I
22        think it almost always -- or you said sometimes it
23        retains the loans as portfolio loans.
24   A.   Right.
25   Q.   Most often it sells off the beneficial interest to
```

```
 1        investors?
 2   A.   Correct.
 3   Q.   And in that process, it retains the MSRs, at least at
 4        the point of selling off the loans to the investors;
 5        is that correct?
 6   A.   We have two methods at this time in order to manage
 7        our MSRs.  We will retain the mortgage servicing
 8        right for a portion of them.  We also have flow sale
 9        agreements in place where at the time of creation of
10        the securitization, in the bifurcation of the MSR, we
11        concurrently sell that MSR to a third party.
12   Q.   And does that third party subcontract back to
13        Flagstar for subservicing?
14                 MR. MARIENTHAL:  Object to form.
15                 THE WITNESS:  In not all scenarios
16             does that happen.  But in the majority of
17             our current relationships, yes.
18   BY MR. FREDMAN:
19   Q.   Does Flagstar -- I think you said Flagstar never just
20        goes out and buys MSR rights exclusive once they've
21        been segregated from the beneficial interest; is that
22        correct?
23   A.   Correct.
24   Q.   So it only gets MSR -- MSRs from loans that it
25        somehow acquires --
```

1   A.   Correct.

2   Q.   -- as loans?

3   A.   Correct.

4   Q.   Thank you.  And then -- but it does -- it does --

5        once it has an MSR, it sometimes sells the MSR but

6        retains the servicing as subservicing; is that

7        correct?

8   A.   Correct.  We will sell MSR and concurrently enter

9        into an agreement to subservice that MSR on behalf of

10       the purchaser.

11  Q.   Okay.  As of now with Flagstar, roughly, with

12       Flagstar's servicing and subservicing portfolio, what

13       percentage of it -- for what percentage of it does

14       Flagstar own the MSRs?

15                MR. MARIENTHAL:  Object to form.

16                THE WITNESS:  Can you clarify that

17          for me?

18  BY MR. FREDMAN:

19  Q.   I mean, I'm taking a snapshot now of the loans that

20       Flagstar is servicing or subservicing.  What

21       percentage of them are subserviced or -- let me back

22       up a little.

23                I think in Flagstar terminology, if you say

24       subservice, that means there's a third party that

25       owns the MSRs.

1    A.   That is correct.

2    Q.   And if you say service, that means Flagstar owns the

3         MSRs?

4    A.   Correct.

5    Q.   And if you say service, that could also mean that

6         Flagstar just owns the loan and, thus, the MSRs have

7         not been segregated?

8    A.   Correct.

9    Q.   Got it.  Okay.  So what percentage -- looking at

10        servicing versus subservicing, which I understand is

11        non-owned versus owned, what percentage of the loans

12        of that group is subserviced at this time?

13   A.   The majority would be subserviced at this time.  My

14        high level estimate would be approximately 80 percent

15        subserviced.

16   Q.   80 percent subserviced.  20 percent either Flagstar

17        is the MSR owner or Flagstar just owns the whole

18        loan?

19   A.   Exactly.

20   Q.   And can you break that down?  Within that 20 percent,

21        what percentage would be owned loans versus MSR

22        holder?

23   A.   Of the 20 percent, my estimate would be 15 percent of

24        that would be -- so breaking the 20 percent into 15

25        and 5, 15 would be MSR, 5 would be whole loan.

1    Q.    Okay.  That's also 75, 25?

2    A.    Exactly.

3    Q.    You're the treasurer.  I think I got that right.  And

4          15 MSR?

5    A.    Correct.

6    Q.    So your estimate is about 5 percent of Flagstar's --

7          if I say servicing portfolio, is that confusing,

8          because it doesn't in your mind include subservicing?

9    A.    It doesn't, but if I -- I would say 5 percent of

10         Flagstar's loans serviced.

11   Q.    I see.  There we go.  Loans -- it's all about the

12         terminology.  Loans serviced.

13               So 5 percent of Flagstar's loans serviced

14         are whole loans owned by Flagstar?

15   A.    Correct.  That is my high level estimate.

16   Q.    I understand.  How many people report to you in your

17         current position?

18   A.    In my current position, there are five people that

19         report to me.

20   Q.    And what title level are they?

21               MR. MARIENTHAL:  Object to form.

22               THE WITNESS:  Their title is either

23          quantitative financial analyst or senior

24          quantitative financial analyst, and their

25          officer titles range from bank officer to

1          in this document or which sections were my

2          specific words.

3   BY MR. FREDMAN:

4   Q.   You can't -- sitting here today, at least at this

5        point, you can't tell the difference between what

6        your attorneys wrote and what you may have added?

7   A.   No, I am not able to provide that information.

8   Q.   Okay.  And let me just ask you this.  As signed, it's

9        nine paragraphs.  Was it nine paragraphs when you got

10       it?

11              MR. MARIENTHAL:  Object to form.  You

12       can answer to the extent you know.

13              THE WITNESS:  If I remember

14       correctly, I do not remember how many

15       paragraphs were in the original document.

16  BY MR. FREDMAN:

17  Q.   Do you remember if you deleted any paragraphs?

18  A.   Yes.  I believe I deleted some paragraphs that were

19       not relevant to my role.

20  Q.   Okay.  Do you remember if you added any paragraphs?

21  A.   I do not remember if I added any specific paragraphs.

22  Q.   Did you -- do you remember if you added any words?

23  A.   Yes.  I definitely added clarification words.

24  Q.   Okay.  Did you add words, like, to make things more

25       contingent, words like may or could?

1    A.    Correct.

2    Q.    So what category of loans are you referring to in

3          paragraph 4?

4    A.    I am referring to all channels of loans.  As in

5          paragraph 4 it says, loan -- mortgage loans

6          originated by other -- for mortgage loans originated

7          by other lenders and serviced by Flagstar.  So that

8          would actually be the correspondents.

9    Q.    It's correspondent loans?

10   A.    Yeah.

11   Q.    And so these are loans where they've been originated

12         through a correspondent channel.  Flagstar buys them.

13         And you say pricing associated with servicing.

14         What's the pricing associated with servicing?

15   A.    So part of the pricing that is provided when you

16         purchase a loan is the expectation or the value

17         associated with the MSR that will be created when

18         that loan is sold.

19   Q.    Would the correspondent lender have any visibility

20         into that?

21   A.    The correspondent lender would be able to see the

22         different pricing components in their rate sheet, so

23         that they could see for their specific loan they

24         would have the option of pricing for an escrowed and

25         a non-escrowed loan, for example.  There's multiple

1          different pricing options they could use.  But in

2          this context, they would have a price for an escrow

3          loan and a price for a non-escrow loan.

4     Q.   So there might be a discount for a -- some basis

5          point discount or add-on for an escrowed or

6          non-escrowed loan.  Is that what you're saying?

7     A.   Yes.

8     Q.   And that would appear on the pricing sheet that

9          Flagstar delivers to the correspondent?

10    A.   Correct.

11    Q.   And what would that percentage be?

12                   MR. MARIENTHAL:  Object to form.

13                   THE WITNESS:  I am unable to say the

14              percentage because it varies greatly based

15              on the different product.  It is a large

16              rate sheet that has a wide grid that

17              factors in a bunch of different

18              components.

19    BY MR. FREDMAN:

20    Q.   Okay.  Are you familiar with these pricing sheets?

21    A.   I do not directly generate the pricing sheets.  I

22         have reviewed them, but I do not have details on all

23         aspects of the pricing sheet.

24    Q.   They're generated every day, right?

25    A.   Yes.

Page 63

1    BY MR. FREDMAN:

2    Q.   Okay.  Does that fee, that .25 percent, does that in

3         any way reflect or represent the money, the pricing

4         that Flagstar paid for the inclusion of an escrow

5         account at origination?

6                    MR. MARIENTHAL:  Object to form.

7                    THE WITNESS:  Although I am not 100

8              percent certain, I believe that is

9              intended to be the estimation of the

10             difference in value between an escrowed

11             and non-escrowed account.

12   BY MR. FREDMAN:

13   Q.   What's your basis for saying that?

14   A.   My basis for saying that is the understanding that

15        when Flagstar attempts to price various things, it

16        utilizes analysis on the potential difference, as

17        well as industry comparisons or industry benchmarks

18        of those types of fees.

19   Q.   I'm going to turn -- direct you now to look at

20        paragraph 5 of your declaration.  Does paragraph 5

21        also refer only to correspondent lending channel?

22   A.   Yes.

23   Q.   Okay.  And this one also has that -- an escrow

24        account or the authority to create an escrow account

25        is a consideration -- it has that or the authority.

```
1        Does that mean the same thing, as far as you're
2        concerned?
3   A.   As far as I'm concerned, yes, the same thing.
4   Q.   So what you're saying is that -- is the same thing
5        you said with respect to paragraph 4.  If there's an
6        escrow account on the loan, there is some kind of
7        discounting, and/or if there's not an escrow account,
8        there's some kind of add-on that the correspondent
9        lender sees on their pricing sheets?
10                   MR. MARIENTHAL:  Object to form.
11                   THE WITNESS:  Correct.
12  BY MR. FREDMAN:
13  Q.   Do you mean to say anything more about the
14       consideration, a consideration for Flagstar when
15       determining purchase price of the loan?
16                   MR. MARIENTHAL:  Object to form.
17                   THE WITNESS:  No, I'm not intending
18            to say anything else.
19  BY MR. FREDMAN:
20  Q.   Okay.  When you say purchase the servicing rights,
21       you're talking about the servicing right -- are you
22       talking about -- in a correspondent lending
23       situation, doesn't Flagstar already own the -- isn't
24       Flagstar already entitled to the whole loan by virtue
25       of the correspondent lending relationship?
```

```
 1    Q.   Are you referring to custodial accounts created,
 2         custodial deposits created by escrow accounts?
 3                   MR. MARIENTHAL:  Object to form.
 4                   THE WITNESS:  Correct.  The escrow
 5              account is held in a custodial deposit.
 6    BY MR. FREDMAN:
 7    Q.   And that increases Flagstar's custodial deposits?
 8                   MR. MARIENTHAL:  Object to form.
 9                   THE WITNESS:  Depending on the amount
10              of the escrow account, yes, it would be
11              held in custodial deposits.
12    BY MR. FREDMAN:
13    Q.   Looking at paragraph 6, I'm going to read it.  In
14         addition to originating and servicing the loan, a
15         mortgage loan, a critical component of Flagstar's
16         mortgage lending business is its ability to sell
17         mortgage servicing rights in the secondary market.
18         The marketability of mortgage servicing right in the
19         secondary market is critical, as Flagstar, by selling
20         mortgage servicing rights into the secondary market,
21         obtains the necessary funds needed to make additional
22         mortgage loans.
23              What's your basis for saying that?
24    A.   My basis of saying that is my understanding of
25         Flagstar's balance sheet and business model and my
```

1          experience in working in the industry.

2    Q.    Is that your opinion, based on those factors?

3    A.    I believe it is more than an opinion, that it is a

4          fact that if Flagstar does not sell mortgage

5          servicing rights, there will come a time when it will

6          no longer be able to make or originate new loans.

7    Q.    You say mortgage servicing rights.  Does that include

8          the actual beneficial interest in the loan as well?

9          Are you attempting to distinguish the mortgage

10         servicing right from the beneficial interest in the

11         loan?

12   A.    I would say it's definitely applicable to both.

13         However, in statement 6, it's identifying the

14         mortgage servicing rights.

15   Q.    What percentage of the value of the loan is in the

16         mortgage servicing rights versus the investment

17         piece, the beneficial interest in the loan?

18               MR. MARIENTHAL:  Object to form.

19               THE WITNESS:  The vast majority of

20            the value is in the beneficial interest of

21            the loan.  The value of the mortgage

22            servicing right, although varies greatly,

23            depending on different factors within the

24            loan is typically between 1 and

25            1.5 percent.

```
 1              THE WITNESS:  I am unable to
 2         determine the exact factor that causes the
 3         pricing disconnect.
 4  BY MR. FREDMAN:
 5  Q.   Do you have any nonspeculative reason for the pricing
 6         disconnect?
 7  A.   No.
 8  Q.   Okay.  All you're saying is that sometimes when
 9         Flagstar wants -- they want more money for something
10         than the other counterparty is willing to pay, right?
11  A.   Correct.
12  Q.   And you don't know why that is?
13  A.   No.
14  Q.   Okay.  As long as the counterparty intended to comply
15         with California IOE law, the fact that -- California
16         IOE law would not itself be a factor.  Are you trying
17         to say that -- Flagstar does not represent to
18         counterparties that they do not have to comply with
19         California IOE law, right?
20              MR. MARIENTHAL:  Object to form.
21              THE WITNESS:  Not to my knowledge.
22  BY MR. FREDMAN:
23  Q.   Okay.  That's not a material component of the
24         transaction, what you sell in MSRs, right?
25              MR. MARIENTHAL:  Object to form.
```

```
 1                    THE WITNESS:  No.
 2    BY MR. FREDMAN:
 3    Q.   Correct.  It's not?  What I said is true?
 4    A.   Can you please repeat what you said.
 5    Q.   Yeah.  We got in a yes-no type -- the fact that third
 6         parties will intend to comply and do comply with
 7         California IOE law -- can I -- let me strike that.  I
 8         got lost a little myself.
 9              As long as a third party intended to comply
10         with California IOE law, the existence of the
11         California IOE law could not be a factor affecting,
12         impeding Flagstar's ability to sell MSRs, right?
13                    MR. MARIENTHAL:  Object to form.
14                    THE WITNESS:  Whether or not a third
15              party intends to comply with California
16              IOE is not something that factors into the
17              analysis.  When I am reviewing potential
18              transactions, I am looking at the bid
19              received, and that is what I am factoring
20              into the decision on whether or not to
21              transact.
22    BY MR. FREDMAN:
23    Q.   These counterparties, are they banks?
24    A.   Certain transactions we complete are with banks, and
25         certain are with nonbank entities.
```

```
 1   Q.   Okay.  Do you have any -- I know the answer.  I'm not
 2        going to --
 3              MR. MARIENTHAL:  Whenever is a good
 4         time for a break, let me know.
 5              MR. FREDMAN:  Let me ask a couple
 6         more.
 7              MR. MARIENTHAL:  Yeah.
 8   BY MR. FREDMAN:
 9   Q.   So I'm going to ask this question again.  I'm not
10        sure if I asked it.
11              Do you have any reason to believe that the
12        third-party purchasers' intent to comply with
13        California law regarding IOE has impeded or would
14        impede Flagstar's ability to sell MSRs on the
15        secondary market?
16   A.   Can you repeat that one more time, please.
17   Q.   Do you have any reason to believe that the
18        third-party purchasers' intent to comply with the
19        California law regarding IOE has impeded or would
20        impede Flagstar's ability to sell MSRs in the
21        secondary market?
22              MR. MARIENTHAL:  Object to form.
23              THE WITNESS:  I am unaware of the
24         third-party purchasers' intent and what
25         impact that may or may not have on a
```

```
 1           transaction.
 2    BY MR. FREDMAN:
 3    Q.   I am asking you to assume their intent to comply with
 4         California law.  Do you have any reason, assuming
 5         that they intend to comply with California law, that
 6         that California law would impede Flagstar's ability
 7         to sell MSRs on the secondary market?
 8              MR. MARIENTHAL:  Same objection.
 9              THE WITNESS:  Assuming their intent
10                  to comply, I am unaware of what impact
11                  that would have, as I am only interested
12                  in the price that they would pay.  I am
13                  unaware of what impact their intention to
14                  comply would have on their bid.
15    BY MR. FREDMAN:
16    Q.   Are you aware of any counterparties who have -- as
17         far as you know, do not believe they have to comply
18         with California IOE law?
19    A.   I am unaware of the counterparties' stance on the
20         California IOE law.
21    Q.   Do you understand Flagstar's basis for claiming it's
22         exempt from the California IOE law?
23              MR. MARIENTHAL:  Asked and answered.
24              Go ahead and answer.
25              THE WITNESS:  Flagstar is a federally
```

1          chartered savings bank that has federal

2          exemption over certain state laws.

3    BY MR. FREDMAN:

4    Q.   And is it your understanding that's transferable to

5         counterparties in MSR transactions?

6    A.   I am unaware of whether or not that's transferable.

7              MR. MARIENTHAL:  Object to the form

8         of that last question.

9    BY MR. FREDMAN:

10   Q.   Are any of the counterparties in MSR transactions

11        federal savings banks?

12   A.   We have historically transacted with federally

13        chartered savings banks.  However, not recently.

14   Q.   Okay.  In your statement in -- in paragraph 6 and 7,

15        are you saying that this lawsuit represents a

16        critical risk to Flagstar's lending business in so

17        far as it may require Flagstar to comply with

18        California IOE law when it services a loan that it

19        owns?

20             MR. MARIENTHAL:  Object to form.

21             THE WITNESS:  I'm sorry.  Can you

22        repeat that?

23             MR. FREDMAN:  Can you read it back?

24             (Last question read back.)

25             MR. MARIENTHAL:  Same objection.

Page 79

```
 1                    THE WITNESS:  I am stating that in
 2               the event it becomes more difficult to
 3               sell mortgage servicing rights, it would
 4               have a significant impact on Flagstar's
 5               lending business.
 6     BY MR. FREDMAN:
 7     Q.   Are you trying to make any conclusions about
 8          California -- or compliance with California IOE law?
 9                    MR. MARIENTHAL:  Object to form.
10                    THE WITNESS:  I am not trying to make
11               any connection.
12     BY MR. FREDMAN:
13     Q.   Okay.  No connection whatsoever, correct?
14     A.   I am unaware of if there is a connection.
15     Q.   Do you have any reason to believe that compliance
16          with -- Flagstar's compliance with California IOE law
17          would make it more difficult for Flagstar to sell
18          MSRs?
19     A.   My understanding is that there would be a pricing
20          difference; however, I am unaware whether or not that
21          would lead to it being more difficult to sell MSRs.
22     Q.   How would Flagstar's compliance with California law,
23          when it services a loan, create a pricing difference
24          when it sells MSR?
25                    MR. MARIENTHAL:  Object to form.
```

```
 1              THE WITNESS:  Correct.  I am -- I do
 2          not have inside knowledge as to their
 3          actual practices.
 4  BY MR. FREDMAN:
 5  Q.   Okay.  But what I want to be really clear about is in
 6       these paragraphs 6, 7, 8, 9 to a certain extent to
 7       the extent it flows from 6, 7, 8, you're talking
 8       about if a third-party purchaser has to comply with
 9       state IOE laws, they might be willing to pay less for
10       MSR that Flagstar is trying to sell them, correct?
11  A.   Correct.
12  Q.   You're not -- you're saying nothing about the
13       requirement that Flagstar comply with state IOE laws?
14  A.   Yes.
15  Q.   Yes, correct?
16  A.   Yes.  Yes.
17  Q.   Okay.  And as far as you know, all third-party
18       purchasers do comply with state IOE laws, correct?
19              MR. MARIENTHAL:  Object to form.
20              THE WITNESS:  I do not know that for
21          a fact.
22  BY MR. FREDMAN:
23  Q.   Do you have any -- you have no reason to doubt that
24       that's true?
25  A.   I am unaware of the practices of all of our
```

**SER-38**

1        third-party potential purchasers.

2    Q.   So you have reason to believe that they don't comply

3        with the law?

4                MR. MARIENTHAL:  Object to form.

5                THE WITNESS:  I have no knowledge of

6            their individual situation regarding

7            compliance with the law or exemption from

8            said law.

9    BY MR. FREDMAN:

10   Q.   Okay.  But you know currently there's -- none of them

11       are federal savings banks, correct?

12               MR. MARIENTHAL:  Object to form.

13               THE WITNESS:  None of our

14           subservicing clients are federal savings

15           banks.  However, people are --

16           counterparties that we have sold to have

17           been federal savings banks.

18   BY MR. FREDMAN:

19   Q.   Which ones?

20   A.   To my knowledge, Fifth Third, I believe, is a federal

21       savings bank.  And the other banks that we have sold

22       to include Regions Bank.  I'm unsure if they're

23       federally chartered or what their charter is.

24   Q.   Uh-huh.

25   A.   And I know that we have sold to other banks.

```
 1              MR. MARIENTHAL:  Object to form.
 2              THE WITNESS:  I am not stating -- in
 3         this statement I am not stating that, no.
 4  BY MR. FREDMAN:
 5  Q.   Anywhere in this declaration are you claiming that
 6       state IOE laws impact Flagstar's ability to sell MSR?
 7              MR. MARIENTHAL:  Object to form.
 8              THE WITNESS:  I am not stating they
 9         do impact.  I am saying that they may
10         impact.
11  BY MR. FREDMAN:
12  Q.   They may or they may not?
13  A.   Correct.
14  Q.   Well, that's speculation, isn't it?  It's possible is
15       what you're saying?
16              MR. MARIENTHAL:  Object to form.
17         Argumentative.
18              THE WITNESS:  I am saying that I am
19         unaware of all of the factors that go into
20         the valuation that a purchaser may use.
21         However, interest on escrow does impact
22         the cost it takes to service.  So that it
23         would be a likely factor that would be
24         included in the valuation.
25
```

1   BY MR. FREDMAN:

2   Q.   On the other hand, if everybody complied with state

3        laws, the marketplace would be stable in the sense

4        that there's nobody gaining an advantage by not

5        having to comply with state laws, correct?

6   A.   There would be -- it would be more aligned in that

7        there -- the majority of the assumption should be

8        more closely aligned.

9   Q.   The majority of the purchasers' assumptions about the

10       costs benefit of purchasing MSRs?

11  A.   The assumptions used in their valuation and,

12       therefore, their bid would theoretically be somewhat

13       aligned.

14  Q.   And for most the times when Flagstar sells MSRs, it

15       retains the subservicing, right?

16  A.   In recent years, the majority of transactions have

17       also had a concurrent subservicing relationship.

18  Q.   So the transaction costs are the same in all those

19       transactions.  It's the subservicing, because

20       Flagstar is doing the subservicing.

21            MR. MARIENTHAL:  Object to form.

22  BY MR. FREDMAN:

23  Q.   It's paying Flagstar to do the subservicing, right?

24  A.   I'm unclear what you mean by transaction costs.

25  Q.   The cost of servicing the loan is the same in all the

```
 1        with those terms.
 2   Q.   Okay.  But if they all -- in terms of the cost of
 3        compliance with state IOE laws, if Flagstar is
 4        performing that compliance, it should all be the
 5        same, correct?
 6             MR. MARIENTHAL:  Object to form.
 7             THE WITNESS:  Assuming there are no
 8          other requirements from the subservicing
 9          counterparty.
10   BY MR. FREDMAN:
11   Q.   Okay.  What I said is correct, assuming that there's
12        no other tangential requirements?
13   A.   Correct.
14   Q.   Got it.  So in paragraph 8 in the second sentence,
15        you say, requiring the payment of interest on escrow
16        in applicable states could impede the sale of
17        Flagstar's originated loans and/or mortgage servicing
18        rights on the secondary market or subject such loans
19        to a discount to reflect the risk associated with the
20        loan.  That's your statement, right?  Did I read it
21        more or less correctly?
22   A.   Yes.  That was the statement.
23   Q.   So you're saying could, as if it's possible?
24   A.   Correct.
25   Q.   Okay.  You're not saying that would happen?
```

Page 92

```
 1   A.    Correct.

 2   Q.    Yeah.  In fact, we know that generally companies are

 3         required to comply with the law, right?

 4                   MR. MARIENTHAL:  Object to form.

 5                   THE WITNESS:  As stated, I am unaware

 6             of each entities different requirements to

 7             apply -- comply with the law.

 8   BY MR. FREDMAN:

 9   Q.    Okay.  Assuming entities are required to comply with

10         the law -- strike that.

11                   So in paragraph 9, you say, additionally,

12         in the event that market participants purchase fewer

13         thrift originated loans and/or servicing rights, the

14         reduced demand could deplete Flagstar's liquidity,

15         reduce its ability to issue credit, increase its

16         exposure to the impact of interest rate fluctuations,

17         etcetera.

18                   First I want to ask you, are you

19         differentiating there between thrift originated

20         versus nonthrift originated loans?

21                   MR. MARIENTHAL:  Object to form.

22                   THE WITNESS:  I am stating thrift

23             originated loans and/or servicing rights,

24             as that is what Flagstar is.

25
```

Page 94

```
 1              MR. MARIENTHAL:  Object to form.
 2              THE WITNESS:  I am unaware of any way
 3         that Flagstar differentiates its products
 4         in the secondary market.
 5    BY MR. FREDMAN:
 6    Q.   Certainly the fact that it's a thrift and it
 7         originated loans as a thrift is not a -- is not a
 8         differentiation, correct?
 9              MR. MARIENTHAL:  Object to form.
10              THE WITNESS:  I am unaware of how
11         being a thrift would differentiate the
12         products in the secondary market.
13    BY MR. FREDMAN:
14    Q.   So you're saying if -- in paragraph 9 essentially it
15         says if market participants stopped or purchased
16         fewer Flagstar loans or MSRs, that would be bad for
17         Flagstar.
18    A.   Yes.
19    Q.   And that's all you're saying, right?
20              MR. MARIENTHAL:  Object to form.
21              THE WITNESS:  I would -- I would say
22         yes, it would be bad for Flagstar.  It
23         would also reduce its ability to issue
24         credit in the market, which would
25         potentially be bad for others.
```

```
 1   BY MR. FREDMAN:
 2   Q.   Okay.  Because it would -- you're saying if --
 3        wouldn't competition fill in the gap?  If people
 4        stopped buying those from Flagstar, there would still
 5        be plenty of credit issued in the market?  Are you
 6        assuming there isn't other parties out there willing
 7        to take Flagstar's market share?
 8             MR. MARIENTHAL:  Object to form.
 9             THE WITNESS:  I am unaware if there
10             is competitors that would be able to
11             quickly fill in all of the product
12             classifications that Flagstar currently
13             offers.
14   BY MR. FREDMAN:
15   Q.   Okay.  In any event, paragraph 9 is a general
16        statement that has nothing to do with compliance with
17        state IOE laws, correct?
18             MR. MARIENTHAL:  Object to form.
19             THE WITNESS:  Paragraph 9 is a
20             statement that discusses what would be the
21             outcome if Flagstar was unable to sell
22             loans and servicing rights into the
23             secondary market.
24   BY MR. FREDMAN:
25   Q.   And I think we've already -- you've already agreed
```

```
 1        that Flagstar's compliance as a servicer with state
 2        IOE laws would have no effect on its ability to sell
 3        loans in the secondary market, right?
 4                  MR. MARIENTHAL:  Object to form.
 5             Misstates the testimony.
 6   BY MR. FREDMAN:
 7   Q.   Do you agree with that?
 8   A.   I don't believe I said it would have no impact.  I
 9        think it's unknown whether or not what impact it
10        would have.
11   Q.   Do you have any theory of why Flagstar's compliance
12        with state IOE laws as a servicer would affect
13        Flagstar's ability to sell loans as a market
14        participant?
15   A.   No, I do not have a theory.
16   Q.   In paragraph 8, you say further, since the
17        transaction and compliance costs for such loans would
18        increase, the loan's respective value to the
19        secondary market participants is likely to be less.
20        You're talking about the third parties' compliance
21        costs, right?  The third party purchasers' compliance
22        costs.
23   A.   Yes.
24   Q.   And you're saying that a third party -- are you aware
25        of Flagstar's compliance costs or the cost that is
```

Page 101

```
 1   Q.   Would you agree that the content of this declaration
 2        is based on your knowledge, skill, experience,
 3        training, and education as a mortgage industry
 4        professional?
 5   A.   Yes.
 6   Q.   Okay.  Is it based on anything else?
 7   A.   No.
 8             MR. FREDMAN:  Okay.  So we're almost
 9        done.  We're basically done, but I need to
10        take about five minutes, ten minutes, to
11        look over stuff.  If you guys want to take
12        a break, or whatever you want to do.
13        Let's call it a ten-minute break.
14             MR. MARIENTHAL:  Okay.
15             (Recess taken.)
16             MR. FREDMAN:  Okay.  We're back on
17        the record.
18   BY MR. FREDMAN:
19   Q.   I just have a few more questions for you.
20             Having gone through this declaration sort
21        of paragraph by paragraph, does that refresh your
22        recollection at all with respect to authorship of the
23        document?
24             MR. MARIENTHAL:  Object to form.
25             THE WITNESS:  I would say I have no
```

```
 1              additional clarity on authorship of the
 2              document.
 3    BY MR. FREDMAN:
 4    Q.   You're unaware of any particular words or phrases
 5         that you added to this document personally?
 6    A.   Correct.
 7    Q.   Let me -- remember to -- we're trying to get out of
 8         here, but let's not talk over each other.
 9              Reading the document, does that refresh
10         your recollection about particular words or phrases
11         that you added to the document that was presented to
12         you by your attorneys?
13    A.   Correct.
14    Q.   Okay.  And it doesn't refresh your recollection about
15         areas that you deleted from the document that was
16         presented to you by your attorneys?
17    A.   Correct.
18    Q.   Your particular area of expertise here is this sale
19         of MSRs on the secondary market, correct?
20    A.   That is one of my areas of expertise.  Yes.
21    Q.   Okay.  Is there another area of expertise that
22         relates to the content of your declaration?
23    A.   The overall management of mortgage servicing right
24         portfolio.
25    Q.   Okay.  Do you -- you have no nonspeculative reason to
```

1          believe that the -- that Flagstar's compliance with

2          state IOE laws in its servicing business would affect

3          the sale -- its sale of MSRs, correct?

4                    MR. MARIENTHAL:  Object to form.

5                    THE WITNESS:  Can you please repeat

6              that?

7     BY MR. FREDMAN:

8     Q.   You have no nonspeculative reason to believe that

9          Flagstar's compliance with state IOE laws in its

10         servicing business would affect its sale of MSRs in

11         the secondary market, correct?

12    A.   Correct.

13    Q.   You have said that -- or I'm not going -- I'll drop

14         that.  I don't want to argue about what you said.

15                   If some MSR purchasers were required to

16         comply with state IOE laws and others were not

17         required to comply, the noncompliant parties might be

18         willing to pay more than the compliant parties for

19         Flagstar MSR rights, correct?

20                   MR. MARIENTHAL:  Object to form.

21                   THE WITNESS:  There may be a pricing

22             difference for MSRs, depending on the

23             purchaser's position on complying with

24             state IOE laws.

25

Page 104

```
 1    BY MR. FREDMAN:

 2    Q.   Right.  And that pricing difference would be if the

 3         purchaser complies with state IOE laws, it might be

 4         willing to pay less than the purchaser who does not

 5         comply with state IOE laws.  That's your testimony,

 6         right?

 7    A.   Correct.

 8    Q.   But you have not observed this differentiation in

 9         demand among potential MSR purchasers, correct?

10    A.   I am unaware of the factors that go into the demand

11         or the pricing that has been received.  In recent

12         months, I have seen adequate demand for mortgage

13         servicing rights.

14    Q.   To your knowledge, you have not observed any

15         differentiation in demand based on compliance or

16         noncompliance with state IOE laws among potential MSR

17         purchasers, correct?

18    A.   Correct.  As I do not know potential purchasers'

19         stance on compliance with IOE.

20    Q.   You're not aware of any MSR owners or potential

21         purchasers, other than Flagstar, you're not aware of

22         any who claim they do not have to comply with state

23         IOE laws, correct?

24              MR. MARIENTHAL:  Object to form.

25              Asked and answered.
```

Page 105

```
 1              THE WITNESS:  I am unaware of MSR

 2         owners or potential purchasers' stance on

 3         their requirements to pay IOE.

 4   BY MR. FREDMAN:

 5   Q.   Therefore, you're unaware of any who claim they don't

 6        have to pay IOE, correct?

 7   A.   Correct.

 8   Q.   And you're saying I wouldn't know?

 9   A.   Correct.

10   Q.   You're just clarifying that I don't know that, but

11        I -- I wouldn't know, right?

12   A.   Correct.

13   Q.   Okay.  You're not aware of any analysis by Flagstar

14        of the cost of its compliance with state IOE laws

15        with respect to the loans that it services on its own

16        account, correct?

17              MR. MARIENTHAL:  Object to form.

18         Asked and answered.

19              THE WITNESS:  Correct.  I am unaware.

20   BY MR. FREDMAN:

21   Q.   When I say services on its own account, you

22        understand what I mean by that?

23   A.   Correct.

24   Q.   Okay.  Where it owns the MSR?

25   A.   Correct.
```

Case 3:18-cv-06531-WHA Document 96-7 Filed 01/24/20 Page 52 of 154

# EXHIBIT 4

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4

 5     WILLIAM KIVETT, individually,

 6     and on behalf of others

 7     similarly situated,

 8                    Plaintiff,

 9         -vs-          Case No. 3:18-cv-05131-WHA (DMR)

10     FLAGSTAR BANK, FSB, a federal

11     savings bank, and DOES 1-1000,

12     inclusive,

13                    Defendants.

14     _____/

15

16     Pages 1 - 153

17

18          THE DEPOSITION OF SEAN M. MANSELL

19          Taken at 8800 Wickham Road

20          Romulus, Michigan

21          Commencing at 12:21 p.m.

22          Wednesday, January 15, 2020

23          Before Trisha Cameron, RDR, RMR, CRR, RPR, CSR

24

25
```

Page 8

1    A.    I do.

2    Q.    And you have to answer the questions I ask you.  Do

3          you understand that?

4    A.    I do.

5    Q.    You understand that the transcript that the court

6          reporter is going to prepare is going to become

7          evidence in this case?

8    A.    I do.

9    Q.    And it could be used in court proceedings, or it

10         could be used if you are a witness at trial to --

11         well, in various ways if you're a witness at trial.

12         Do you understand that?

13   A.    Understood.

14   Q.    You shouldn't guess, but you must provide estimates

15         if you have information available to you.  Do you

16         understand that?

17   A.    Understood.

18   Q.    You shouldn't guess or speculate.  Speculation, I'll

19         just define it as something that -- a theory or

20         conjecture that's not based on evidence.  It's just

21         something you say.  You understand?

22   A.    Understood.

23   Q.    If you say something might be so or might not be so,

24         that's speculation or a guess.  It's not -- it's just

25         a possibility.  You understand that?

1   A.   Understood.

2   Q.   If you think an answer to a question I'm asking would

3       be speculation or a guess, you should let me know

4       that.

5   A.   Understood.

6   Q.   Agreed?  And if there's a question I ask that you

7       don't understand, please let me know that as well.

8   A.   Understood.

9   Q.   Okay.  And the other part of this is there's

10      attorney-client privilege that applies to your

11      conversations, your confidential communications with

12      your attorneys.  I'm sure you've heard about that

13      before.  You understand that?

14   A.   I do.

15   Q.   So just in general, my questions are not aimed at

16      your communications with your attorneys, and you can

17      exclude that, those communications from your answers.

18      So if I say has anybody ever told you X and only your

19      attorney told you that a few minutes ago, then by all

20      means you can -- you can answer nobody but my

21      attorneys or just no, not outside, you know, the

22      litigation context.

23           On the other hand, there may be times where

24      you know something but you've also discussed it with

25      your attorneys, and that's not confidential because

```
 1        you know it.  The fact that you talk about it with

 2        your attorneys does not make a fact confidential.  It

 3        just makes those communications with your attorneys

 4        confidential.  Do you understand that?

 5   A.   I do.

 6   Q.   And we may get into that more over the course of this

 7        deposition.  Are you appearing here to testify as a

 8        corporate representative?

 9   A.   I am not.

10   Q.   Are you here to testify as an expert?

11               MR. MARIENTHAL:  Object to form.

12               THE WITNESS:  I do not know the

13           definition of what counsel considers to be

14           an expert.

15   BY MR. FREDMAN:

16   Q.   Okay.

17   A.   So I would have to defer to counsel on that

18        designation.

19   Q.   Okay.  In terms of the colloquial use of the term

20        expert, do you think you're here to testify as an

21        expert in, we'll say, mortgage servicing?

22   A.   I believe that I am here to testify based on my

23        extensive experience.

24   Q.   Okay.  We'll get into that in a second.  When you say

25        your extensive experience, what is your -- what areas
```

```
 1        do you have extensive experience in related to
 2        mortgage banking?
 3   A.   Loan servicing.
 4   Q.   Loan servicing?
 5   A.   Mortgage servicing.
 6   Q.   And that's the experience you're referring to that
 7        you believe you're here to testify about?
 8   A.   Correct.
 9   Q.   And is there any particular areas within the category
10        of loan servicing that you have particular expertise
11        in?
12   A.   The management over the overall operation.
13   Q.   Managing loan servicing operation?
14   A.   That is correct.
15   Q.   Do you have particular expertise in default
16        servicing?
17   A.   I have run default servicing in the past.  Yes.
18   Q.   How about escrow accounts?
19   A.   Yes, I've -- I've had the escrow areas report to me.
20   Q.   Okay.
21   A.   Both currently and in the past.
22   Q.   You currently have escrow reporting to you?
23   A.   Yes, sir.
24   Q.   Are you an expert or -- colloquially.  I'm not asking
25        for you to engage in legal definitions.  But are you
```

1    A.    Yes.

2    Q.    She said it doesn't really typically buy mortgages

3          from third parties, except in connection with those

4          originations, like corresponding originations.

5    A.    Can you clarify?  When you say mortgages, are you

6          referring to the servicing asset?

7    Q.    Loans, whole loans.

8    A.    I'm not for certain what Flagstar has done in the

9          past.

10   Q.    Okay.  If I change that to MSR or MSRs, I may have to

11         say it with the plural --

12   A.    The same answer would apply.  I'm not certain what

13         they have done in the time that I have been there.

14   Q.    Okay.  So your understanding is that -- is it your

15         understanding that Flagstar, generally speaking,

16         originates mortgages through or obtains mortgages

17         through various origination channels and then --

18         you're going to have to help me with the terminology.

19         But then strips off the MSR in the process of selling

20         the --

21   A.    The loan asset.

22   Q.    -- the loan asset itself?

23   A.    Yes, sir.

24   Q.    So you refer to sort of the beneficial right to the

25         proceeds of the loan as the loan asset?

1   A.   Yes.

2   Q.   And then MSR is --

3   A.   The servicing asset.

4   Q.   -- the servicing asset?  And those are the two

5        components of the whole loan?

6   A.   Yes, sir.

7   Q.   And then Flagstar may sell or keep the loan asset,

8        correct?

9   A.   That is correct.

10  Q.   And it may sell or keep the MSR?

11  A.   That is correct.

12  Q.   And if it sells the MSR, it often retains the

13       subservicing; is that correct?

14  A.   If it sells the MSR, there are opportunities for us

15       to sell to our clients which we already subservice

16       for.  So, therefore, while the client will own the

17       MSR, we will subservice that servicing asset, that

18       loan, on their behalf.

19  Q.   Okay.  And Ms. Chang estimated that currently with

20       respect to Flagstar's loans serviced, 80 percent are

21       subserviced on behalf of third-party MSR holders and

22       roughly 20 percent are serviced on Flagstar's own

23       account.

24  A.   That's very close.  Yeah.  That's correct.

25  Q.   Okay.  And she estimated that of that 20 percent

Case 3:18-cv-05131-VMH202D Document 154-1, Filed 01/24/20 Page 9 of 42

```
 1        component where Flagstar is the MSR owner, about a
 2        quarter of the time it owns -- it owns the whole
 3        loan.  So the MSR has not been segregated from the --
 4        from the loan asset itself?
 5   A.   I would say it's slightly lower than 25 percent, but
 6        roughly.
 7   Q.   Roughly.
 8   A.   I would say it would be closer to 15 to 20 percent is
 9        when they would own the actual whole loan based on
10        current portfolio characteristics.
11             MR. MARIENTHAL:  You probably need to
12          clarify your numbers.
13  BY MR. FREDMAN:
14   Q.   That's 15 percent -- 15 to 20 percent of the
15        20 percent --
16   A.   So currently we have a total portfolio of
17        approximately 1.1 million, of which -- that's units.
18        Of which approximately 175,000 make up Flagstar-owned
19        either whole loans or servicing --
20   Q.   Uh-huh.
21   A.   -- owned MSR.  The deviation between the whole loan
22        to MSR owned would be -- I'm not certain of the exact
23        breakdown.  But I would estimate it being between
24        15 and 20 percent of that 175.
25   Q.   And would those statistics, I understand they're
```

1    comply with state law.  There would need to be legal
2    interpretation of that state law.  There would need
3    to be implementation into our core servicing system,
4    Black Knight MSP, to be able to effectively manage
5    that.  There would also have to be protocols from a
6    QA, quality assurance, perspective to ensure that not
7    only is it being performed correctly, but the regular
8    maintenance that would need to occur based on the
9    frequency of change by state law.  And then
10   subsequently, our risk areas, such as internal audit,
11   would have to accommodate for that testing now to
12   ensure that we are, in fact, accommodating that
13   appropriately.  So there would be a fairly extensive
14   shift within the organization from a foundational
15   standpoint to be able to accommodate this change.
16   Q.   So everything you've just described, those are costs
17        of compliance with --
18   A.   Those are possible -- yeah.
19   Q.   Possible costs?
20   A.   Possible costs, yes.
21   Q.   Okay.  Now, Flagstar already complies with state IOE
22        laws with respect to the 80 percent of loans it
23        subservices on behalf of third-party MSR holders,
24        correct?
25   A.   That is correct.  But that is at the behest of the

1    master service agreement.

2  Q.   Okay.  But Flagstar already incurs those costs with

3    respect to those loans, right?

4  A.   Not necessarily.

5  Q.   Why not?

6  A.   It would be up to those master servicers to perform

7    the QA and various forms of internal audit on their

8    side, as it is their MSR portfolio and ultimately

9    they would be held responsible for maintaining the

10    payment of the interest on escrow pursuant to state

11    regulatory guidance.

12  Q.   When Flagstar subservices loans for third-party MSR

13    holders, it calculates the amount of IOE it has to

14    pay, right?

15  A.   It does calculate the amount of interest based on the

16    guidance provided by the master servicer.

17  Q.   Okay.  And it incurs those costs, right?

18  A.   When you say it incurs the costs --

19  Q.   Flagstar.

20  A.   No.  Those costs are passed back to our clients.

21  Q.   The IOE or the compliance cost?

22  A.   The IOE, as well as those increased compliance costs

23    are banked into the overall pricing that we would

24    deliver to the client --

25  Q.   Okay.  So --

Page 47

1    A.    -- as a cost to service.

2    Q.    So are you saying that there's elements of compliance

3          that -- with state IOE laws that Flagstar does not

4          perform for its subservice accounts?

5    A.    I'm sorry.  Can you rephrase?

6    Q.    Are there certain elements of compliance with state

7          IOE laws that Flagstar does not currently perform for

8          its subserviced accounts?

9    A.    I wouldn't be able to answer that definitively.

10   Q.    You don't know?

11   A.    Don't know.

12   Q.    You often say that it complies with state IOE laws at

13         the request of the master service -- MSR holder,

14         right?

15   A.    That is correct.

16   Q.    And all the MSR holders now require it to comply with

17         state IOE laws, right?

18   A.    To the best of my knowledge, correct.

19   Q.    Okay.  And it represents to the state IOE -- to the

20         MSR holders that it has the capacity to perform that

21         role on their behalf, correct?

22   A.    Yes.

23   Q.    And it does have the capacity to perform that role on

24         their behalf, correct?

25   A.    Yes.

1    Q.   And it does perform that role on their behalf,

2         correct?

3    A.   Yes.

4    Q.   And are there elements of compliance that it does not

5         perform on behalf of the MSR holder?

6              MR. MARIENTHAL:  Object to form.

7              THE WITNESS:  Not to my knowledge.

8              However, based on us being federally

9              exempt, we do not specifically know to the

10             level of scrutiny that our compliance

11             would perform for our asset.  There is a

12             responsibility by the master servicer to

13             perform a level of due diligence and audit

14             to ensure that we, their subservicer,

15             their vendor, are performing adequately.

16             Whereas if we were to service the loan

17             ourselves, meaning we own the MSR, that

18             level of review may potentially be

19             increased comparatively to what's provided

20             today for the cost that's been negotiated

21             with the current client.

22   BY MR. FREDMAN:

23   Q.   What compliance functions do you -- does Flagstar

24        require MSR holders to perform when Flagstar

25        subservices the loan?  And when I say compliance

1    A.    None that I've seen.

2    Q.    Are you aware of any analysis by Flagstar regarding

3          the consequences of being required to comply with

4          California State IOE law?

5    A.    Personally, I am unaware.

6    Q.    All right.  Are you aware that any has -- that any

7          such analysis has occurred anywhere in the

8          organization?

9    A.    I am not aware.

10   Q.    Okay.  You talked about compliance costs generally.

11         You tried to identify some compliance costs.  Has

12         there been any studies or analysis trying to assess

13         the marginal compliance costs that Flagstar would

14         incur if it were required to comply with California

15         State IOE law with respect to its MSR owned

16         portfolio?

17   A.    None that I'm aware.

18   Q.    So at this time, are you saying there is a material

19         risk to Flagstar's business that would result from

20         being required to comply with California State IOE

21         law?

22              MR. MARIENTHAL:  Asked and answered.

23              THE WITNESS:  I believe I said

24         potentially.  Yes.

25

1   BY MR. FREDMAN:

2   Q.   Potentially.  But potentially means it's a

3        possibility, right?

4                 MR. MARIENTHAL:  Object to form.

5                 THE WITNESS:  That is correct.  As it

6           has not happened yet, it cannot be

7           definitively measured.

8   BY MR. FREDMAN:

9   Q.   Do you have any other evidence -- I mean, you can say

10       it might happen, it might not happen.  Do you have

11       any evidence that brings that out of the realm of

12       conjecture, speculation?

13  A.   I can go based off of my experience having worked in

14       nonbank entities that are required to adhere to state

15       regulatory requirements and the amount of work,

16       maintenance, and upkeep that's necessary to adhere to

17       those, as well as to execute against from a

18       maintenance standpoint.  I can only bring my

19       experience to bear in saying that I believe that it

20       would potentially increase the risk and/or cost of

21       Flagstar if we were not to be able to -- allowed to

22       continue to fall under a federal exemption.

23  Q.   Has Flagstar conducted any analysis or studies of the

24       compliance cost it currently incurs with respect to

25       the loans that it subservices on behalf of

 1       third-party MSR holders?

 2   A.   None that I have seen.

 3   Q.   Have you -- did you attempt to analyze that for

 4        purposes of this declaration?

 5   A.   Did I attempt to analyze what?

 6   Q.   The cost, the compliance costs that Flagstar

 7        currently incurs with respect to complying with state

 8        IOE laws for the -- for the subservicing portfolio.

 9             MR. MARIENTHAL:  Object to form.

10             THE WITNESS:  The specific cost, no.

11   BY MR. FREDMAN:

12   Q.   Have you done any analysis of that?

13   A.   Any analysis of what specifically?

14   Q.   The cost -- Flagstar's cost of complying with state

15        IOE laws for its subservicing portfolio.

16   A.   I have not, no.

17   Q.   Are you aware of any that's been conducted at all?

18   A.   I have not seen.

19   Q.   Has anybody -- other than your own statements, has

20        anybody within Flagstar told you that being required

21        to comply with state IOE laws would present a

22        material risk to Flagstar's business or operations?

23             MR. MARIENTHAL:  Other than your

24          discussions with counsel.

25             THE WITNESS:  Not that I can recall.

Page 56

```
 1   BY MR. FREDMAN:
 2   Q.   Are you relying -- have you heard any -- other than
 3        advice of counsel, have you heard any executive at
 4        Flagstar say that?
 5   A.   Not that I can recall.
 6   Q.   Given your role at Flagstar, would you be aware if
 7        this litigation were considered a material risk to
 8        Flagstar's business or operations?
 9             MR. MARIENTHAL:  Object to form.
10             THE WITNESS:  I'm not sure I can
11          answer that.
12   BY MR. FREDMAN:
13   Q.   You don't know if you would be aware or not?
14   A.   I do not know.
15   Q.   It could be above your pay grade?  It could be
16        something you're aware of?
17   A.   I don't know what I don't know.
18   Q.   Okay.  What executive at Flagstar would be able to
19        say if Flagstar considered this litigation or the
20        prospect of having to pay IOE on California mortgages
21        a material risk to Flagstar's banking business or
22        operation?
23   A.   I would suspect that it would be our executive team,
24        which is a matter of public record, which would
25        include but not limited to our CEO and our COO.
```

```
 1   Q.   And --
 2   A.   That is my opinion.
 3   Q.   That's your personal opinion?
 4   A.   Yes, sir.
 5   Q.   You're not -- you're not claiming to speak for
 6        Flagstar?
 7   A.   I am not a corporate witness.
 8   Q.   Okay.  And that's throughout this deposition.  You're
 9        not the corporate witness?
10   A.   That's correct.
11   Q.   Okay.  What I'm trying to -- these are very general
12        statements.  I'm trying to siphon out what
13        specifically you're saying.
14   A.   Sure.
15   Q.   I understand that in the retail channel and in the
16        correspondent channel, Flagstar offers better pricing
17        for a loan that's originated with an escrow account
18        versus one that's not.  Is that the basis for this
19        statement in paragraph 16?
20   A.   Part of, yes.
21   Q.   Okay.  And are you able -- what's the basis for
22        you're saying it offers the better pricing based on
23        risk mitigation as opposed to the profit benefits
24        that Flagstar derives from escrow accounts?
25   A.   It would be both, and that is based off of my
```

```
 1            servicers, either through direct
 2            passthroughs or through the negotiation of
 3            the overall contract for pricing
 4            structure, I would say that Flagstar is
 5            less affected by those relationships
 6            comparatively as it would be for
 7            maintenancing its relatively small MSR
 8            portfolio internally.
 9   BY MR. FREDMAN:
10   Q.   What about the MSR holders?  Are they -- the
11        third-party MSR holders.  Are they encouraging
12        Flagstar to stop maintaining escrows for the loans?
13   A.   No.  Not at this point.
14   Q.   Are they small entities or large entities?
15   A.   Most of our clients are fairly large.
16   Q.   What are your clients?
17   A.   Pardon?
18   Q.   What are they?
19   A.   They are anything ranging from MSR hedge funds
20        through other mortgage organizations.
21   Q.   You're saying they're bigger than Flagstar?
22   A.   From an MSR holding standpoint, yes.
23   Q.   From a capital standpoint?
24   A.   So one of the things that we need to be cognizant of
25        is that based on Tier 1 capital, Flagstar can only
```

```
 1   Q.   Okay.  So how does Flagstar calculate the borrower's
 2        relative risk in relation to an escrow account?
 3   A.   Pursuant to investor guidelines.
 4   Q.   In Flagstar originations, retail originations?
 5   A.   Yes.  So, again, if the borrower is applying for a
 6        conventional loan or if the borrower is applying for
 7        an FHA loan, various loans have different
 8        underwriting criteria.  Borrowers may or may not
 9        qualify based on that underwriting for a different
10        loan product.
11   Q.   Are you saying anything more than having an escrow
12        account is a good thing?
13             MR. MARIENTHAL:  Object to form.
14             THE WITNESS:  I am saying that having
15          an escrow account and the ability to
16          service that escrow account is less risk
17          than having a loan that is not escrowed.
18   BY MR. FREDMAN:
19   Q.   Are you saying anything more than that?
20   A.   No.
21   Q.   Looking at paragraph 18 -- it's a big statement.  So
22        let's -- I'll read through it, and we can unpack it.
23             Without the ability to create an escrow
24        account on any particular loan or in the event escrow
25        accounts become more costly to provide to a borrower,
```

Page 114

1     Flagstar may be forced to charge higher interest

2     rates, assess larger origination fees, or loan less

3     money to mitigate additional risk of loss, and it

4     would severely inhibit Flagstar's desire to

5     participate in originating agency loans, as such

6     loans -- such agency loans have stringent escrow

7     requirements.

8            First of all, you used the term may in the

9     first part of it.  Flagstar may be forced.  Are you

10    offering a specific opinion there, or just saying

11    that's something that might possibly happen?

12           MR. MARIENTHAL:  Object to form.

13           THE WITNESS:  As it has not happened,

14        so we can definitively say whether

15        something would or would not happen, it is

16        speculation on my part based on what a

17        potential could be.

18   BY MR. FREDMAN:

19   Q.   That's all it is?

20   A.   Yes, sir.

21   Q.   Okay.  And does that may apply to the second part

22     where it says it would severely inhibit Flagstar's

23     desire?

24   A.   Yes.

25   Q.   Okay.  So that's, again, speculation on your part

1    about what a potential impact could be?

2  A.   Correct.

3  Q.   Okay.  Have you done any analysis, or are you aware

4       of any analysis that supports the statement in

5       paragraph 18?

6            MR. MARIENTHAL:  Object to form.

7            THE WITNESS:  No.

8  BY MR. FREDMAN:

9  Q.   Do you have any reason to believe that requiring

10      Flagstar to comply with California State IOE law

11      would result in Flagstar's inability to create escrow

12      accounts?

13            MR. MARIENTHAL:  Object to form.

14            THE WITNESS:  I believe that it is a

15       possibility.

16  BY MR. FREDMAN:

17  Q.   Are you able to say anything more than that?

18  A.   I'm not able to say whether it is definitive or not,

19      as it hasn't happened.

20  Q.   Okay.  Are you -- the possibility -- it might happen,

21      it might not happen, right?

22  A.   That is true.

23  Q.   In paragraph 19 -- again, I'll read it to you.

24            In other words, without the risk mitigation

25      protections offered by an escrow account, Flagstar

1          may be forced to either, one, increase the interest

2          rate associated with the loan, two, charge greater

3          loan origination fees, three, lend a smaller sum of

4          money of funds, or four, refrain from making the

5          mortgage loan.  You wrote that, right?

6     A.   It was a collaborative effort in which I was a part

7          of.  Yes.

8     Q.   Okay.  And the term you all used was may again.

9     A.   Yes.

10    Q.   And, again, you're speculating on something that

11         might occur?

12    A.   Possibility that could happen.  Yes.

13    Q.   Anything more than that?

14    A.   No.

15    Q.   Have you done any -- have you done any or are you

16         aware of any studies or analysis that support this

17         likelihood of this possibility?

18              MR. MARIENTHAL:  Object to the form.

19              THE WITNESS:  This is the same of the

20            previous possibility that you asked that.

21            So no.

22    BY MR. FREDMAN:

23    Q.   Okay.  Thank you.  I'll read you paragraph 20.

24              Due to Flagstar's relatively small size in

25         the mortgage origination industry, any increase in

1        interest rates, increase in fees, or reduced loan

2        amounts could significantly impact Flagstar's ability

3        to offer and/or service competitive mortgage loan

4        products.  You wrote that, right?

5  A.   Collaborative effort.  Yes.  I was part of writing

6        it.

7  Q.   Collaborative effort with your attorneys?

8  A.   Yes.

9  Q.   And, again, the term you all settled on was could,

10       right?

11  A.   Yes.

12  Q.   Again, you're referring to a speculative possibility?

13  A.   That is correct.

14  Q.   Okay.  I'm trying to understand how the potential for

15       compliance for Flagstar in its servicing operation to

16       be required to comply with state escrow interest laws

17       would impact loan origination at all.

18           Is it your position that requiring Flagstar

19       to comply with state escrow interest laws and

20       California State IOE law in particular would affect

21       Flagstar's origination business?

22  A.   What I am saying is that as with any product that is

23       offered, there is a cost that's associated with that

24       product.  There's also a gain that's associated with

25       that product.  If the cost is increased as such as

Page 122

1      State IOE law.  You don't have to agree with that.

2                  But assuming that's true, is it fair to --

3      for Flagstar not to comply with California State IOE

4      law?

5                  MR. MARIENTHAL:  Object to form.

6                  THE WITNESS:  I can't base my

7            decision to your assumption that -- the

8            question that you posed, I can't base my

9            decision on what everybody else is doing.

10           Just because other participants are doing

11           it doesn't necessarily mean it's correct

12           or the correct interpretation of the law.

13     BY MR. FREDMAN:

14     Q.   Assuming it's true what I said, that all the other

15          market competitors are doing it at this time, does it

16          give Flagstar a unique competitive advantage to not

17          comply with state IOE laws?

18                  MR. MARIENTHAL:  Object to form.

19                  THE WITNESS:  I'm not comfortable

20           with answering that.  It's too speculative

21           in nature.

22     BY MR. FREDMAN:

23     Q.   In paragraph 21 you say, if a mortgage loan did not

24          have an escrow account, Flagstar may likely

25          seek/require a premium for the loan to the

```
1        unmitigated risk of loss.  And, again, you use the
2        word may.
3   A.   Yes.
4   Q.   Is this, again, speculation?
5   A.   It is.
6   Q.   Thank you.
7   A.   It is a possibility that could exist.
8   Q.   Do you agree that's speculation?
9   A.   Yes.
10  Q.   That's all you're trying to do right there?
11            THE WITNESS:  Yes.
12            MR. MARIENTHAL:  Object to form.
13         Asked and answered.
14  BY MR. FREDMAN:
15  Q.   Looking at paragraph 22 -- I'll read the whole thing.
16       However, if a mortgage loan already had an escrow
17       account created at loan origination, Flagstar relies
18       on this risk mitigation protection to assess the
19       borrower's mitigated risk level.  If the maintenance
20       of the escrow account would now impose a further cost
21       on Flagstar due to the payment of interest, Flagstar
22       may be forced to seek an additional premium that was
23       neither calculated or assessed at loan origination to
24       compensate for those additions costs.
25            You wrote that, correct?
```

```
 1   A.   In part from a collaborative effort with counsel.
 2        Yes.
 3   Q.   And in the second paragraph, you use, again, the
 4        word -- the second sentence of the paragraph, again,
 5        you use the word may.
 6   A.   Yes.
 7   Q.   And, again, that means that your -- this is
 8        speculation or conjecture about something that might
 9        happen?
10   A.   Correct.
11   Q.   And what you're -- what you're saying in the second
12        sentence is -- boils down to if Flagstar had to pay
13        the cost of paying interest on escrow, then it
14        would -- might be forced to make up that cost through
15        seeking additional revenues, right?
16   A.   That is correct.  And that could also mean
17        approaching agencies to say that we ultimately as a
18        servicer need to get paid more.
19   Q.   Due to --
20   A.   To offset.
21   Q.   Do agencies differentiate what they pay servicers?  I
22        mean, agencies take loans from all different banks --
23   A.   It depends on the deal.  Yeah.  It differs based on
24        the deal, the investor, the type of loan, etcetera,
25        etcetera, etcetera.
```

```
1    Q.   Do you think that the agencies are currently
2         compensating Flagstar less for servicing or
3         subservicing because they know that Flagstar doesn't
4         comply with state IOE laws?
5                   MR. MARIENTHAL:  Object to form.
6                   THE WITNESS:  No.
7    BY MR. FREDMAN:
8    Q.   To your knowledge, is compliance with state IOE law a
9         factor in pricing of what agencies pay for loans or
10        for servicing loans?
11                  MR. MARIENTHAL:  Object to form.
12                  THE WITNESS:  To my knowledge, no.
13   BY MR. FREDMAN:
14   Q.   Paragraph 23.  Flagstar has contractural
15        relationships with clients who are owners of mortgage
16        servicing rights, MSRs, where Flagstar is the
17        subservicer of a mortgage loan owned by a third-party
18        MSR owner.  When Flagstar enters these contractural
19        relationships, the costs and risks associated with
20        maintaining an escrow account for a borrower are
21        priced into the terms of the contractural agreement.
22                  You wrote that in collaboration with
23        counsel, right?
24   A.   Yes, sir.
25   Q.   And Flagstar currently pays or complies with state
```

```
 1        IOE laws with respect to the loans described in this

 2        paragraph, right?

 3   A.   Yes, sir.

 4   Q.   Are you simply trying to convey that the compliance

 5        costs, including the IOE cost, are baked into the

 6        contract?

 7   A.   That is correct.

 8   Q.   So then the next paragraph says, any increase in the

 9        risk portfolio in the underlying loans or an increase

10        of the servicing and maintenance of the loans and

11        escrow accounts could cause Flagstar to seek further

12        compensation in premiums from its subservicing

13        clients.  You wrote that in collaboration with

14        counsel, right?

15   A.   I did.

16   Q.   If Flagstar's already complying with state IOE laws

17        with respect to these loans and it's already baked

18        that compliance into its contractual relationships

19        with these subservicing clients, what are you saying

20        in this paragraph?

21   A.   That overall as a servicer, subservicer, if there is

22        a loss of income in a certain segment, we would have

23        to try to make that up in another segment.  So

24        theoretically speaking, if we had to increase fees

25        for our subservicing because we weren't able to hold
```

```
 1        as many MSRs or we weren't, you know -- or the cost
 2        to service those MSRs lowered our overall profit
 3        margin, we may have to increase contractural fees
 4        with those subservicing clients.
 5    Q.  Okay.  That's the intent.  The intent is to say if we
 6        lose money on MSR because we're complying with state
 7        IOE laws with respect to owned MSRs, then we might
 8        have to try and increase prices in our other business
 9        lines.
10    A.  Yes.
11    Q.  And I'm trying to understand the point of that
12        relative to the overall -- what we're talking about
13        here.
14                So you're saying a risk of requiring
15        Flagstar to comply with state IOE laws with respect
16        to its MSR -- its own MSRs is that it would not make
17        as much money on its own MSRs, right?
18    A.  The cost would raise.  And based on that analysis,
19        there may have to be adjustments in other areas of
20        the structure in order to continually maintain.
21    Q.  So the costs would raise and, therefore, the profits
22        would decline on the MSR -- owned MSR side of the
23        business?
24    A.  Uh-huh.  Which ultimately would decrease in the
25        offerings that we make to the people that in turn
```

1    much from those subservicing clients, per se, because

2    we're no longer selling the MSRs to them.  It's a

3    full circle.

4              So the potentiality with any business.  If

5    one segment of the business is no longer profitable,

6    you may have to increase overall cost or fees with

7    remaining segments.  But again --

8  Q.  Okay.  Okay.  Looking at paragraph 24, each sentence

9      includes the word could.

10 A.  Sure.

11 Q.  And you put that word in there to note that it's

12     speculation about something that could happen?

13 A.  That's correct.

14 Q.  Okay.  So given that I'm not sure how much we need to

15     get into the logic behind it -- but I do want to

16     understand it, so I'm asking you to let me try and

17     dish it out piece by piece.

18 A.  Sure.

19 Q.  If Flagstar is required to comply with state IOE laws

20     with respect to its owned MSR portfolio, its costs

21     will go up for that portfolio and, therefore, its

22     profits will go down for that portfolio, right?

23     That's part of what -- that's the basis of what

24     you're saying in this?

25 A.  Or it may inhibit the number of loans.  Because if we

1              MR. MARIENTHAL:  Object to form.

2              THE WITNESS:  I do not believe so.

3    BY MR. FREDMAN:

4    Q.   It does the same thing for each subservicing client?

5    A.   I believe that there are certain points of

6         commonality.  There may be some things that each

7         master servicer may request to be performed

8         differently.  What those are, I cannot attest to at

9         this time.

10   Q.   You said there may be.  Are you, again, just

11        speculating about something that's possible?

12   A.   No.  I know that there have been special projects

13        that have been requested by master servicers, such as

14        delivery of particular statements or things of that

15        nature that may not have been requested by all of

16        them.  So --

17   Q.   In terms of the function of accounting for and

18        paying, crediting or paying state IOE -- in terms of

19        the function of crediting or paying IOE in compliance

20        with state laws, is there any difference in how

21        Flagstar performs those functions between the various

22        subservicer clients it has at this time?

23   A.   Not to my knowledge, no.

24   Q.   So this paragraph 25 says that Flagstar would be

25        faced with increased transaction and compliance costs

1       associated with -- I'm going to break it down --

2       originating a loan.  What would be those increased

3       compliance -- transaction and compliance costs of

4       originating a loan that would result from the finding

5       that it's not exempt from state escrow interest laws?

6    A.  If I may, I might be able to simplify.  What that is

7       entailing is the entire loan manufacturing process.

8       We look at the profitability model of a loan

9       manufacturing process as a whole.  So if the overall

10      profitability model of the loan manufacturing process

11      is less comparatively to what it is today, then

12      that's something that potentially we would have to

13      evaluate and ultimately say what are the areas that

14      are profitable, what do we wish to continue with,

15      what do we wish to not continue with.  You know,

16      there may be an area that it's reduced profitability,

17      so we have to try to make it up over here by doing

18      that.  It may make us less competitive.

19              Again, from a speculation standpoint, this

20      is something that from an entire loan manufacturing

21      process, if you increase the cost that's associated

22      with it, the entire thing would have to be evaluated,

23      and potentially the entire piece of it could be

24      affected because this is based on a current model

25      that we use.  And if you disrupt any segment of that

1       model, you're going to have to analyze the whole

2       model to say what are the things that are still

3       profitable, what are the things that may be less

4       profitable if not profitable at all, and reevaluate

5       the entire thing.  So that's what we're looking at is

6       the entire loan manufacturing process.  At the end of

7       the day, it could be less profitable based on us --

8       if we were not able to adhere to the federal

9       preemption.

10  Q.  Is that -- what you've just said, is that your

11      explanation of paragraph 25 of your declaration?

12  A.  Originating, purchasing, selling, and servicing, yes.

13      That is the lifecycle or manufacturing cycle, if you

14      will, of a loan.

15  Q.  So is there any point in me asking you about the

16      increased transaction and compliance cost associated

17      with each of those elements?

18  A.  No.

19              MR. MARIENTHAL:  Object to form to

20          that last question.

21              MR. FREDMAN:  Okay.  You want me to

22          reask it?

23              MR. MARIENTHAL:  No.  It's not a

24          question for him to answer.

25

 1   BY MR. FREDMAN:

 2   Q.   So I'm going to ask you item by item.  Other than

 3        what you've said already, you do not need to repeat

 4        what you said, but what would be the increased

 5        transaction and compliance costs associated with

 6        originating a loan under that scenario described in

 7        the first sentence of paragraph 25?

 8                  MR. MARIENTHAL:  Object to form.

 9             Asked and answered.

10                  THE WITNESS:  The purpose of 25 was

11             not to parse each individual but, again,

12             the loan manufacturing process as a whole.

13             So I would not be able to speak to

14             individual percentages of what would

15             specifically happen with originations,

16             what would specifically happen with

17             purchasing.  It's all encompassing.  It is

18             the loan manufacturing process.

19   BY MR. FREDMAN:

20   Q.   Well, you could speak with respect to servicing

21        because you -- the increased costs would be paying

22        the IOE, right?

23   A.   That would be a piece of it.  Yes.  But just as with

24        purchasing, it would also possibly lower the overall

25        profitability margin and what we're able to sell the

```
 1    A.   I believe it's 18 to 20, somewhere around there.

 2    Q.   You sure?

 3    A.   No, I'm not.

 4    Q.   Okay.  So when you say compliance with each

 5         respective state law, in this scenario you'd only

 6         have to comply, ensure compliance with the state law

 7         in states that have IOE laws, right?

 8    A.   That have IOE requirements.  Right.

 9    Q.   And you don't know how many states that is?

10    A.   No.  I have a matrix back on my desk I could refer

11         to.  But to be able to speak from memory, no.

12    Q.   Is this statement based on any studies or analysis

13         that Flagstar has done about --

14    A.   Just my personal experience.

15    Q.   Okay.  Paragraph 30.  All the way down to paragraph

16         30.  Paragraph 26 through 29 are just your sort of

17         recitation of the content of Mr. Kivett's loan file,

18         right?

19    A.   Yes, sir.

20    Q.   In Paragraph 29, you say that the interest -- his

21         interest rate was 3.649 percent, correct?

22    A.   That's correct.

23    Q.   And you determined that by looking at the loan file?

24    A.   I did.

25    Q.   And then in paragraph 30 you say that if plaintiff
```

```
1         did not obtain an escrow account with respect to his
2         loan, Flagstar may have, one, increased Plaintiff's
3         interest rate to an amount greater than 3.649
4         percent, two, charge Plaintiff a higher origination
5         fee to attempt to offset the risk of loss, or, three,
6         decided not to offer Plaintiff the $400,610 mortgage
7         loan.  You wrote that in conjunction with counsel?
8    A.   I did.
9    Q.   And you used the word may, again, to denote that it's
10        speculation about something that might have happened?
11   A.   Correct.
12   Q.   You have no way of actually knowing -- you have no
13        opinion about what likely would have happened,
14        correct?
15              MR. MARIENTHAL:  Object to form.
16              THE WITNESS:  I have no opinion -- I
17         have no opinion as to what likely could
18         have happened?
19   BY MR. FREDMAN:
20   Q.   No.  Never mind.  I'll drop that.
21              The fact that you used the word may denotes
22        that it's speculation about one possibility.
23   A.   Agree.  It is a possibility.  Those are all
24        possibilities.  Yes.
25   Q.   Is there any documentation in Mr. Kivett's loan file
```

```
 1   A.   No.

 2   Q.   No.  You disagree with me?

 3   A.   No.  No.  I agree with you.  From a qualification

 4        perspective, no.  But it may be a -- let me

 5        rephrase.

 6             It may be a requirement of a particular

 7        loan product for them to have an escrow account, such

 8        as the loan product he entered into.

 9   Q.   Right.  But with respect to other loan products he

10        might have entered into if he didn't want an escrow

11        account, that's just speculating about things that

12        might have happened?

13   A.   Absolutely.  Yes.

14             MR. FREDMAN:  We're very close to

15        being done here.

16             MR. MARIENTHAL:  Can we go off for a

17        second?

18        (Recess taken.)

19             MR. FREDMAN:  Back on the record.

20   BY MR. FREDMAN:

21   Q.   Do you have any reason to believe that an adverse

22        result in this litigation, meaning that Flagstar had

23        to fully comply with California State IOE law, would

24        result in Flagstar ceasing to create escrow

25        accounts?
```

```
 1              MR. MARIENTHAL:  Object to form.
 2              THE WITNESS:  I believe, as I've
 3         stated in the declaration, I said that it
 4         is a possibility.
 5   BY MR. FREDMAN:
 6   Q.   Well, do you have any reason to believe that it's
 7        likely?
 8   A.   I'm not comfortable in answering that question.
 9   Q.   Do you have any reason to believe that it's
10        likely?
11   A.   I believe that it is a possibility.  Whether it's
12        likely or not, I haven't seen analysis to determine
13        one way or another.
14   Q.   All right.  Stepping back for a second.  You're a
15        mortgage industry professional?
16   A.   Sure.
17   Q.   And I've represented to you that there's lots of --
18        you know, that nonbanks have never complained with --
19        have always complied with state IOE laws and created
20        escrows, right?
21   A.   Uh-huh.
22   Q.   And I'm telling you that all the other banks in
23        California now comply with state IOE laws.  You don't
24        have to believe me, but I'm probably not lying to
25        you.
```

Page 150

1              Do you really think it's realistic to say

2        that Flagstar would cease creating escrow accounts

3        with mortgages because it has to comply with the

4        state IOE law under the circumstances?

5                  MR. MARIENTHAL:  Object to form.

6              Asked and answered.

7    BY MR. FREDMAN:

8    Q.   Even if speculation.

9    A.   I genuinely can't answer that, as I am not the one

10        that makes the decisions as to whether we move

11        forward with a particular business practice or not,

12        based on profitability analysis.

13   Q.   Okay.  Do you have any reason to believe that an

14        adverse result in this litigation, meaning that

15        Flagstar had to comply with California State IOE law,

16        would likely result in any impact to Flagstar's loan

17        origination business?

18                  MR. MARIENTHAL:  Object to form.

19                  THE WITNESS:  I would use my previous

20            answer.  I'm not comfortable in asking

21            that, as I'm not the one who -- who would

22            ultimately make those decisions.

23   BY MR. FREDMAN:

24   Q.   You don't know?

25   A.   I don't know.

1  Q.   Do you have any reason to believe that an adverse

2       result in this litigation, meaning that Flagstar had

3       to fully comply with California IOE law, would likely

4       result in any impact to Flagstar's loan servicing

5       business beyond the expense of paying IOE to the

6       extent it does not already?

7                 MR. MARIENTHAL:  Object to form.

8                 THE WITNESS:  I don't know.

9  BY MR. FREDMAN:

10  Q.   Do you have any reason to believe that the cost to

11       Flagstar of paying IOE to the extent it does not

12       already would materially interfere with Flagstar's

13       ability to engage in loan servicing?

14                 MR. MARIENTHAL:  Object to form.

15                 THE WITNESS:  I don't know.

16                 MR. FREDMAN:  Okay.  I'm going to get

17            you out of here.  Give me two minutes.

18                 MR. MARIENTHAL:  Sure.

19                 (Recess taken.)

20  BY MR. FREDMAN:

21  Q.   Last question.  Would you -- would you agree that

22       your -- the content of your declaration, substantive

23       content of your declaration is based on the

24       specialized knowledge you obtained through your

25       experience in the mortgage industry?

```
                                                      Page 152

1    A.   Yes, sir.

2    Q.   Okay.  All right.  I have no further questions.

3                    MR. MARIENTHAL:  Thank you.

4                    (Deposition concluded at 4:35 p.m.)

5                              *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1
2
3
4
5
6            UNITED STATES DISTRICT COURT
7
8            NORTHERN DISTRICT OF CALIFORNIA
9
10   WILLIAM KIVETT and BERNARD and
     LISA BRAVO, individually, and on behalf
11   of others similarly situated,                 No.  C 18-05131 WHA
12              Plaintiffs,
13         v.                                        **AMENDED CASE MANAGEMENT
                                                     SCHEDULING ORDER**
14   FLAGSTAR BANK, FSB, a federal savings
     bank, and DOES 1-100, inclusive,
15
16              Defendants.
     _____
17
18        A prior order (Dkt. No. 129) addressed plaintiffs' administrative motion to enlarge time

19   and extend deadlines (Dkt. No. 127), but left open the scheduling and discovery issues pending

20   receipt of supplemental briefing and the parties' proposed class notice and plan of distribution

21   (Dkt. Nos. 132, 138–40).  This order rules as follows:

22   1.   The Court has received the parties' stipulation for class notice and will approve it

23        separately.  By **JANUARY 9, 2020**, Flagstar shall provide the notice administrator

24        with contact information for all class members, as the parties stipulated to (Dkt.

25        No. 137 ¶ 3).  Notice shall be distributed to the class by **JANUARY 16, 2020**, as

26        stipulated (Dkt. No. 137 ¶ 5).  Class members will have until *either* March 2, 2020,

27        *or* 45 days from the member's receipt of the notice, whichever is later, to opt out of

28        the class.

United States District Court
Northern District of California

2. Both parties' summary judgment motions (Dkt. Nos. 122, 125) shall be heard on **JANUARY 30, 2020**, at **8:00 A.M.** Flagstar has agreed to produce its employees, Courtney Chang and Sean Mansell, for deposition. Flagstar shall ensure that these depositions are conducted no later than **JANUARY 20, 2020**, unless plaintiffs agree to a later date. Plaintiffs may submit a supplemental brief no longer than six pages by **JANUARY 24, 2020**, at **NOON**, addressing information gleaned from these depositions only. Plaintiffs' request for permission to retain an expert to address Flagstar's preemption defense is **DENIED**. Flagstar's list of issues regarding expert testimony, served on plaintiffs on September 27, 2019, sufficiently disclosed that Flagstar intended to offer expert testimony on the "economic impact of variable state laws and regulatory schemes." This order reserves the decision on whether or not to strike the Chang and Mansell declarations until after oral argument is heard on the motions.

3. The final pretrial conference shall be held on **MARCH 4, 2020**, at **2:00 P.M.**

4. The trial date will be set in March, April, or May, after the final pretrial conference in early March.

No more continuances will be allowed.

**IT IS SO ORDERED.**

Dated: January 6, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

1  Thomas E. Loeser (SBN 202724)
   **HAGENS BERMAN SOBOL SHAPIRO LLP**
2  1301 Second Avenue, Suite 2000
   Seattle, WA 98101
3  Tel: (206) 623-7292
   toml@hbsslaw.com
4
   Peter B. Fredman (SBN 189097)
5  **LAW OFFICE OF PETER FREDMAN PC**
   2550 Ninth Street. Suite 111 (South Hall)
6  Berkeley, CA 94710
   Tel: (510) 868-2626
7  peter@peterfredmanlaw.com

8  *Attorneys for Plaintiffs WILLIAM KIVETT and*
   *BERNARD and LISA BRAVO, on behalf of themselves*
9  *and the certified Class*

10

11

12                  UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                    SAN FRANCISCO DIVISION

15  WILLIAM KIVETT and BERNARD and LISA       No. 3:18-CV-05131-WHA (DMR)
    BRAVO, individually, and on behalf of others
16  similarly situated,                        **DECLARATION OF PETER FREDMAN**
                                               **IN SUPPORT OF PLAINTIFFS'**
17                Plaintiffs,                   **OPPOSITION TO DEFENDANT**
                                               **FLAGSTAR BANK, FSB'S MOTION**
18       vs.                                   **FOR SUMMARY JUDGMENT**

19  FLAGSTAR BANK, FSB, a federal savings bank,
    and DOES 1-100, inclusive,                 CLASS ACTION
20
                  Defendant.                   Hearing Date:  TBD[1]
21                                             Time:          8:00 a.m.
                                               Courtroom:     12, 19th Floor
22
                                               Complaint Filed: August 22, 2018
23                                             FAC Filed: October 19, 2018

24                                             Honorable Judge William Alsup
25

26
   ─────────────────────
27      [1] The hearing was initially scheduled for January 9, 2020, a date the Court was unavailable. The
   Court's Amended Case Management Order and Order on Plaintiffs' Motion to Enlarge Time and
28 Extend Deadlines does not specify a hearing date for this motion. *See* Dkt. No. 129.

I, Peter Fredman, do hereby declare as follows:

1.      I am an attorney duly licensed to practice before all courts of the States of California and before this Court.  I am co-counsel of record for Plaintiffs William Kivett, Lisa and Bernard Bravo (the "Bravos"), and the certified Class (collectively "Plaintiffs") in the above-entitled action.  I have personal knowledge of the matters stated herein and, if called to testify, I could and would competently testify thereto.

2.       I submit this declaration in support of Plaintiffs' Opposition to Defendant Flagstar Bank, FSB's Motion For Summary Judgment ("MSJ") by Defendant Flagstar Bank, FSB ("Flagstar") in this action.

3.      In support of its MSJ, Flagstar relies exclusively on the declarations of two previously undisclosed employee witnesses, Sean Mansell and Courtney Chang, in support of its assertion of the existence of undisputed material facts proving its preemption defense. *See* Dkt. Nos. 125, 125-1, 125-2. As these witnesses are being offered as having information supporting Flagstar's affirmative defense of preemption, Flagstar was plainly obliged to timely disclose them under Rule 26 and related scheduling and standing orders as detailed in the memorandum herewith.

4.      Flagstar failed to disclose these declarants as witnesses, or to disclose any such witnesses, in any of its Rule 26 disclosures, or otherwise, prior to filing its MSJ on December 5, 2016. Eleven days after filing the MSJ, on December 16, 2019, Flagstar served a supplemental Rule 26 disclosure belatedly identifying these declarants as fact witnesses. This was only after Plaintiffs had filed an administrative motion seeking relief for the non-disclosure on December 12, 2019.

5.      This was the second (and third) instance where Flagstar failed to disclose an employee witness before filing that witness's declaration in support of important briefing. In support of its opposition to the motion for class certification, on August 22, 2019, Flagstar filed the declaration of previously disclosed Flagstar Vice President, Mark Albers. Plaintiffs were forced to obtain an extension of their reply deadline in order to obtain his deposition and incorporate it into their reply briefing. *See* Dkt. Nos. 86, 88. This reduced the Court's time to consider the papers in advance of the hearing on class certification by two weeks. *See id.*

DECL. OF PETER FREDMAN ISO PLTFS'
OPP'N TO DEF'S MSJ
Case No.: 3:18-cv-05131-WHA (DMR)          **SER-97**

6. If Flagstar had timely disclosed the declarants, then Plaintiffs would have taken their depositions, of course, and used the transcripts in opposition to Flagstar's MSJ. Flagstar denied Plaintiffs that opportunity, however, by failing disclose these witnesses prior to filing its MSJ or the close of discovery.

7. If Flagstar had timely disclosed these witnesses, or the defense theory (regarding the alleged interference impact on Flagstar resulting from compliance with section 2954.8) that these witnesses were tasked with affirming, Plaintiffs would also have retained an expert to provide testimony evidencing the fact that all banks and non-bank mortgage servicers (except Flagstar with respect to its portfolio of loans where it owns the mortgage servicing rights ("MSR")) now routinely comply with section 2954.8(a) of the California Civil Code ("section 2954.8") with respect to all loans originated after the Dodd-Frank enactment date of July 21, 2010. Because Flagstar only disclosed these witnesses after the close of discovery, however, Plaintiffs are here forced to rely on the undersigned's declaration as to this fact.

8. Specifically, since the inception of this case, the undersigned has investigated compliance with section 2954.8 among bank and non-bank mortgage servicers, including (a) tracking of *Lusnak* and the cases that followed *Lusnak* decision, (b) discussions with the plaintiffs' attorneys in those cases, and (c) review of the mortgage servicing practices of bank and other non-bank servicers through online research, review of client's and potential client's mortgage documents, consultation with other attorneys in this practice area, and the like. Based on these investigations, it is my knowledge and opinion that all banks and non-bank mortgage servicers now routinely comply with section 2954.8 with respect to loans originated after the Dodd-Frank enactment date of July 21, 2010. The basis for this knowledge and opinion includes the following:

    a. **Bank of America** (the *Lusnak* defendant) voluntarily began complying with section 2954.8 in 2019 in response to the Ninth Circuit ruling in *Lusnak*. *See Lusnak*, Case No. 2:14-cv-01855-GW-GJS, Dkt. No. 112-1 (12/27/2019), Class Action Settlement Agreement And Release, Recitals, ¶ 5. It also agreed to pay $35 million to settle past section 2954.8 liabilities. *See id.,* ¶ 3.2.

1  b. **Wells Fargo** has routinely complied with section 2954.8 for quite some time. Indeed, the

2  *Lusnak* plaintiffs alleged this fact as evidence refuting the existence of "significant

3  interference" in that case since at least 2014. Wells Fargo's website currently states: "We

4  pay interest on escrow in certain states. We do this in accordance with the Real Estate

5  Settlement Procedures Act (RESPA) and applicable state laws."[2] The First Amended

6  Complaint filed in *Lusnak* in June 2014 reports that the Wells Fargo's website included

7  this same content at that time.

8  c. **Citimortgage**, on June 18, 2019, entered into a stipulation with the California

9  Commissioner of Business Oversight confirming that it has complied with section 2954.8

10  since January 1, 2019 and further agreeing to pay restitution of $7.8 million to its

11  California customers for its past section 2954.8 liabilities since July 1, 2014.[3]

12  a. **JPMorgan Chase Bank ("Chase")** routinely complies with section 2954.8, except with

13  respect to the loans involved in *McShannock v. JP Morgan Chase Bank N.A.*, 354 F.

14  Supp. 3d 1063, 1067 (N.D. Cal. 2018), according to representations to the *McShannock*

15  court by Chase's counsel in that case (who are also Flagstar's counsel here). Specifically,

16  they represent that *McShannock* involves a distinct set of loans originated by the former

17  Washington Mutual, FSB ("WaMu") before Chase acquired WaMu's assets when WaMu

18  failed in 2008.[4] Based on non-WaMu legacy Chase mortgage statements personally

19  reviewed by the undersigned, it appears that Chase has generally complied with section

20  2954.8 for some time with respect to its other loan portfolios.

---

[2] Escrow Accounts – FAQs, WELLS FARGO, wellsfargo.com/mortgage/manage-account/escrow/faqs/ (last visited 12/29/2019).

[3] Stipulation, CRMLA License No: 4131200, Dep't of Business Oversight of the State of California (June 2019), dbo.ca.gov/wp-content/uploads/sites/296/2019/06/CitiMortgage-Stipulation.pdf.

[4] Thus, the question presented in *McShannock*, now on interlocutory appeal, is whether Chase, as a national bank, was and is currently entitled to rely on pre-Dodd-Frank Home Owners' Loan Act ("HOLA") field preemption with respect to loans it acquired from a federal thrift in 2008. That question, and whether Chase is ultimately required to pay IOE on these pre-Dodd-Frank loans, is obviously of no significance to the post-Dodd-Frank loans at issue in this case.

DECL. OF PETER FREDMAN ISO PLTFS'
OPP'N TO DEF'S MSJ
Case No.: 3:18-cv-05131-WHA (DMR)

-3-

b. **Non-bank mortgage servicers**, of which there are many (including, for example, Nationstar Mortgage (now d/b/a Mr. Cooper), Fay Servicing, and Quicken), would have no basis to assert federal preemption regardless of how they acquired the servicing of the loan. Based on Plaintiffs counsel's investigations, they all appear to comply with section 2954.8.

9.     Attached as **Exhibit A** is a true and correct copy of the deposition excerpts of Stephanie Ryan dated May 22, 2019.

10.     Attached as **Exhibit B** is a true and correct copy of excerpts of the Defendant Flagstar Bank, FSB's Disclosure of Opposition Expert Report (the "Skanderson Report").

11.     Attached as **Exhibit C** are true and correct copies of Flagstar mortgage records produced in this litigation related to the Bravos. They show that Flagstar originated the Bravos' subject mortgage loan (through a broker) on or about December 1, 2017 and required the Bravos to establish an escrow account as a condition of the loan.

12.     Neither of Flagstar's Rule 30(b)(6) corporate designees, nor its retained expert, have ever suggested that Flagstar has actually experienced any type of difficulty or interference resulting from its compliance with section 2954.8 with respect to non-owned MSR loans since 2017.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed on December 30, 2019, in Berkeley, California.

*/s/ Peter Fredman*
PETER FREDMAN

I, THOMAS LOESER, am the ECF User whose ID and password are being used to file this document hereby attest that all signatories concur with this filing. /s/Thomas Loeser

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2019, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of Electronic Filing to all ECF registrants.

/s/ Thomas E. Loeser
THOMAS E. LOESER

# Exhibit A

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4

 5   LOWELL and GINA SMITH, husband and

 6   Wife, and WILLIAM KIVETT, individually,

 7   and on behalf of others similarly situated,

 8        Plaintiff,

 9   -vs-                   No. 3:18-dv-05131-WHA (DMR)

10                          COMPL Filed April 19, 2018

11                          FAC Filed:  Oct 19, 2018

12                          Hon. William Alsup

13   FLAGSTAR BANK, FSB a federal savings

14   Bank, and DOES 1-1000, inclusive,

15        Defendant.

16   _____/

17   PAGE 1 - 95

18

19   The 30(b)(6)Deposition of - Flagstar Bank - FSB

20   STEPHANIE RYAN,

21   Taken at 3600 Center Point Parkway,

22   Pontiac, Michigan,

23   Commencing at 8:34, a.m.,

24   Wednesday, May 22, 2019,

25   Before Lucy Capobianco CSR 3061.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

SER-103

```
 1        balance was last February 17th, can you determine what
 2        the balance was?
 3   A.   Not necessarily.
 4   Q.   Okay.  But you could pull up a record of all of the
 5        transactions in and out of that escrow, correct?
 6             MS. HOOVER:  Objection to form.
 7   A.   Correct.
 8        BY MR. LOESER:
 9   Q.   So, for example, if there was a tax payment made on a
10        certain date, you would know what the beginning balance
11        was on that date, what the payment was, and what the
12        ending balance was after that payment was made,
13        correct?
14             MS. HOOVER:  Objection to form.
15   A.   Correct.
16        BY MR. LOESER:
17   Q.   And because there's a record like that for every
18        transaction, you could, in fact, determine what the
19        balance was on any given date simply by looking at the
20        ending balance after one transaction and the beginning
21        balance for the next transaction, and if they're the
22        same, then you would know that the balance didn't
23        change on the days in between, correct?
24   A.   Correct.
25   Q.   You're aware that not just California, but, in fact,
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

**SER-104**

```
 1          several states require lenders -- require lenders to

 2          pay interest on escrow monies that they collect from

 3          borrowers in connection with mortgage loans?

 4                  MS. HOOVER:  Objection to form.

 5   A.     Yes.

 6          BY MR. LOESER:

 7   Q.     And in California, the rule is for mortgages secured by

 8          one-to-four-unit residential buildings, the mortgage

 9          servicer is required to pay 2 percent annual interest

10          on escrow accounts?

11                  MS. HOOVER:  Objection to form.

12   A.     Correct.

13          BY MR. LOESER:

14   Q.     But as you mentioned, Flagstar doesn't do that, except

15          for loans with third-party MSRs, correct?

16   A.     Correct.

17   Q.     Do you know why that is?

18                  MS. HOOVER:  Just to note my objection, to

19          the extent if any of your conversations or knowledge

20          comes from conversations with counsel, either in-house

21          or outside counsel, you can't disclose those, but to

22          the extent you have knowledge within your own personal

23          knowledge or not from lawyers, you can answer the

24          question.

25          BY MR. LOESER:
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

SER-105

```
 1   Q.   So for clarity, I'm not asking you to tell me what
 2        anything is that was told to you by your counsel, but
 3        to the extent you know the answer to my question,
 4        simply because you spoke to counsel about it and you
 5        may have covered it, doesn't change the fact that you
 6        had knowledge prior to such conversations.  So to the
 7        extent you have knowledge independent of your
 8        conversations with counsel, I would need you to answer
 9        the question.
10   A.   It is our bank policy that we do not pay interest on
11        escrow outside of restricted escrow.
12   Q.   And you don't know the reason why the policy is what
13        the policy is?
14   A.   No.  No.
15   Q.   So the extent of your knowledge is that you've been
16        told that this is our policy and we're not going to do
17        it, correct?
18   A.   Correct.
19             MS. HOOVER:  Objection to form.
20        BY MR. LOESER:
21   Q.   But at the same time, you know that for some loans
22        where another entity holds the servicing rights,
23        Flagstar is acting on their behalf, as a subservicer,
24        and so they are paying the interest on escrow for those
25        accounts?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

SER-106

```
 1              MS. HOOVER:  Objection to form.
 2  A.   Correct.
 3       BY MR. LOESER:
 4  Q.   Okay.  So from at least the beginning of 2014 until
 5       January 28th, 2017, Flagstar did not pay interest on
 6       escrow for any of the subject loans, correct?
 7  A.   Correct.
 8  Q.   And that as we talked about, and I don't need to go
 9       through each of the specific dates because we already
10       have that on the record, from the period of
11       January 28th until approximately the end of 2018,
12       Flagstar began to pay interest on escrow for
13       third-party MSRs, rolling it out on a
14       third-party-by-third-party basis, correct?
15  A.   Correct.
16  Q.   So, for example, on January 28th, it began paying
17       interest on escrow for third-party MSR loans held by
18       Matrix, correct?
19  A.   Correct.
20  Q.   And then there was a couple others that it added in in
21       Q2 of that year and some more that it added in in 2018,
22       correct?
23  A.   Correct.
24  Q.   Are you aware of any plans or intentions of Flagstar to
25       begin to pay interest on escrow for loans where it
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        holds the MSRs?

 2   A.   No.

 3   Q.   As between loans where a third party holds the MSR

 4        rights and loans where Flagstar holds the MSR rights,

 5        are there any other differences in how escrow accounts

 6        are handled other than whether or not interest on

 7        escrow is paid?

 8   A.   No.

 9   Q.   Now, the information systems that you have access to,

10        there is a field or a designator in there that allows

11        you to determine whether or not interest on escrow is

12        being paid on a particular escrow account, correct?

13                  MS. HOOVER:  Objection to form.

14   A.   Correct.

15        BY MR. LOESER:

16   Q.   So if someone were to come to you and say, Ms. Ryan, I

17        need to know whether or not we're paying interest on

18        escrow on a loan with the number 77472, you'd be able

19        to look in the system and say yes, it's being paid or

20        no, it's not being paid?

21   A.   Correct.

22   Q.   And, in fact, you would be able to look at the

23        transaction history for the escrow and determine the

24        amount of escrow that's been paid on that loan,

25        correct?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

SER-108

1 **MCGUIREWOODS LLP**
David C. Powell (SBN 129781)
2 dpowell@mcguirewoods.com
Carolee A. Hoover (SBN 282018)
3 choover@mcguirewoods.com
Aaron R. Marienthal (SBN 273154)
4 amarienthal@mcguirewoods.com
Alexander J. Gershen (SBN 291929)
5 agershen@mcguirewoods.com
Two Embarcadero Center, Suite 1300
6 San Francisco, CA 94111-3821
Telephone: 415.844.9944
7 Facsimile: 415.844.9922

8 Attorneys for Defendant
Flagstar Bank, FSB

9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11

12
LOWELL and GINA SMITH, individually,          CASE NO. 3:18-cv-05131-WHA
13 and on behalf of others similarly situated,
                                              **DECLARATION OF DAVID C. POWELL**
14              Plaintiffs,                    **IN SUPPORT OF DEFENDANT**
                                              **FLAGSTAR BANK, FSB'S RESPONSE**
15      vs.                                    **TO ORDER TO SHOW CAUSE WHY**
                                              **DECLARATIONS OF SEAN MANSELL**
16 FLAGSTAR BANK, FSB, a federal savings       **AND COURTNEY CHANG SHOULD**
bank, and DOES 1-100, inclusive,              **NOT BE STRICKEN**
17
                Defendant.                     Complaint Filed: August 22, 2018
18                                             FAC Filed: October 19, 2018

19                                             Honorable Judge William H. Alsup

20

21

22

23

24

25

26

27

28
                                        1
SER-109

1    I, David C. Powell, declare and state as follows:

2      1.      I am an attorney licensed to practice law in the state of California and am admitted

3 to practice before this Court. I am a partner with the law firm of McGuireWoods LLP, counsel of

4 record for Defendant Flagstar Bank, FSB ("Flagstar"). I am personally familiar with the legal

5 proceedings in this matter and make this declaration from my own personal knowledge, and could

6 and would competently testify to the following if called upon to do so.

7      2.      I submit this declaration in support of Flagstar's response to the Court's Order to

8 Show Cause Why the Declarations of Sean Mansell and Courtney Chang should not be stricken,

9 Dkt. No. 129.

10      3.      On December 14, 2018, Flagstar served its initial disclosures on Plaintiff, noting that,

11 among other topics, a Flagstar representative "may have discoverable information that Flagstar may

12 use to support its allegations, defenses and potential claims in this action." Attached hereto as

13 **Exhibit A** is a true and correct copy of Flagstar's Initial Disclosures.

14      4.      Flagstar subsequently served supplemental disclosures on August 29, 2019 and

15 December 16, 2019. Attached hereto as **Exhibit B** are Flagstar's Second Supplemental Disclosures.

16      5.      Over the course of this action, Plaintiff has served Flagstar with five sets of

17 interrogatories and three sets of requests for production. None of Plaintiff's discovery requests seek

18 information or documents supporting or related to Flagstar's preemption defense, let alone any

19 affirmative defense. Rather, Plaintiff's discovery requests sought almost exclusively class level data

20 related to escrow account balances for class members during the class period.

21      6.      On March 8, 2019, Plaintiff served his Notice of Deposition on Flagstar's corporate

22 representative pursuant to Federal Rule of Civil Procedure, Rule 30(b)(6). Attached hereto as

23 **Exhibit C** is a true and correct copy of Plaintiffs' Notice of Deposition of Flagstar's Corporate

24 Representative.

25      7.      Plaintiff identified eight topics, none of which relate to Flagstar's affirmative defense

26 based on HOLA preemption. After Flagstar identified two witnesses to testify on Plaintiff's

27 proposed topics, Plaintiff served his amended notice on May 7, 2019, identifying the same eight

28

DECLARATION OF DAVID C. POWELL IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
RESPONSE TO ORDER TO SHOW CAUSE WHY DECLARATIONS OF SEAN MANSELL AND COURTNEY
CHANG SHOULD NOT BE STRICKEN

1    topics. Attached hereto as **Exhibit D** is a true and correct copy of Plaintiffs' Amended Notice of

2    Deposition of Flagstar's Corporate Representative.

3          8.     Plaintiff proceeded to take Flagstar's depositions on May 21, 2019 and May 22,

4    2019.

5          9.     Since the depositions of Flagstar's corporate representative, Plaintiff proceeded with

6    deposing a Flagstar employee, Mark Albers, who had personal knowledge of information in the

7    case.

8          10.    On September 27, 2019, Flagstar disclosed in its List of Issues Regarding Expert

9    Discovery that it may offer testimony on general banking and legislative history of Federal banking

10   charters, state and federal regulatory schemes, and economic impact of variable state laws and

11   regulatory schemes. Plaintiff neither served discovery on this topic nor requested and discovery on

12   Flagstar's purported expert on the issue. Attached hereto as **Exhibit E** is a true and correct copy of

13   Flagstar's List of Issues Regarding Expert Discovery.

14         11.    Until filing Flagstar's motion for summary judgment on December 5, 2019, Plaintiff

15   had not sought a deposition of Flagstar's corporate representative on topics related to Flagstar's

16   defenses, including its preemption defense.

17         12.    In deciding to file a motion for summary judgment motion, particularly in light of

18   receiving the Court's order on class certification, Flagstar identified corporate representatives Sean

19   Mansell and Courtney Chang to execute declarations on behalf of Flagstar regarding preemption,

20   and the implications of Section 2954.8 on Flagstar's business.[1] Flagstar timely served supplemental

21   Rule 26 disclosures to identify both witnesses on December 16, 2019. *See* Ex. B.

22         I declare under penalty of perjury under the laws of the United States of America and the

23   State of California that the foregoing is true and correct.

24         Executed at San Francisco, California, this 20th day of December, 2019.

25

26   _____

27   [1] Despite the fact that Rule 26 does not require Flagstar to identify its corporate representative witnesses by name [*See
     Moore,* 653 F.Supp. 2d 955, 959–60 (D. Ariz. 2009), on reconsideration, 2010 WL 11515202 (D. Ariz. Sept. 7, 2010)]
     Flagstar nonetheless supplemented its Rule 26 disclosures as soon as reasonably practicable and offered to produce

28   them for deposition.

3

DECLARATION OF DAVID C. POWELL IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
RESPONSE TO ORDER TO SHOW CAUSE WHY DECLARATIONS OF SEAN MANSELL AND COURTNEY
CHANG SHOULD NOT BE STRICKEN

1

2

By:   */s/ David C. Powell*

3          David C. Powell
           Attorney for Flagstar Bank, FSB

4

5          .

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DAVID C. POWELL IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
RESPONSE TO ORDER TO SHOW CAUSE WHY DECLARATIONS OF SEAN MANSELL AND COURTNEY
CHAVE SHOULD NOT BE STRICKEN

1

2

**CERTIFICATE OF SERVICE**

3      I hereby certify that on December 20, 2019, a copy of the foregoing pleading, with any

4  and all attachments, was filed electronically with the clerk of court via ECF, which will serve all

5  counsel of record, and served via First Class Mail to any party not filing ECF, postage prepaid.

6      This the 20th day of December, 2019.

7

8                                      By:    _/s/ David C. Powell_

9                                             David C. Powell
                                              Attorney for Flagstar Bank, FSB

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1   **MCGUIREWOODS LLP**
    David C. Powell (SBN 129781)
2   dpowell@mcguirewoods.com
    Carolee A. Hoover (SBN 282018)
3   choover@mcguirewoods.com
    Alicia A. Baiardo (SBN 254228)
4   abaiardo@mcguirewoods.com
    Alexander J. Gershen (SBN 291929)
5   agershen@mcguirewoods.com
    Two Embarcadero Center, Suite 1300
6   San Francisco, CA  94111-3821
    Telephone:  415.844.9944
7   Facsimile:  415.844.9922

8   Attorneys for Defendant
    Flagstar Bank, FSB
9
                        UNITED STATES DISTRICT COURT
10
                      NORTHERN DISTRICT OF CALIFORNIA
11

12  LOWELL and GINA SMITH, individually, and     Case No. 3:18-cv-05131-WHA
13  on behalf of others similarly situated,
                                                 **DEFENDANT FLAGSTAR BANK, FSB'S**
14                      Plaintiffs,              **INITIAL DISCLOSURES PURSUANT TO**
                                                 **F.R.C.P. RULE 26(A)(1)**
15            vs.
                                                 Complaint Filed: August 22, 2018
16  FLAGSTAR BANK, FSB, a federal savings        FAC Filed: October 19, 2018
    bank, and DOES 1-100, inclusive,
17                                               Honorable Judge William H. Alsup
                        Defendant.
18

19

20

21

22

23

24

25

26

27

28

FLAGSTAR BANK, FSB'S INITIAL DISCLOSURES PURSUANT TO F.R.C.P. RULE 26(A)(1)

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendant Flagstar Bank, FSB ("Flagstar") makes the following disclosure of witnesses and documents based on the information currently and reasonably available to Flagstar. These disclosures are based upon information that is currently available to Flagstar. Flagstar reserves the right to supplement or amend these disclosures as further information becomes available. Flagstar does not, by describing documents and other information herein, waive its right to object to production or admission of such documents or information on any ground. Discovery in this case has not yet commenced and Flagstar recognizes its obligations under Fed. R. Civ. P. Rule 26(e) to amend or supplement these initial disclosures as it obtains additional discoverable information that it may use to support its allegations, claims or defenses.

These disclosures do not identify any potential experts consulted or retained by Flagstar. Nor do these disclosures identify persons or a description of documents to be used solely for impeachment purposes. Flagstar will provide expert witness disclosures consistent with Rule 26(a)(2) or as otherwise ordered by the Court. These disclosures do not constitute a waiver of any privilege or work product protection.

A.  **Individuals Likely To Have Discoverable Information:**

The following individuals may have discoverable information that Flagstar may use to support its allegations, defenses and potential claims in this action.

1.  **Plaintiffs Lowell and Gina Smith**
    c/o Thomas E. Loeser
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
    Seattle, WA 98101
    Tel: (206) 623-7292

    c/o Peter B. Fredman
    LAW OFFICE OF PETER FREDMAN PC
    125 University Ave, Suite 102
    Berkeley, CA 94710
    Tel: (510) 868-2626

Plaintiffs Lowell and Gina Smith have knowledge and discoverable information related to their allegations and claims, and the purported damages set forth in the First Amended Complaint

("FAC").

      **2. Plaintiff William Kivett**
        c/o Thomas E. Loeser
        HAGENS BERMAN SOBOL SHAPIRO LLP
        1301 Second Avenue, Suite 2000
        Seattle, WA 98101
        Tel: (206) 623-7292

        c/o Peter B. Fredman
        LAW OFFICE OF PETER FREDMAN PC
        125 University Ave, Suite 102
        Berkeley, CA 94710
        Tel: (510) 868-2626

      Plaintiff William Kivett has knowledge and discoverable information related to his allegations and claims, and the purported damages set forth in the First Amended Complaint ("FAC").

      **3. Representative(s) of Flagstar Bank, FSB**
        c/o Dave Powell
        MCGUIREWOODS LLP
        Two Embarcadero Center, Suite 1300
        San Francisco, CA  94111

      Flagstar's representative(s) are likely to have discoverable information related to Plaintiffs Lowell and Gina Smith and William Kivett (collectively, "Plaintiffs") claims, Flagstar's defenses, and general knowledge regarding Plaintiff Lowell Smith's mortgage loan in the amount of $401,250 to finance the purchase of real property located at 4291 Wilson Lane, Concord, California 94521 and Plaintiff William Kivett's mortgage loan in the amount of $400,610 from Flagstar to finance his purchase of real property located at 1873 Love Circle, Simi Valley, California 93063.

    **B.**     <u>**Documents and Electronically Stored Information Flagstar May Use to Support Its Defenses**</u>

      The following is a description, by category, of documents, electronically stored information ("ESI") and tangible things that are in the possession, custody, or control of Flagstar that may be used to support Flagstar's allegations, defenses and potential claims in this action. Each document is subject to and without waiver of Flagstar's right to object to the authenticity of, qualification or reference of any such document, or to move *in limine* to exclude such documents or portion thereof.

1  Flagstar reserves the right to amend or supplement this information if additional relevant, non-
2  privileged documents or categories of documents are located or identified.

     1.   Flagstar may use non-privileged documents relating to Plaintiff Lowell Smith's October 27, 2004 mortgage loan, including the promissory note, deed of trust, and documents and correspondences related to loan servicing.

     2.   Flagstar may use non-privileged, confidential documents relating to the loan file, servicing records, and account statements and correspondences associated with Plaintiff Lowell Smith's October 27, 2004 mortgage loan that Flagstar will produce only pursuant to an appropriate protective order.

     3.   Flagstar may use non-privileged documents relating to Plaintiff William Kivett's September 19, 2012 mortgage loan, including the promissory note, deed of trust, and documents and correspondences related to loan servicing.

     4.   Flagstar may use non-privileged, confidential documents relating to the loan file, servicing records, and account statements and correspondences associated with Plaintiff William Kivett's September 19, 2012 mortgage loan that Flagstar will produce only pursuant to an appropriate protective order.

     5.   Selected documents, ESI and tangible things identified by Plaintiffs, through initial disclosures or discovery, that support Flagstar's allegations, defenses and potential claims in this action.

**C.**    <u>**Damages**</u>

As of the date of these disclosures, Flagstar claims no damages against any party to this action. Therefore, no computation of damages under Rule 26(a)(1)(A)(iii) is required of Plaintiffs at this time. Plaintiffs reserve the right to assert a claim or claims should it become apparent that such an assertion of claims is warranted.

**D.**    <u>**Insurance**</u>

At this time, Flagstar is not aware of any insurance agreement that would satisfy any possible judgment in the action.

FLAGSTAR BANK, FSB'S INITIAL DISCLOSURES PURSUANT TO F.R.C.P. RULE 26(A)(1)

Date:  December 14, 2018

Respectfully submitted,

**MCGUIREWOODS LLP**

By: _/s/ David C. Powell_
     David C. Powell
     Attorney for Defendant Flagstar Bank, FSB

**SER-119**
FLAGSTAR BANK, FSB'S INITIAL DISCLOSURES PURSUANT TO F.R.C.P. RULE 26(A)(1)

## CERTIFICATE OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

      I am employed in the County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within action; my business address is Two Embarcadero Center, Suite 1300, San Francisco, CA 94111.

      On December 14, 2018, I served the following document(s) described as

**DEFENDANT FLAGSTAR BANK, FSB'S INITIAL DISCLOSURES PURSUANT TO F.R.C.P. RULE 26(A)(1)**

Thomas E. Loeser                 Attorneys for Plaintiff Lowell and Gina Smith
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Email: toml@hbsslaw.com

Peter B. Fredman
Law Office of Peter Fredman
125 University Ave., Suite 102
Berkeley, CA 94710
Tel: 510-868-2626
Email: peter@peterfredmanlaw.com

☒    **BY ELECTRONIC MAIL**: by transmitting via email to the parties at the email addresses listed above.

☒    **BY OVERNIGHT DELIVERY:** I deposited such document(s) in a box or other facility regularly maintained by the overnight service carrier, or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier with delivery fees paid or provided for, addressed to the person(s) served hereunder. (C.C.P. § 1013(d)(e))

      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

      Executed on December 14, 2018, at San Francisco, CA.

                             */s/ Josh Tabisaura*
                             Josh Tabisaura

EXHIBIT B

1  **MCGUIREWOODS LLP**
   David C. Powell (SBN 129781)
2  dpowell@mcguirewoods.com
   Carolee A. Hoover (SBN 282018)
3  choover@mcguirewoods.com
   Aaron R. Marienthal (SBN 273154)
4  amarienthal@mcguirewoods.com
   Alexander J. Gershen (SBN 291929)
5  agershen@mcguirewoods.com
   Two Embarcadero Center, Suite 1300
6  San Francisco, CA  94111-3821
   Telephone:  415.844.9944
7  Facsimile:  415.844.9922

8  Attorneys for Defendant
   Flagstar Bank, FSB
9

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12

13  LOWELL and GINA SMITH, individually, and          Case No. 3:18-cv-05131-WHA
    on behalf of others similarly situated,
14                                                     **DEFENDANT FLAGSTAR BANK,**
              Plaintiffs,                              **FSB'S SUPPLEMENTAL**
15                                                     **DISCLOSURES PURSUANT TO**
                                                       **F.R.C.P. RULE 26(A)(1)**
16       vs.
                                                       Complaint Filed: August 22, 2018
17  FLAGSTAR BANK, FSB, a federal savings              FAC Filed: October 19, 2018
    bank, and DOES 1-100, inclusive,
18                                                     Honorable Judge William H. Alsup
              Defendant.

19

20

21

22

23

24

25

26

27

28

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2         Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendant Flagstar Bank,

3    FSB ("Flagstar") makes the following supplemental disclosure of witnesses and documents based

4    on the information currently and reasonably available to Flagstar.  These disclosures are based upon

5    information that is currently available to Flagstar.  Flagstar reserves the right to supplement or

6    amend these disclosures as further information becomes available.  Flagstar does not, by describing

7    documents and other information herein, waive its right to object to production or admission of

8    such documents or information on any ground.  Flagstar recognizes its obligations under Fed. R.

9    Civ. P. Rule 26(e) to further amend or supplement these initial disclosures as it obtains additional

10   discoverable information that it may use to support its allegations, claims or defenses.

11        These disclosures do not identify any experts consulted or retained by Flagstar.  Nor do

12   these disclosures identify persons or a description of documents to be used solely for impeachment

13   purposes.  Flagstar will provide expert witness disclosures consistent with Rule 26(a)(2) or as

14   otherwise ordered by the Court.  These disclosures do not constitute a waiver of any privilege or

15   work product protection.

16        A.    **Individuals Likely To Have Discoverable Information:**

17        The following individuals may have discoverable information that Flagstar may use to

18   support its allegations, defenses and potential claims in this action.

19
20        **1.   Plaintiffs Lowell and Gina Smith**
             c/o Thomas E. Loeser
21           HAGENS BERMAN SOBOL SHAPIRO LLP

22           1301 Second Avenue, Suite 2000

23           Seattle, WA 98101

24           Tel: (206) 623-7292

25           c/o Peter B. Fredman
             LAW OFFICE OF PETER FREDMAN PC
26           125 University Ave, Suite 102
             Berkeley, CA 94710
27           Tel: (510) 868-2626

28

DEFENDANT FLAGSTAR BANK, FSB'S SUPPLEMENTAL DISCLOSURES PURSUANT TO F.R.C.P. RULE 26(A)(1),
CASE NO. 3:18-cv-05131-WHA
**SER 123**

1    Plaintiffs Lowell and Gina Smith have knowledge and discoverable information related to

2 their allegations and claims, and the purported damages set forth in the First Amended Complaint

3 ("FAC").

4

5    **2.  Plaintiff William Kivett**
         c/o Thomas E. Loeser
6        HAGENS BERMAN SOBOL SHAPIRO LLP

7        1301 Second Avenue, Suite 2000

8        Seattle, WA 98101

9        Tel: (206) 623-7292

10       c/o Peter B. Fredman
         LAW OFFICE OF PETER FREDMAN PC
11       125 University Ave, Suite 102
         Berkeley, CA 94710
         Tel: (510) 868-2626
12   Plaintiff William Kivett has knowledge and discoverable information related to his

13 allegations and claims, and the purported damages set forth in the First Amended Complaint

14 ("FAC").

15

16       **3.  Representative(s) of Flagstar Bank, FSB**
             c/o Dave Powell
17           MCGUIREWOODS LLP
             Two Embarcadero Center, Suite 1300
18           San Francisco, CA  94111

19   Flagstar's representative(s) are likely to have discoverable information related to Plaintiffs

20 Lowell and Gina Smith and William Kivett (collectively, "Plaintiffs") claims, Flagstar's defenses,

21 and general knowledge regarding Plaintiff Lowell Smith's mortgage loan in the amount of

22 $401,250 to finance the purchase of real property located at 4291 Wilson Lane, Concord, California

23 94521 and Plaintiff William Kivett's mortgage loan in the amount of $400,610 from Flagstar to

24 finance his purchase of real property located at 1873 Love Circle, Simi Valley, California 93063.

25 **SUPPLEMENTAL RESPONSE:  Individuals Likely To Have Discoverable Information**:

26   In addition to the individuals identified in Flagstar's initial disclosures, which it served on

27 Plaintiff on December 14, 2018 ("Flagstar's Initial Disclosures"), the following individuals may

28

have discoverable information that Flagstar may use to support its allegations, defenses and potential claims in this action.

**4. Proposed Plaintiffs Bernard and Lisa Bravo**
   c/o Thomas E. Loeser
   HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Second Avenue, Suite 2000
   Seattle, WA 98101
   Tel: (206) 623-7292

   c/o Peter B. Fredman
   LAW OFFICE OF PETER FREDMAN PC
   125 University Ave, Suite 102
   Berkeley, CA 94710
   Tel: (510) 868-2626

Proposed class representatives Bernard and Lisa Bravo (the "Bravos") may have knowledge and discoverable information related to their allegations and claims, and the purported damages set forth in the First Amended Complaint ("FAC").

**5. Representative(s) of Flagstar Bank, FSB**
   c/o Dave Powell
   MCGUIREWOODS LLP
   Two Embarcadero Center, Suite 1300
   San Francisco, CA 94111

In addition to the topics identified in Flagstar's Initial Disclosures, Flagstar's representative(s) are likely to have discoverable information related to the Bravos' potential claims, Flagstar's defenses, and general knowledge regarding the origination and servicing of the Bravos mortgage loan. Flagstar's representative(s) are also likely to have discoverable information regarding Flagstar's general account servicing, escrow accruals and distributions, policies and procedures regarding loan servicing and interest on escrow, and interest on escrow accrual information. Flagstar's representative(s) are also likely to have discoverable information related to the proposed class population, including but not limited to, the servicing history for each class member, which includes default rates, charge-offs, paid off loans, loans in foreclosures, loans that received a modification or forbearance agreements, bankruptcy history, servicing history, identify of the ownership of mortgage servicing rights ("MSR"), and the number of loans that received interest on escrow during the purported class period.

1    **SECOND SUPPLEMENTAL RESPONSE:  Individuals Likely To Have Discoverable**
2    **Information:**

3           In addition to the individuals identified in Flagstar's initial disclosures, which it served on
4    Plaintiff on December 14, 2018 ("Flagstar's Initial Disclosures"), and its supplemental disclosures
5    served on August 29, 2019 ("Supplemental Disclosures"), the following individuals may have
6    discoverable information that Flagstar may use to support its allegations, defenses and potential
7    claims in this action.

8
9            6.   **Representative(s) of Flagstar Bank, FSB, including Sean Mansell and**
                  **Courtney Chang**
10                c/o Dave Powell
                  MCGUIREWOODS LLP
11                Two Embarcadero Center, Suite 1300
                  San Francisco, CA  94111
12          In addition to the topics identified in Flagstar's Initial Disclosures and Supplemental
13   Disclosures, Flagstar's representative(s), including Sean Mansell and Courtney Chang, are likely
14   to have discoverable information related to Flagstar's defenses, including its defense that California
15   Civil Code Section 2954.8 is preempted by the Home Owners' Loan Act ("HOLA") and it's
16   implementing regulations.  Specifically, Flagstar's representative(s) are likely to have discoverable
17   information related to the impacts of escrow accounts on Flagstar's business, including Flagstar's
18   authority to create escrow accounts at loan origination and loan servicing, whether and how Flagstar
19   utilizes escrow accounts to reduce the risk associated with a mortgage loan, and whether and how
20   Flagstar relies on the risk mitigation protections offered by an escrow account during loan
21   servicing.  The Flagstar representative(s) are likely to have discoverable information related to how
22   an escrow account factors into the pricing associated with servicing a mortgage loan and selling
23   mortgage servicing rights into the secondary market to investors.  The Flagstar representative(s)
24   are likely to have discoverable information related to Flagstar's mortgage origination and servicing
25   volume in the U.S. and California, along with other statistics about loan origination, servicing, and
26   escrow accounts for mortgage customers.  The Flagstar representative(s) are likely to have
27   discoverable information related to Plaintiff's escrow account and the impact that the escrow
28   account had or could have had on his interest rate, borrowing costs, and risk exposure.

7. **Representative(s) of Flagstar Bank, FSB, including Mark Albers and David Fecht**
c/o Dave Powell
MCGUIREWOODS LLP
Two Embarcadero Center, Suite 1300
San Francisco, CA  94111

In addition to the topics identified in Flagstar's Initial Disclosures and Supplemental Disclosures, Flagstar's representative(s), including Mark Albers and David Fecht, are likely to have discoverable information related to the Plaintiff's claims, Flagstar's defenses, and Flagstar's general account servicing, escrow accruals and distributions, policies and procedures regarding loan servicing and interest on escrow, and interest on escrow accrual information.  Flagstar's representative(s) are also likely to have discoverable information related to the proposed class population, including but not limited to, the servicing history for each class member, which includes default rates, charge-offs, paid off loans, loans in foreclosures, loans that received a modification or forbearance agreements, bankruptcy history, servicing history, identify of the ownership of mortgage servicing rights ("MSR"), and the number of loans that received interest on escrow during the purported class period.

B. **Documents and Electronically Stored Information Flagstar May Use to Support Its Defenses**

The following is a description, by category, of documents, electronically stored information ("ESI") and tangible things that are in the possession, custody, or control of Flagstar that may be used to support Flagstar's allegations, defenses and potential claims in this action.  Each document is subject to and without waiver of Flagstar's right to object to the authenticity of, qualification or reference of any such document, or to move *in limine* to exclude such documents or portion thereof.  Flagstar reserves the right to amend or supplement this information if additional relevant, non-privileged documents or categories of documents are located or identified.

1. Flagstar may use non-privileged documents relating to Plaintiff Lowell Smith's October 27, 2004 mortgage loan, including the promissory note, deed of trust, and documents and correspondences related to loan servicing.
2. Flagstar may use non-privileged, confidential documents relating to the loan file, servicing records, and account statements and correspondences associated with

DEFENDANT FLAGSTAR BANK, FSB'S SUPPLEMENTAL DISCLOSURES PURSUANT TO F.R.C.P. RULE 26(A)(1),
CASE NO. 3:18-cv-05131-WHA

Plaintiff Lowell Smith's October 27, 2004 mortgage loan that Flagstar will produce only pursuant to an appropriate protective order.

3. Flagstar may use non-privileged documents relating to Plaintiff William Kivett's September 19, 2012 mortgage loan, including the promissory note, deed of trust, and documents and correspondences related to loan servicing.

4. Flagstar may use non-privileged, confidential documents relating to the loan file, servicing records, and account statements and correspondences associated with Plaintiff William Kivett's September 19, 2012 mortgage loan that Flagstar will produce only pursuant to an appropriate protective order.

5. Selected documents, ESI and tangible things identified by Plaintiffs, through initial disclosures or discovery, that support Flagstar's allegations, defenses and potential claims in this action.

**SUPPLEMENTAL RESPONSE:  Documents and Electronically Stored Information Flagstar May Use to Support Its Defenses**

In addition to the documents and electronically stored information identified in Flagstar's Initial Disclosures, the following is a description, by category, of documents, electronically stored information ("ESI") and tangible things that are in the possession, custody, or control of Flagstar that may be used to support Flagstar's allegations, defenses and potential claims in this action. Each document is subject to and without waiver of Flagstar's right to object to the authenticity of, qualification or reference of any such document, or to move *in limine* to exclude such documents or portion thereof.  Flagstar reserves the right to amend or supplement this information if additional relevant, non-privileged documents or categories of documents are located or identified.

6. Flagstar may use non-privileged documents relating to the Bravos' December 1, 2017 mortgage loan, including the promissory note, deed of trust, and documents and correspondences related to loan servicing.

7. Flagstar may use non-privileged, confidential documents relating to the loan file, servicing records, and account statements and correspondences associated with the Bravos' December 1, 2017 mortgage loan that Flagstar will produce pursuant to an appropriate protective order.

Selected documents, ESI and tangible things identified by Plaintiffs, through initial disclosures or discovery, that support Flagstar's allegations, defenses and potential claims in this action, including but not limited to data regarding the putative class population of loans secured by a one to four unit property in California, serviced by Flagstar from January 1, 2014 to April 30, 2019, which were

1   originated and/or serviced after July 21, 2010, where Flagstar did not pay interest to the borrower

2   on the amounts held in escrow accounts for taxes and assessment, which includes data pertaining

3   to: (1) the total number of loans, (2) the date of loan origination, (3) the identity of the owner of the

4   loan's MSR rights, (4) the monthly and daily escrow account balances, and (5) other data related

5   to these loans, including default rates, charge-offs, paid off loans, loans in foreclosures, loans that

6   received a modification or forbearance agreements, bankruptcy history, servicing history, identify

7   of the ownership of MSRs, and the number of loans that received interest on escrow during the

8   purported class period, as set forth in the declaration of Mark Albers submitted in support of

9   Flagstar's Opposition to Plaintiff's Motion for Class Certification on August 22, 2019.

10   **SECOND SUPPLEMENTAL RESPONSE: Documents and Electronically Stored**

11   **Information Flagstar May Use to Support Its Defenses**

12         In addition to the documents and electronically stored information identified in Flagstar's

13   Initial Disclosures and Supplemental Disclosures, the following is a description, by category, of

14   documents, electronically stored information ("ESI") and tangible things that are in the possession,

15   custody, or control of Flagstar that may be used to support Flagstar's allegations, defenses and

16   potential claims in this action. Each document is subject to and without waiver of Flagstar's right

17   to object to the authenticity of, qualification or reference of any such document, or to move *in*

18   *limine* to exclude such documents or portion thereof. Flagstar reserves the right to amend or

19   supplement this information if additional relevant, non-privileged documents or categories of

20   documents are located or identified.

21

22         8.  Flagstar may use non-privileged documents relating to Flagstar's authority to create escrow accounts at loan origination and servicing, the financial and

23           economic impact of escrow accounts, the effect escrow accounts have on pricing a mortgage loan and assessing risk of loss, the effect that interest on escrow laws

24           have on Flagstar's pricing decisions and ability to contract with MSR owner clients or sell mortgage servicing rights.

25   **C.   Damages**

26         As of the date of these disclosures, Flagstar claims no damages against any party to this

27   action. Therefore, no computation of damages under Rule 26(a)(1)(A)(iii) is required of Plaintiffs

28

1 | at this time. Plaintiffs reserve the right to assert a claim or claims should it become apparent that
2 | such an assertion of claims is warranted.

3     **D.**     <u>**Insurance**</u>

4     At this time, Flagstar is not aware of any insurance agreement that would satisfy any
5 | possible judgment in the action.

8 | Date: December 16, 2019         Respectfully submitted,

10              **MCGUIREWOODS LLP**

12              By: _____
13                 David C. Powell
                Attorney for Flagstar Bank, FSB

-8-

## CERTIFICATE OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I am employed in the County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within action; my business address is Two Embarcadero Center, Suite 1300, San Francisco, CA 94111.

On December 16, 2019, I served the following document(s) described as

**DEFENDANT FLAGSTAR BANK, FSB'S SUPPLEMENTAL DISCLOSURES PURSUANT TO F.R.C.P. RULE 26(A)(1)**

on the interested parties in this action as follows:

Thomas E. Loeser                    Attorneys for Plaintiff Lowell and Gina Smith
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Email: toml@hbsslaw.com

Peter B. Fredman
LAW OFFICE OF PETER FREDMAN PC
2550 Ninth Street, Suite 111
Berkeley, CA 94710
Tel: (510) 868-2626
Fax: (510) 868-2627
Email: peter@peterfredmanlaw.com

☒ **BY ELECTRONIC MAIL**: by transmitting via email to the parties at the email addresses listed above.

☒ **BY OVERNIGHT DELIVERY:** I deposited such document(s) in a box or other facility regularly maintained by the overnight service carrier, or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier with delivery fees paid or provided for, addressed to the person(s) served hereunder. (C.C.P. § 1013(d)(e))

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 16, 2019, at San Francisco, CA.

_____
Josh Tabisaura

-9-
CERTIFICATE OF SERVICE

**SER-131**

1 | **MCGUIREWOODS LLP**
David C. Powell (SBN 129781)
2 | dpowell@mcguirewoods.com
Carolee A. Hoover (SBN 282018)
3 | choover@mcguirewoods.com
Aaron R. Marienthal (SBN 273154)
4 | amarienthal@mcguirewoods.com
Alexander J. Gershen (SBN 291929)
5 | agershen@mcguirewoods.com
Two Embarcadero Center, Suite 1300
6 | San Francisco, CA 94111-3821
Telephone: 415.844.9944
7 | Facsimile: 415.844.9922
8 |
Attorneys for Defendant
9 | Flagstar Bank, FSB

10 | **UNITED STATES DISTRICT COURT**

11 | **NORTHERN DISTRICT OF CALIFORNIA**

12 |

13 | LOWELL and GINA SMITH, individually, and
on behalf of others similarly situated,

Case No. 3:18-cv-05131-WHA

14 | Plaintiffs,

**DECLARATION OF
COURTNEY E CHANG
IN SUPPORT OF DEFENDANT
FLAGSTAR BANK, FSB'S
OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

15 | vs.

16 | FLAGSTAR BANK, FSB, a federal savings
bank, and DOES 1-100, inclusive,

17 |

18 | Defendant.

Complaint Filed: August 22, 2018
FAC Filed: October 19, 2018

19 |

Honorable Judge William H. Alsup

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1

1

2                     **DECLARATION**

3 I, Courtney E Chang declare as follows:

4      1.    I am employed by Flagstar Bank, FSB ("Flagstar") as an Assistant Treasurer. In my

5 capacity as Assistant Treasurer, I assist with Flagstar's practice of selling mortgage servicing rights

6 into the secondary market. In making this declaration, I relied upon records that were made by

7 Flagstar in the regular course of business at or near the time of the act, condition, or event reflected

8 in the records.

9      2.    The records that I relied upon were prepared in a manner so as to assure the

10 trustworthiness of the records, and the accuracy of the matters related therein. I am familiar with

11 and have access to the electronic systems of record that Flagstar uses to create and record

12 information related to the sale of mortgage servicing rights into secondary markets. Much of the

13 information stored in Flagstar's electronic systems is captured automatically at or about the time of

14 the events recorded. All of Flagstar's computerized records are created and maintained in the

15 regular course of its business, and Flagstar relies on those records in the ordinary course to conduct

16 its business. I also have personal knowledge of and familiarity with Flagstar's business practices,

17 including the manner in which it sells mortgage servicing rights into secondary markets.

18      3.    The facts set forth herein are of my own personal knowledge and business records

19 of Flagstar, and if called upon as a witness, I could and would testify competently to such facts. I

20 submit this declaration in support of Flagstar's opposition to Plaintiff's motion for partial summary

21 judgment as to Plaintiff's First Amended Complaint ("FAC"). I am over 18 years of age.

22

23             **Whether or Not a Loan Has an Escrow Account**

24         **Factors Into the Pricing Associated With Servicing the Loan**

25      4.    For mortgage loans originated by other lenders and serviced by Flagstar, Flagstar

26 calculates the pricing associated with servicing the loan based upon whether the loan has, or

27 authorizes, an escrow account.

28

2

DECLARATION OF COURTNEY E CHANG IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

SER-133

5. An escrow account, or the authority to create an escrow account, is a consideration for Flagstar when determining whether to purchase the servicing rights for a mortgage loan.

**As a Critical Component to Flagstar's Business, Flagstar Sells Mortgage Servicing Rights into the Secondary Market to Investors and Whether Or Not a Loan Has An Escrow Account Factors Into the Pricing**

6. In addition to originating and servicing a mortgage loan, a critical component of Flagstar's mortgage lending business is its ability to sell mortgage servicing rights on the secondary market. The marketability of a mortgage servicing right in the secondary market is critical, as Flagstar, by selling mortgage servicing rights into the secondary market, obtains the necessary funds needed to make additional mortgage loans.

7. If mortgage servicing rights could not be resold on the market, or the ability to do so was restricted, Flagstar would be required to vastly reduce the amount of credit available to extend and increase the costs associated with borrower.

8. Further, since the transaction and compliance costs for such loans would increase, the loan's respective value to secondary market participants is likely to be less due to the additional costs and risks they carry. As a result, requiring the payment of interest on escrow in applicable states could impede the sale of Flagstar's originated loans and/or mortgage servicing rights on the secondary market or subject such loans to a discount to reflect the risk associated with the loan.

9. Additionally, in the event that market participants purchase fewer thrift-originated loans and/or servicing rights, the reduced demand could deplete Flagstar's liquidity, reduce its ability to issue credit, and increase its exposure to the impact of interest rate fluctuations, all of which could significantly impact Flagstar's ability to complete in the mortgage industry and provide borrowers with competitive mortgage loan products.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

1   Executed on December ___17___, 2019 in Oakland County, Michigan.

2

3                                  *Courtney E Chang*

                                 Name: Courtney E Chang

4                                  Title: Assistant Treasurer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SER.135**

DECLARATION OF COURTNEY E. CHANG IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 21-15667, 11/22/2021, ID: 12295641, DktEntry: 31, Page 136 of 154

1  **MCGUIREWOODS LLP**
   David C. Powell (SBN 129781)
2  dpowell@mcguirewoods.com
   Carolee A. Hoover (SBN 282018)
3  choover@mcguirewoods.com
   Aaron R. Marienthal (SBN 273154)
4  amarienthal@mcguirewoods.com
   Alexander J. Gershen (SBN 291929)
5  agershen@mcguirewoods.com
   Two Embarcadero Center, Suite 1300
6  San Francisco, CA  94111-3821
   Telephone:  415.844.9944
7  Facsimile:  415.844.9922
8
9  Attorneys for Defendant
   Flagstar Bank, FSB
10
                    **UNITED STATES DISTRICT COURT**
11
                    **NORTHERN DISTRICT OF CALIFORNIA**
12

13  LOWELL and GINA SMITH, individually, and        Case No. 3:18-cv-05131-WHA
    on behalf of others similarly situated,
14                                                   **DECLARATION OF SEAN MANSELL**
                         Plaintiffs,                 **IN SUPPORT OF DEFENDANT**
15                                                   **FLAGSTAR BANK, FSB'S**
              vs.                                    **OPPOSITION TO PLAINTIFF'S**
16                                                   **MOTION FOR PARTIAL SUMMARY**
    FLAGSTAR BANK, FSB, a federal savings            **JUDGMENT**
17  bank, and DOES 1-100, inclusive,
                                                     Complaint Filed: August 22, 2018
18                       Defendant.                  FAC Filed: October 19, 2018
19
                                                     Honorable Judge William H. Alsup
20

21

22

23

24

25

26

27

28
                                               1
DECLARATION OF SEAN MANSELL IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**SER-136**

1

2 <u>**DECLARATION**</u>

3 I, Sean Mansell declare as follows:

4      1.    I am employed by Flagstar Bank, FSB ("Flagstar") as Director of Servicing Loan

5 Administration.  In my capacity as Director of Servicing Loan Administration, I am personally

6 familiar with certain record keeping practices of Flagstar, including those for mortgage accounts

7 and mortgage servicing.   In making this declaration, I relied upon records that were made by

8 Flagstar in the regular course of business at or near the time of the act, condition, or event reflected

9 in the records.  Such records include, but are not necessarily limited to, Flagstar's loan origination

10 and loan servicing files.  I have personal knowledge of Flagstar's recordkeeping system, including

11 their procedures for creating and maintaining these records.

12      2.    The records that I relied upon were prepared in a manner so as to assure the

13 trustworthiness of the records, and the accuracy of the matters related therein. I am familiar with

14 and have access to the electronic systems of record that Flagstar uses to create and record

15 information related to customer accounts. Much of the information stored in Flagstar's electronic

16 systems is captured automatically at or about the time of the events recorded.  Information that is

17 not automatically captured electronically by Flagstar's electronic systems is entered manually by

18 Flagstar's employees at or about the time of the events recorded, who have personal knowledge of

19 that information. All of Flagstar's computerized records are created and maintained in the regular

20 course of its business, and Flagstar relies on those records in the ordinary course to conduct its

21 business. I also have personal knowledge of and familiarity with Flagstar's business practices,

22 including the manner in which it originates, purchases, services, and sell mortgage loans.

23      3.    All of the records referred to below and attached to this declaration are public

24 documents and/or records maintained by Flagstar for originating and servicing of a loan made to

25 William Kivett ("Plaintiff").  I have examined each of these documents and know them to be from

26 Flagstar's system of record or Flagstar's loan file for Plaintiff and are the type of records that are

27 normally maintained and kept by Flagstar in the normal course of business with respect to its

28 servicing of loans.

Case: 21-15667, 11/22/2021, ID: 12295641, DktEntry: 31, Page 138 of 154

4.      The facts set forth herein are of my own personal knowledge and business records of Flagstar, and if called upon as a witness, I could and would testify competently to such facts. I submit this declaration in support of Flagstar's opposition to Plaintiff's motion for partial summary judgment as to Plaintiff's First Amended Complaint ("FAC").  I am over 18 years of age.

**As a Federal Thrift, Flagstar Originates, Purchases, Sells, and Services Mortgage Loans**

5.      Founded in 1987, Flagstar is a federally chartered savings bank.

6.      Flagstar is subject to federal regulation and oversight by the Office of the Comptroller of the Currency ("OCC"). Flagstar is also subject to regulation and examination by the Federal Deposit Insurance Corporation and the supervision of the Consumer Financial Protection Bureau.  As a federal thrift, Flagstar relies in large part on preemption determinations made by the OCC to determine whether it must comply with various state laws, including California Civil Code § 2954.8.

7.      Flagstar, through its own loan officers in 24 states and a wholesale network of brokers and correspondents, originate, purchase, sell and service mortgages in all 50 states.

8.      As of 2018, Flagstar originated approximately ███████ in loans, including approximately █████ in California, consisting of approximately ████ loans originated in California.

9.      As of 2018, Flagstar serviced or subserviced ████ loans, including █████ in California.  As of 2018, servicing revenue makes up approximately █ percent of Flagstar's total revenue and contributed to approximately ██████ in custodial deposits.

**Flagstar Has Authority to Create Escrow Accounts for the Benefit of the Borrowers at**
**Origination and During Loan Servicing**

10.      In originating mortgage loans, Flagstar is authorized, and sometimes required, to provide its borrowers with escrow services, including the establishment of an escrow account to collect money from borrowers in advance of their respective tax and insurance bills.

11.      Flagstar also retains authority to create escrow accounts on its own discretion in some instances.  All loans made by Flagstar allow it authority to provide for escrow accounts under

3

DECLARATION OF SEAN MANSELL IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**SER-138**

1  various circumstances, including upon a borrower's default or their failure to make any payment to

2  a tax entity or insurance company.

3        12.    Of the total loans originated by or through Flagstar in 2018, approximately ▮

4  have, or have had an associated escrow account.

5        13.    Escrow accounts are maintained by Flagstar for the benefit of the borrower by

6  relieving them of the obligation to manage the payment of property taxes and insurance premiums.

7  **At Loan Origination, Escrow Accounts Are Used To Reduce the Risk Associated With**

8  **Potential Property Loss, Tax Liens, Default, And Foreclosure, Thereby Reducing a**

9  **Borrower's Interest Rate and Reducing the Costs Associated with Lending**

10        14.    Flagstar uses escrow accounts to ensure that necessary funds are available to pay

11  taxes and insurance premiums. This reduces the risk of loss to the property securing the mortgage

12  loan from a tax liens, foreclosure, property damage, and loan default. An escrow account affects

13  the payment a borrower must pay each month to ensure that the borrower does not default on the

14  loan.

15        15.    By proving the necessary funds to pay for taxes and insurance, an escrow account

16  reduces the risk associated with the loan. The escrow account provides stability to a borrower,

17  reduces their risk of default, and reduces the risk of foreclosure due to failure to pay property taxes

18  and/or property loss due to failure to pay insurance premiums.

19        16.    At loan origination, Flagstar relies on escrow accounts to reduce the risk levels

20  associated with an individual borrower. An escrow account thereby allows Flagstar, in some

21  instances, to offer lower interest rates and extend more credit to its borrowers.

22        17.    During the underwriting and origination of a mortgage loan, Flagstar calculates the

23  borrower's relative risk levels in part based on Flagstar's understanding of the risk reduction

24  provided by an escrow account and the costs associated with providing an escrow account.

25        18.    Without the ability to create an escrow account on any particular loan, or in the event

26  escrow accounts become more costly to provide to a borrower, Flagstar may be forced to charge

27  higher interest rates, assess larger origination fees, or loan less money, to mitigate the additional

28  risk of loss, and it would severely inhibit Flagstar's desire to participate in originating agency loans,

DECLARATION OF SEAN MANSELL IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

SER-139

Case: 21-15667, 11/22/2021, ID: 12295641, DktEntry: 31, Page 140 of 154

as such agency loans have stringent escrow requirements.

19.    In other words, without the risk mitigation protections offered by an escrow account, Flagstar may be forced to either (1) increase the interest rate associated with the loan; (2) charge greater loan origination fees; (3) lend a smaller sum of funds; or (4) refrain from making the mortgage loan.

20.    Due to Flagstar's relatively small size in the mortgage origination industry, any increase in interest rates, increase in fees, or reduced loan amounts could significantly impact Flagstar's ability to offer and/or service competitive mortgage loan products.

**During Loan Servicing, Flagstar Relies on the**

**Risk Mitigation Protections Offered by an Escrow Account**

21.    If a mortgage loan did not have an escrow account, Flagstar may likely seek/require a premium for the loan due to the unmitigated risk of loss.

22.    However, if a mortgage loan already had an escrow account created at loan origination, Flagstar relies on this risk mitigation protection to assess the borrower's mitigated risk level.  If the maintenance of the escrow account would now impose a further cost on Flagstar (due to the payment of interest), Flagstar may be forced to seek an additional premium that was neither calculated or assessed at loan origination to compensate for those additional costs.

23.    Flagstar has contractual relationships with clients who are owners of mortgage servicing rights (MSRs), where Flagstar is the subservicer of a mortgage loan owned by the third-party MSR owner.   When Flagstar enters these contractual relationships, the costs and risks associated with maintaining an escrow account for the borrower are priced into the terms of the contractual agreements.

24.    Any increase in the risk portfolio of the underlying loans or an increase of the servicing and maintenance of the loans and escrow accounts could cause Flagstar to seek further compensation and premiums from its subservicing clients.  Due to the limited number of these contractual subservicing relationships, any adverse change in contractual terms and pricing could have a significant negative impact to Flagstar's mortgage servicing revenue, including the discontinuation of existing agreements with third party MSR owners and a decreased ability to

5

DECLARATION OF SEAN MANSELL IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

SER-140

1   compete with other mortgage loan servicers for new subservicing clients.

2         25.    If Flagstar could not exercise its preemption rights with respect to state laws

3   requiring the payment of interest on funds held in escrow, Flagstar would be faced with an increased

4   transaction and compliance cost associated with originating, purchasing, selling, and servicing a

5   loan.  Flagstar would be forced to provide extensive monetary investment in operations, regulatory,

6   compliance, legal, and accounting departments to ensure compliance with each respective state or

7   local law.

8   **Plaintiff's Escrow Account Lowered His Interest Rate, Borrowing Costs, and Risk Exposure**

9         26.    On September 19, 2012, William Kivett executed a promissory note reflecting a

10   $400,610.00 mortgage loan (the "Loan") secured by a deed of trust on property located at 1873

11   Love Circle, Simi Valley, California 93063 and recorded in the Ventura County Clerk and

12   Recorder's Office on September 28, 2012 as Document No. 20120928-00173292-0 (the "Deed of

13   Trust").  The Deed of Trust was executed by Plaintiff. A true and correct copy of the Note and the

14   Deed of Trust are attached hereto as **Exhibit A** (Note) and **Exhibit B** (Deed of Trust), respectively.

15         27.    Under Uniform Covenants, paragraph 2, the Deed of Trust provides for the lender's

16   establishment of an escrow account for the payment of property taxes and insurance premiums and

17   other potential charges related to the property in accordance with RESPA.

18         28.    Flagstar, pursuant to the Uniform Covenants contained in the Deed of Trust,

19   established an escrow account for the payment Plaintiff's property taxes and insurance premiums

20   and other potential charges related to the property.

21         29.    According to the terms of the Deed of Trust and Note, and having mitigated the risk

22   of loss to the Loan through an escrow account, Flagstar charged Plaintiff a 3.649% interest rate on

23   his Loan.

24         30.    If Plaintiff did not obtain an escrow account with respect to his Loan, Flagstar may

25   have (1) increased Plaintiff's interest rate to an amount greater than 3.649%; (2) charged Plaintiff

26   a higher origination fee to attempt to offset the risk of loss; or (3) decided not to offer Plaintiff the

27   $400,610.00 mortgage loan.

28         I declare under penalty of perjury under the laws of the United States and the State of

DECLARATION OF SEAN MANSELL IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Case: 21-15667, 11/22/2021, ID: 12295641, DktEntry: 31, Page 142 of 154

1   California that the foregoing is true and correct.

2       Executed on December 17th, 2019 in Oakland County, Michigan.

3

4

5                                    Name: Sean Mansell

6                                    Title: Director of Servicing Loan Administration

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SEAN MANSELL IN SUPPORT OF DEFENDANT FLAGSTAR BANK, FSB'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**United States District Court**
For the Northern District of California

WILLIAM KIVETT, individually, and on
behalf of others similarly situated,

        Plaintiffs,

    v.

FLAGSTAR BANK, FSB, a federal savings
bank, and DOES 1–100, inclusive,

        Defendants.

                        /

No. C 18-05131 WHA

**AMENDED CASE
MANAGEMENT ORDER AND
ORDER ON PLAINTIFFS'
MOTION TO ENLARGE TIME
AND EXTEND DEADLINES**

     In this class action, plaintiffs move to enlarge time and extend deadlines (Dkt. No. 127).
Flagstar did not respond.  Plaintiffs contend that Flagstar relied on declarations of its employees
that were never disclosed to plaintiffs in support of its motion for summary judgment and well
after the close of discovery.

     By **FRIDAY**, **DECEMBER 20**, at **NOON**, Flagstar shall show cause why the declarations of
Sean Mansell and Courtney Chang should not be stricken for failure to comply with the initial
disclosure requirements of Rule 26 and/or to timely seek to supplement their initial disclosure.

     Pending further order of the court, plaintiffs' response to Flagstar's motion for summary
judgment is postponed to **DECEMBER 30**.  Flagstar's response to plaintiffs' motion for partial
summary judgment is due on the established schedule.

     Replies in support of both sides motions for summary judgment are postponed to
**JANUARY 6**, pending further order.

**SER-143**

The parties are reminded that by **JANUARY 2, 2020**, they shall submit a proposed form of notice to the class with a plan of distribution by first-class mail. In light of plaintiffs' briefing on the one-way intervention issue, the judge is inclined to order the following:

> The approved form of notice shall be distributed no later than January 16, 2020. Class members will have until *either* March 2, 2020, *or* 45 days from receipt of the notice, whichever is later, to opt out of the class. Should plaintiffs prevail on their motion for partial summary judgment, judgment will be issued March 2. To ensure all class members are bound by the judgment, defendant is encouraged to work diligently with plaintiffs' counsel to ensure timely and effective notice is given.

With their proposed form of notice, both sides shall submit limited briefing, no longer than five pages, responding to this proposed course of action. The parties shall also address, with supporting authorities, the following two questions:

(1)    Does Rule 23(c)(2) require the opt-out period to run before granting *partial* summary judgment in favor of a class, as here, rather than judgment fully resolving the case?

(2)    Does Rule 23(c)(2) require the opt-out period to run before ruling on Flagstar's motion for summary judgment?

All other dates remain unchanged, pending further order of the court.

**IT IS SO ORDERED.**

Dated:  December 18, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

1  Thomas E. Loeser (SBN 202724)
   **HAGENS BERMAN SOBOL SHAPIRO LLP**
2  1301 Second Avenue, Suite 2000
   Seattle, WA 98101
3  Tel: (206) 623-7292
   toml@hbsslaw.com
4
   Peter B. Fredman (SBN 189097)
5  **LAW OFFICE OF PETER FREDMAN PC**
   2550 Ninth Street. Suite 111 (South Hall)
6  Berkeley, CA 94710
   Tel: (510) 868-2626
7  peter@peterfredmanlaw.com

8  *Attorneys for Plaintiff's WILLIAM KIVETT and*
   *BERNARD and LISA BRAVO, on behalf of themselves*
9  *and the certified Class*

10

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14

15  WILLIAM KIVETT and BERNARD and LISA          No. 3:18-CV-05131-WHA
    BRAVO, individually, and on behalf of others
16  similarly situated,                          **DECLARATION OF THOMAS E.**
                                                 **LOESER IN SUPPORT OF**
                    Plaintiffs,                  **PLAINTIFF'S MOTION FOR PARTIAL**
17                                               **SUMMARY JUDGMENT**

18       vs.                                     <u>CLASS ACTION</u>

19  FLAGSTAR BANK, FSB, a federal savings bank,  Hearing Date:  January 9, 2020
    and DOES 1-100, inclusive,                   Time:          8:00 a.m.
20                                               Courtroom:     12, 19th Floor
                    Defendant.
21                                               Complaint Filed: August 22, 2018
                                                 FAC Filed: October 19, 2018
22

23                                               Honorable Judge William Alsup

24

25

26

27

28

I, Thomas E. Loeser, do hereby declare as follows:

1.  I am an attorney duly licensed to practice before all courts of the States of California and Washington and before this Court. I am co-counsel of record for Plaintiffs William Kivett, Lisa and Bernard Bravo, and the putative class (collectively "Plaintiffs") in the above-entitled action. I have personal knowledge of the matters stated herein and, if called to testify, I could and would competently testify thereto.

2.  I submit this declaration in support of Plaintiff's Notice of Motion and Memorandum in Support of Motion for Partial Summary Judgment in the above entitled action (the "motion").

3.  Attached as **Exhibit A** is a true and correct copy of the deposition excerpts of Stephanie Ryan dated May 22, 2019.

4.  Attached as **Exhibit B** is a true and correct copy of the deposition excerpts of David Fetch dated May 21, 2019.

5.  Plaintiffs met and conferred with Defendant regarding the one-way intervention rule, and requested that it waive the rule here, but Defendant has declined to do so.

I declare under penalty of perjury under the laws of the State of Washington the foregoing is true and correct and that this Declaration was executed on December 5, 2019, in Seattle, Washington.

*/s/ Thomas E. Loeser*
THOMAS E. LOESER

DECL. OF THOMAS E. LOESER ISO PLF'S MOT.
FOR PARTIAL SUMMARY JUDGMENT     - 1
Case No.: 3:18-CV-05131-WHA
010748-11/1216187 V1

**SER-146**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2019, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of Electronic Filing to all ECF registrants.

                                            */s/ Thomas E. Loeser*
                                            THOMAS E. LOESER

DECL. OF THOMAS E. LOESER ISO PLF'S MOT.
FOR PARTIAL SUMMARY JUDGMENT      - 2
Case No.: 3:18-CV-05131-WHA
010748-11/1216187 V1

**SER-147**

# EXHIBIT A

30(B)(6) FLAGSTAR BANK, FSB- RYAN; April 19, 2018                    1

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4

 5   LOWELL and GINA SMITH, husband and

 6   Wife, and WILLIAM KIVETT, individually,

 7   and on behalf of others similarly situated,

 8         Plaintiff,

 9   -vs-                    No. 3:18-dv-05131-WHA (DMR)

10                          COMPL Filed April 19, 2018

11                          FAC Filed:  Oct 19, 2018

12                          Hon. William Alsup

13   FLAGSTAR BANK, FSB a federal savings

14   Bank, and DOES 1-1000, inclusive,

15         Defendant.

16   _____/

17   PAGE 1 - 95

18

19   The 30(b)(6)Deposition of - Flagstar Bank - FSB

20   STEPHANIE RYAN,

21   Taken at 3600 Center Point Parkway,

22   Pontiac, Michigan,

23   Commencing at 8:34, a.m.,

24   Wednesday, May 22, 2019,

25   Before Lucy Capobianco CSR 3061.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

SER-149

Case 2:11-cv-15667 11/22/2021 ID: 12295641 DktEntry: 36 Page 150 of 154
Case 3:18-cv-05131-WHA Document 123-1 Filed 12/05/19 Page 3 of 7
30(B)(6) FLAGSTAR BANK, FSB- RYAN; April 19, 2018                    44

```
 1        balance was last February 17th, can you determine what
 2        the balance was?
 3   A.   Not necessarily.
 4   Q.   Okay.  But you could pull up a record of all of the
 5        transactions in and out of that escrow, correct?
 6                 MS. HOOVER:  Objection to form.
 7   A.   Correct.
 8        BY MR. LOESER:
 9   Q.   So, for example, if there was a tax payment made on a
10        certain date, you would know what the beginning balance
11        was on that date, what the payment was, and what the
12        ending balance was after that payment was made,
13        correct?
14                 MS. HOOVER:  Objection to form.
15   A.   Correct.
16        BY MR. LOESER:
17   Q.   And because there's a record like that for every
18        transaction, you could, in fact, determine what the
19        balance was on any given date simply by looking at the
20        ending balance after one transaction and the beginning
21        balance for the next transaction, and if they're the
22        same, then you would know that the balance didn't
23        change on the days in between, correct?
24   A.   Correct.
25   Q.   You're aware that not just California, but, in fact,
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1          several states require lenders -- require lenders to

 2          pay interest on escrow monies that they collect from

 3          borrowers in connection with mortgage loans?

 4                  MS. HOOVER:  Objection to form.

 5   A.     Yes.

 6          BY MR. LOESER:

 7   Q.     And in California, the rule is for mortgages secured by

 8          one-to-four-unit residential buildings, the mortgage

 9          servicer is required to pay 2 percent annual interest

10          on escrow accounts?

11                  MS. HOOVER:  Objection to form.

12   A.     Correct.

13          BY MR. LOESER:

14   Q.     But as you mentioned, Flagstar doesn't do that, except

15          for loans with third-party MSRs, correct?

16   A.     Correct.

17   Q.     Do you know why that is?

18                  MS. HOOVER:  Just to note my objection, to

19          the extent if any of your conversations or knowledge

20          comes from conversations with counsel, either in-house

21          or outside counsel, you can't disclose those, but to

22          the extent you have knowledge within your own personal

23          knowledge or not from lawyers, you can answer the

24          question.

25          BY MR. LOESER:
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

SER-151

Case 2:11-56667 11/22/2021 ID: 12295641 DktEntry: 345 Page 152 of 154
Case 3:18-cv-05131-WHA Document 123-1 Filed 12/05/19 Page 9 of 7

30(B)(6) FLAGSTAR BANK, FSB- RYAN; April 19, 2018                                    46

```
 1   Q.    So for clarity, I'm not asking you to tell me what
 2         anything is that was told to you by your counsel, but
 3         to the extent you know the answer to my question,
 4         simply because you spoke to counsel about it and you
 5         may have covered it, doesn't change the fact that you
 6         had knowledge prior to such conversations.  So to the
 7         extent you have knowledge independent of your
 8         conversations with counsel, I would need you to answer
 9         the question.
10   A.    It is our bank policy that we do not pay interest on
11         escrow outside of restricted escrow.
12   Q.    And you don't know the reason why the policy is what
13         the policy is?
14   A.    No.  No.
15   Q.    So the extent of your knowledge is that you've been
16         told that this is our policy and we're not going to do
17         it, correct?
18   A.    Correct.
19               MS. HOOVER:  Objection to form.
20         BY MR. LOESER:
21   Q.    But at the same time, you know that for some loans
22         where another entity holds the servicing rights,
23         Flagstar is acting on their behalf, as a subservicer,
24         and so they are paying the interest on escrow for those
25         accounts?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                 MS. HOOVER:  Objection to form.
 2   A.    Correct.
 3         BY MR. LOESER:
 4   Q.    Okay.  So from at least the beginning of 2014 until
 5         January 28th, 2017, Flagstar did not pay interest on
 6         escrow for any of the subject loans, correct?
 7   A.    Correct.
 8   Q.    And that as we talked about, and I don't need to go
 9         through each of the specific dates because we already
10         have that on the record, from the period of
11         January 28th until approximately the end of 2018,
12         Flagstar began to pay interest on escrow for
13         third-party MSRs, rolling it out on a
14         third-party-by-third-party basis, correct?
15   A.    Correct.
16   Q.    So, for example, on January 28th, it began paying
17         interest on escrow for third-party MSR loans held by
18         Matrix, correct?
19   A.    Correct.
20   Q.    And then there was a couple others that it added in in
21         Q2 of that year and some more that it added in in 2018,
22         correct?
23   A.    Correct.
24   Q.    Are you aware of any plans or intentions of Flagstar to
25         begin to pay interest on escrow for loans where it
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

SER-153

| 1  |    | holds the MSRs? |
|----|----|----|
| 2  | A. | No. |
| 3  | Q. | As between loans where a third party holds the MSR |
| 4  |    | rights and loans where Flagstar holds the MSR rights, |
| 5  |    | are there any other differences in how escrow accounts |
| 6  |    | are handled other than whether or not interest on |
| 7  |    | escrow is paid? |
| 8  | A. | No. |
| 9  | Q. | Now, the information systems that you have access to, |
| 10 |    | there is a field or a designator in there that allows |
| 11 |    | you to determine whether or not interest on escrow is |
| 12 |    | being paid on a particular escrow account, correct? |
| 13 |    | MS. HOOVER:  Objection to form. |
| 14 | A. | Correct. |
| 15 |    | BY MR. LOESER: |
| 16 | Q. | So if someone were to come to you and say, Ms. Ryan, I |
| 17 |    | need to know whether or not we're paying interest on |
| 18 |    | escrow on a loan with the number 77472, you'd be able |
| 19 |    | to look in the system and say yes, it's being paid or |
| 20 |    | no, it's not being paid? |
| 21 | A. | Correct. |
| 22 | Q. | And, in fact, you would be able to look at the |
| 23 |    | transaction history for the escrow and determine the |
| 24 |    | amount of escrow that's been paid on that loan, |
| 25 |    | correct? |

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com