No. 21-15667

In the

# United States Court of Appeals

## For the Ninth Circuit

---

WILLIAM KIVETT, BERNARD BRAVO, and LISA BRAVO,
*Plaintiffs-Appellees*,

v.

FLAGSTAR BANK, N.A.,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of California
Honorable William Haskell Alsup
Case No. 3:18-cv-05131

---

## SUPPLEMENTAL BRIEF OF DEFENDANT-APPELLANT FLAGSTAR BANK, N.A.

---

David C. Powell
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
T: (415) 844-1970

Kathryn M. Barber
Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 E Canal Street
Richmond, VA 23219
T: (804) 775-1227

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
T: (919) 755-6688
jellis@mcguirewoods.com

*Counsel for Defendant-Appellant Flagstar Bank, N.A.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... ii

INTRODUCTION .................................................................................. 1

BACKGROUND ..................................................................................... 3

I.    National banks exercise their powers to administer mortgage escrow accounts consistent with federal law ................. 3

II.   Plaintiffs seek to apply California's IOE law to Flagstar, a national bank. ..................................................................... 8

III.  The Supreme Court provides new guidance on NBA preemption of state IOE laws ....................................................... 10

ARGUMENT ....................................................................................... 14

I.    California Civil Code § 2954.8(a) is preempted. ........................... 14

    A.   *Cantero* requires a "nuanced comparative analysis" assessing similarity to other preempted and non-preempted state laws. ........................................................... 14

    B.   California Civil Code § 2954.8(a) significantly interferes with a national bank's exercise of federal banking powers. ................................................................. 20

        1.   National banks have broad authority to administer mortgage escrow accounts ....................... 20

        2.   California Civil Code § 2954.8(a) burdens that broad authority in a similar manner as other preempted state laws. ............................................... 22

        3.   California Civil Code § 2954.8(a) does not resemble non-preempted state laws. .......................... 29

    C.   Sound federal banking policy confirms that conclusion ...... 34

II.   This Court's pre-*Cantero* decision in *Lusnak* cannot save California Civil Code § 2954.8(a). ............................................... 38

CONCLUSION ................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson National Bank v. Luckett,*
    321 U.S. 233 (1944) .............................................................. 16, 30, 31

*Barnett Bank of Marion County, N.A. v. Nelson,*
    517 U.S. 25 (1996) ......................................... 4, 17, 19-21, 28

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001) .............................................................. 29

*Cantero v. Bank of Am., N.A.,*
    49 F.4th 121 (2d Cir. 2022) .......................................... 10-11

*Cantero v. Bank of America, N.A.,*
    602 U.S. 2025 (2024) ................................................. *passim*

*Close v. Sotheby's, Inc.,*
    894 F.3d 1061 (9th Cir. 2018) ........................................ 40

*Easton v. Iowa,*
    188 U.S. 220 (1903) ............................................... 28-29, 35

*Fidelity Federal Savings & Loan Association v. De la Cuesta,*
    458 U.S. 141 (1982) ...................................... 15-16, 25-26

*First National Bank of San Jose v. California,*
    262 U.S. 366 (1923) ..................................................... 31, 35

*Franklin National Bank of Franklin Square v. New York,*
    347 U.S. 373 (1954) ................................................. 15, 18, 23

*Geier v. Am. Honda Motor Co., Inc.,*
    529 U.S. 861 (2000) .............................................................. 28

*Lusnak v. Bank of Am., N.A.,*
    883 F.3d 1185 (9th Cir. 2018) ................................... 2, 9, 10

*McClellan v. Chipman,*
    164 U.S. 347 (1896) .......................................................... 16, 33

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) ..................................... 2, 38, 40

*National Bank v. Commonwealth,*
    76 U.S. (9 Wall.) 353 (1869) ................................... 16, 32-33

*Talbott v. Bd. of Cnty. Comm'rs,*
    139 U.S. 438 (1891) ................................................................ 19

*Watters v. Wachovia Bank, N.A.,*
    550 U.S. 1 (2007) ........................................................ 3, 19, 35

**Statutes**

12 U.S.C. § 1 *et seq.* ............................................................... 3

12 U.S.C. § 24 ............................................................... 3, 22

12 U.S.C. § 25b .................................................... 4, 8, 13

12 U.S.C. § 371(a) ............................................... 3, 21

12 U.S.C. § 1828(o) ...................................................... 21-22

12 U.S.C. § 2601 *et seq.* ......................................................... 5

15 U.S.C. § 1601 *et seq.* ......................................................... 7

15 U.S.C. § 1639d .......................................... 7, 9, 27, 28, 42

Cal. Bus. & Prof. Code § 17200 ................................... 9

Cal. Civil Code § 2954.8(a) ...................................... *passim*

Conn. Gen. Stat. § 49-2a ...................................... 6, 35

Iowa Code § 524.905(2) ................................................. 6

Mass. Gen. Laws ch. 183, § 61 ................................... 6

Md. Code Ann., Com. Law § 12-109(b)(1) ........................................... 6, 35

Me. Rev. Stat. Ann. tit. 33, § 504 ...................................................... 6

Minn. Stat. § 47.20 ........................................................................... 6, 35

N.H. Rev. Stat. Ann. § 383-B:3-303(a)(7)(E) ...................................... 6, 35

N.Y. G.O.L. § 5-601 ......................................................................... 6, 35

Or. Rev. Stat. § 86.205 ..................................................................... 6

Or. Rev. Stat. § 86.245 ..................................................................... 6

R.I. Gen. Laws § 19-9-2 .................................................................... 6, 35

Utah Code Ann. § 7-17-3 ................................................................... 6, 35

Vt. Stat. Ann. tit. 8, § 10404 ........................................................... 6

Wis. Stat. § 138.052(5) ..................................................................... 6

## Rules and Regulations

12 C.F.R. § 5.20(f)(i) ....................................................................... 36

12 C.F.R. § 34.4(a) ........................................................................... 22

12 C.F.R. § 1024.17 ......................................................................... 5

## Other Authorities

Br. in Op., *Flagstar Bank, N.A. v. Kivett*,
No. 22-349 (U.S. Dec. 13, 2022). ..................................................... 11

Br. of Amici Curiae Bank Policy Institute et al.,
No. 18-212, 2018 WL 4464737 (Sept. 17, 2018) ................................. 25

Br. of Amicus Curiae Flagstar Plaintiffs, *Cantero v. Bank of Am., N.A.*,
No. 22-529 (Dec. 15, 2023) ............................................................. 39

Br. of the Bank Policy Institute, et al., *Cantero v. Bank of Am., N.A.*,
No. 21-400 (2d Cir. Oct. 25, 2024) ...................................................... 36

Bruce E. Foote, Cong. Rsch. Serv., *Mortgage Escrow Accounts: An Analysis of the Issues* (1998) ........................................... 4

FDIC, National Rate on Non-Jumbo Deposits (less than $100,000): 12-Month CD (Mar. 29, 2021),
https://fred.stlouisfed.org/ series/CD12NRN ..................................... 25

*Flagstar Bank, N.A. v. Kivett*,
No. 22-349 (U.S. June 10, 2024) .................................................. 13, 38

Government Accountability Office, *Study of the Feasibility of Escrow Accounts on Residential Mortgages Becoming Interest Bearing* (1973), https://www.gao.gov/assets/b-114860-091984.pdf; .................................................................... 6

H.R. 3542, 102d Cong. (1991) .......................................................... 6

H.R. 27, 103d Cong. (1993) .............................................................. 6

OCC Br., *Ill. Bankers Ass'n v. Raoul*,
No. 1:24-cv-07307 (N.D. Ill. Oct. 2, 2024) ........................................ 28

OCC Interpretive Letter No. 1041,
2005 WL 3629258 (Sept. 28, 2005) ............................................ 4, 22

OCC, *Interpretive Ruling Concerning National Bank Service Charges*,
48 Fed. Reg. 54,319 (Dec. 2, 1983) .................................................. 37

Pet. for Writ of Certiorari, *Cantero v. Bank of Am., N.A.*,
No. 22-529 (U.S. Dec. 5, 2022) ......................................................... 11

Petrs.' Br., *Cantero v. Bank of Am., N.A.*,
No. 22-529 (U.S. Dec. 8, 2023) ......................................................... 12

U.S. Br., *Cantero v. Bank of Am.*, N.A.,
No. 22-529 (U.S. Dec. 15, 2023) ....................................................... 12

U.S. Br., *Flagstar Bank, N.A. v. Kivett*,
Nos. 22-349 and 22-529 (U.S. Aug. 30, 2023)......................................11

# INTRODUCTION

Under the Supreme Court's decision in *Cantero v. Bank of America, N.A.*, a state law "significantly interfere[s] with the exercise by [a] national bank of its powers" and is thus preempted if a "nuanced comparative analysis" (1) assessing the text and structure of the relevant laws, (2) comparing the laws and interference at issue with those involved in other precedents, and (3) employing common sense, shows that the law interferes with federal banking powers in the same way as other laws the Supreme Court has held preempted and is unlike the laws the Supreme Court has held permissible. 602 U.S. 205, 220 (2024). This test requires a qualitative, precedent-heavy assessment of the *kind* of interference a state law poses.

Applying that test here leads to one conclusion: California Civil Code § 2954.8(a)'s requirement for national banks like Flagstar Bank, N.A., to pay interest on funds held in mortgage escrow accounts is preempted under the Dodd-Frank Act's codified standard. California's law limits the exercise of broad federal banking powers in the same or similar manner as other preempted state laws. In so doing, it interferes with the flexibility and efficiency Congress wanted banks to wield in the

mortgage lending realm. And it is nothing like the laws the Supreme Court has held permissible. It is not a generally applicable law governing a bank's daily course of business, nor does it simply require a federal bank to perform duties that federal law already commands. *Cantero*'s application here is thus straightforward.

Contrary to Plaintiffs' contentions, this Court's pre-*Cantero* decision in *Lusnak v. Bank of America* does not require a different result. 883 F.3d 1185 (9th Cir. 2018). The Supreme Court vacated and remanded the initial panel decision here for consideration of its new controlling guidance in *Cantero*. The Court should undertake that analysis without a thumb on the scale for its pre-*Cantero* National Bank Act precedent. This Court's cases require panels to disregard circuit precedent that is "clearly irreconcilable" with "intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). And *Cantero* requires a preemption analysis that is directly opposed to *Lusnak*'s categorical and incorrect preemption rule. *Lusnak* is thus effectively overruled. This Court should reverse the district court and remand to enter judgment for Flagstar.

2

# BACKGROUND

## I. National banks exercise their powers to administer mortgage escrow accounts consistent with federal law.

"The United States maintains a dual system of banking, made up of parallel federal and state banking systems" that "co-exist and compete." *Cantero*, 602 U.S. at 209-10. Federally chartered banks are principally subject to federal oversight and regulation, while state-chartered banks are "subject to additional state oversight and regulation." *Id.* at 210.

The National Bank Act (NBA), 12 U.S.C. § 1 *et seq.*, established the federal banking system in 1863 and defines that system's exclusive sphere. *See Cantero*, 602 U.S. at 210; *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 13-14 (2007). The NBA grants federally chartered banks enumerated and incidental powers, including the express authority to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate" and all "incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. §§ 24, 371(a). As amended by Dodd-Frank in 2010, the NBA expressly preempts any "State consumer financial law" that, "in accordance with the legal standard for preemption" set forth in *Barnett Bank of Marion County,*

3

*N.A. v. Nelson*, 517 U.S. 25 (1996), "prevents or significantly interferes with the exercise by the national bank of its powers." 12 U.S.C. § 25b(b)(1)(B).

The Office of the Comptroller of the Currency (OCC), national banks' primary federal regulator, has long recognized that national banks possess the incidental powers to provide, establish, and service mortgage escrow accounts. OCC Interpretive Letter No. 1041, 2005 WL 3629258, at *2 (Sept. 28, 2005). And because such accounts are an important risk-mitigation tool for both mortgage lenders and borrowers, national banks often employ them when extending or servicing residential mortgage loans. *See Cantero*, 602 U.S. at 210 ("Mortgage-escrow accounts are designed to protect both the bank and the borrower."). Mortgage escrow accounts allow borrowers to make installment payments into escrow, which lenders then use to pay the lump-sum amounts the borrowers owe in property taxes, insurance premiums, and related charges. This system simplifies budgeting for borrowers while avoiding issues like tax liens, lapses in insurance coverage, or foreclosure. *See id.*; *see also* Bruce E. Foote, Cong. Rsch. Serv., *Mortgage Escrow Accounts: An Analysis of the Issues* 1-2 (1998).

Federal law "extensively regulates" mortgage escrow accounts. *Cantero*, 602 U.S. at 211. Most directly, the Real Estate Settlement Procedures Act of 1974 (RESPA), 12 U.S.C. § 2601 *et seq.*, governs national banks' administration of mortgage escrow accounts. *Cantero*, 602 U.S. at 211; *see* 12 U.S.C. §§ 2605, 2609. Among other requirements, RESPA requires lenders to make timely payments from escrow accounts when charges become due and to promptly return any escrowed funds after a mortgage loan is paid off. *See* 12 U.S.C. § 2605(g). The law also limits the amount that a lender may require a borrower to deposit in any escrow account each month. *See id.* § 2609(a). And it requires lenders to provide borrowers with certain statements and notifications about escrow account balances and the charges accounts are intended to cover. *See id.* § 2609(b)-(c). The statute even imposes civil penalties for failures to transmit required statements. *Id.* § 2609(d). RESPA's implementing regulation, Regulation X, further details extensive requirements for performing escrow account analyses, providing escrow account statements, and disbursing escrow funds. *See generally* 12 C.F.R. § 1024.17.

But RESPA "does *not* mandate that national banks pay interest to borrowers on the balances of their escrow accounts." *Cantero*, 602 U.S. at 211 (emphasis added). In fact, Congress has considered such a requirement three times—but has never adopted it. *See generally*, Government Accountability Office, *Study of the Feasibility of Escrow Accounts on Residential Mortgages Becoming Interest Bearing* (1973), https://www.gao.gov/assets/b-114860-091984.pdf; H.R. 3542, 102d Cong. (1991); H.R. 27, 103d Cong. (1993).

Meanwhile, several States have taken a different approach. At least twelve States including California have their own unique laws requiring banks to pay interest on funds held in mortgage escrow accounts.[1] Each of these interest-on-escrow (IOE) laws differs from the others by imposing different interest rates that are calculated differently and apply to different properties. Relevant to this action, California Civil

---

[1] *See* Conn. Gen. Stat. § 49-2a; Mass. Gen. Laws ch. 183, § 61; Md. Code Ann., Com. Law § 12-109(b)(1); Me. Rev. Stat. Ann. tit. 33, § 504; Minn. Stat. § 47.20, subdiv. 9(a); N.H. Rev. Stat. Ann. § 383-B:3-303(a)(7)(E); N.Y. G.O.L. § 5-601; Or. Rev. Stat. §§ 86.205, 86.245; R.I. Gen. Laws § 19-9-2; Utah Code Ann. § 7-17-3; Vt. Stat. Ann. tit. 8, § 10404. Wisconsin no longer requires paying interest on escrow for mortgage loans originated after April 2018, *see* Wis. Stat. § 138.052(5)(a)-(am), while Iowa law permits but does not require paying interest on escrow funds, Iowa Code § 524.905(2).

Code § 2954.8(a), requires financial institutions to pay at least 2% interest annually on escrow accounts associated with "loans upon the security of real property" located in California and "containing only a one-to four-family residence."

Finally, although it does not apply here, the Truth in Lending Act (TILA), as amended by Dodd-Frank, 15 U.S.C. § 1601 *et seq.*, also addresses mortgage escrow accounts for certain higher-priced mortgage loans (a category that does not include Plaintiffs' loans). TILA requires creditors—whether state banks, federally chartered banks, or other lenders—to establish escrow accounts for that specific subset of mortgage loans. *See id.* § 1639d(a)-(b). A creditor required to establish an escrow account under TILA's Section 1639d must pay interest on the amount held in the account, "[i]f prescribed by applicable State or Federal Law," "in the manner as prescribed by that applicable State or Federal law." *Id.* § 1639d(g)(3).

7

## II. Plaintiffs seek to apply California's IOE law to Flagstar, a national bank.

Flagstar is a national bank engaged in mortgage lending and servicing.[2]  2-ER-206.  Like many national banks, Flagstar uses escrow accounts to reduce the risks associated with individual mortgage loans.  2-ER-207.  Flagstar did so for Plaintiffs William Kivett and Bernard and Lisa Bravo, who had home mortgage loans in California that Flagstar serviced.  1-ER-8; 2-ER-209.  The deeds of trust securing those loans required escrow accounts.  1-ER-7-8.  According to OCC regulations and Flagstar's understanding of applicable law, Flagstar did not pay interest on the amounts held in escrow for either loan.  1-ER-5-6.

Plaintiffs filed this putative class action asserting that California Civil Code § 2954.8(a) applied to Flagstar and that the company's nonpayment of interest on California mortgage escrow accounts was an "unlawful . . . business act or practice" under California's Unfair

---

[2] At the litigation's outset, Flagstar was Flagstar Bank, FSB, a federally chartered savings bank.  It converted to a federally chartered national bank on December 1, 2022.  Dodd-Frank's preemption standard applies to all federally chartered banks, including savings banks.  *See* 12 U.S.C. § 25b(a)(1), (b)(1)(B) (defining "national banks" to include "any bank organized under the laws of the United States" and applying *Barnett Bank* preemption standard to all national banks).

Competition Law. Cal. Bus. & Prof. Code § 17200. In response, Flagstar argued that Section 2954.8(a) was preempted as applied to national banks because it would significantly interfere with the exercise of national banking powers. 2-ER-179-80, 146.

The district court certified a class of California borrowers, rejected Flagstar's preemption argument, and granted Plaintiffs' motion for summary judgment on liability, holding Flagstar liable for failing to pay interest on class members' escrowed funds. 1-ER-34. The court enjoined Flagstar to pay interest going forward and awarded the class around $9 million in restitution and prejudgment interest. 1-ER-3, 1-ER-32.

On appeal, the panel affirmed the district court's preemption holding based on an earlier decision by a three-judge panel in *Lusnak v. Bank of America, N.A.*, 883 F.3d 1185 (9th Cir. 2018). *See* ECF No. 48 at 5. *Lusnak* held that the NBA did not preempt Section 2954.8(a) as applied to similar claims against another national bank. 883 F.3d at 1194-97. The *Lusnak* panel relied on Dodd-Frank's TILA amendment requiring creditors to pay interest on escrow accounts associated with higher-cost mortgages, "if prescribed by applicable State or Federal law." 15 U.S.C. § 1639d(g)(3). The panel acknowledged that, as here,

Section 1639d did not apply to the plaintiffs' loans, yet viewed the provision as "express[ing] Congress's view that [state IOE] laws would not necessarily prevent or significantly interfere with a national bank's operations." *Lusnak*, 883 F.3d at 1194-95. On that basis, it held that Section 2954.8(a) was not preempted. *Id.* at 1197.

In this case, Flagstar preserved its argument on appeal that *Lusnak* was wrongly decided. *See* Op. Br. 31-32. But recognizing that *Lusnak* was then-binding authority, *see id.* at 32 n.8, Flagstar primarily focused on how far *Lusnak* extended. Flagstar argued that *Lusnak* should not be controlling as to smaller banks like Flagstar and should not necessarily control on a different evidentiary record. *See* Op. Br. 24-31. The panel disagreed. It viewed "*Lusnak*'s language [as] unqualified." ECF No. 48 at 3. And it held that, under *Lusnak*, Flagstar "could not succeed in arguing that § 2954.8 was preempted by the NBA." *Id.*

## III. The Supreme Court provides new guidance on NBA preemption of state IOE laws.

Shortly after the panel's initial decision in this case, the Second Circuit reached a contrary conclusion about preemption of New York's similar IOE law. In *Cantero v. Bank of America, N.A.*, 49 F.4th 121 (2d Cir. 2022), the Second Circuit found "incorrect" *Lusnak*'s nearly

categorical view "that the TILA amendments somehow reflected Congress's judgment that all escrow accounts . . . must be subject to [state IOE] laws." *Id.* at 137. The court adopted a converse, nearly categorical rule that the NBA preempted any state law that "would exert control over a banking power." *Id.* at 132.

Both Flagstar and the *Cantero* plaintiffs petitioned the Supreme Court for certiorari to resolve the conflict. In their cert.-stage briefing, the *Cantero* plaintiffs and Plaintiffs here continued to invoke and defend *Lusnak* and the TILA theory. *See* Pet. for Writ of Certiorari at 23-24, *Cantero v. Bank of Am., N.A.*, No. 22-529 (U.S. Dec. 5, 2022); Br. in Op. at 14, *Flagstar Bank, N.A. v. Kivett*, No. 22-349 (U.S. Dec. 13, 2022). When the Solicitor General weighed in at the Court's invitation, however, she argued that *Cantero*, *Lusnak*, and the panel's initial decision here all erred in their approach to preemption. In the United States' view, while *Cantero*'s rule was too broad, *Lusnak* and the panel here likewise "erred in treating Section 1639d as determinative of the preemption question." U.S. Br. at 20, *Flagstar Bank, N.A. v. Kivett*, Nos. 22-349 and 22-529 (U.S. Aug. 30, 2023).

The Supreme Court granted certiorari in *Cantero* and held Flagstar's petition. At the merits stage, the *Cantero* plaintiffs abandoned express reliance on *Lusnak*'s unqualified view of TILA, arguing only that Section 1639d provides some evidence of a lack of significant interference. Petrs.' Br. at 43, *Cantero v. Bank of Am., N.A.*, No. 22-529 (U.S. Dec. 8, 2023). Meanwhile, the United States, while supporting the plaintiffs on the merits, never even mentioned TILA or Section 1639d. *See* U.S. Br. at 21-34, *Cantero v. Bank of Am., N.A.*, No. 22-529 (U.S. Dec. 15, 2023).

Ultimately, the Supreme Court declined to adopt either side's approach. *See Cantero*, 602 U.S. at 221 (describing parties' positions as "opposite extreme[s]"). And it eschewed any reliance on TILA— referencing Section 1639d in its opinion only to note that "[a]ll parties agree[d] that § 1639d d[id] not apply to the mortgages in this case." *Id.* at 211 n.1.

The Supreme Court held instead that in applying Dodd-Frank's codified *Barnett Bank* standard, courts must conduct a "nuanced comparative analysis" lining up the challenged state law against those the Supreme Court had examined in its precedents "on which *Barnett*

*Bank* relied." *Id.* at 220. It is those precedents, the Court explained, not Section 1639d, that "furnish content to *Barnett Bank*'s significant-interference test—and therefore also to Dodd-Frank's preemption standard incorporating *Barnett Bank*." *Id.* at 219. Thus, in deciding whether a state consumer financial law "prevents or significantly interferes with the exercise by [a] national bank of its powers," 12 U.S.C. § 25b(b)(1)(B), courts must "do as *Barnett Bank* did": they must "take account of [the Supreme Court's] prior decisions . . . and similar precedents" addressing NBA preemption to "make a practical assessment of the nature and degree of the interference caused by [the] state law." *Cantero*, 602 U.S. at 215-16, 219-20.

Because the Second Circuit had not conducted this analysis, the Supreme Court vacated and remanded for further proceedings consistent with its decision. *Id.* at 221. Soon after, the Supreme Court granted Flagstar's cert. petition, vacated the panel's initial decision, and remanded "for further consideration in light of *Cantero*." *Flagstar Bank, N.A. v. Kivett*, No. 22-349 (U.S. June 10, 2024).

On remand, the panel here issued a new memorandum disposition holding, as it had before, that *Lusnak*'s "unqualified" language controlled

and thus Section 2954.8 was not preempted. ECF No. 61. Flagstar petitioned for panel rehearing and, in the alternative, rehearing en banc, arguing that *Lusnak* is "clearly irreconcilable" with *Cantero* and that Section 2954.8(a) is prempted under *Cantero*. ECF No. 66.

Over Plaintiffs' opposition—and assertion that *Lusnak* remains controlling—the panel granted the petition for panel rehearing, withdrew its memorandum disposition of August 22, 2024, and ordered the parties to file simultaneous supplemental briefs "addressing whether California Civil Code § 2954.8(a) is preempted by the National Bank Act under the standard and methodology described in *Cantero*." ECF No. 75.

## ARGUMENT

## I. California Civil Code § 2954.8(a) is preempted.

Under the standard and methodology described in *Cantero*, Section 2954.8(a) significantly interferes with national banks' exercise of their federal powers and is thus preempted.

### A. *Cantero* requires a "nuanced comparative analysis" assessing similarity to other preempted and non-preempted state laws.

*Cantero* makes clear that, under *Barnett Bank's* now-codified "legal standard for preemption," preemption is decided by examining the "nature and degree of the interference" posed by a state law "based on

14

the text and structure of the [federal and state] laws, comparison to other precedents, and common sense." *Cantero*, 602 U.S. at 214, 219-20 & n.3. Rather than employ any "categorical test" dividing preempted state laws from non-preempted ones by a "clear line," courts must engage in a more careful "comparative analysis" assessing, in the same manner that "*Barnett Bank* did," the relevant state law in light of previous ones the Supreme Court has examined. *Id.* at 215-16, 220. Because *"Barnett Bank* sought to carefully account for and navigate [the Supreme] Court's prior bank preemption cases" to determine "whether a state law regulating national banks falls on the permissible or preempted side of the significant-interference line," lower courts confronting preemption questions must do the same. *Id.* at 219, 221. Only by performing this "practical assessment of the nature and degree of interference caused by a state law" as it compares to previously addressed laws, *Cantero* emphasized, may courts answer the legal question of NBA preemption. *Id.* at 219-20.

*Cantero* identified the precedents most relevant to this analysis. *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954), and *Fidelity Federal Savings & Loan Association v. De la Cuesta*,

458 U.S. 141 (1982), along with "the other precedents on which *Barnett Bank* relied," "together illustrate the kinds of state laws that significantly interfere with the exercise of a national bank power and thus are preempted." *Id.* at 217, 220. Meanwhile, *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944), *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353 (1869), and *McClellan v. Chipman*, 164 U.S. 347 (1896), reflect "the kinds of state-law interference that are not 'significant' and that are therefore not preempted." *Id.* at 217-19. If a "state law's interference with national bank powers is more akin to the interference in" the first set of cases, it is preempted; if it's more like the interference in the latter three, it is not. *Id.* at 220.

*Cantero* and these precedents further demonstrate the "comparative analysis" courts must undertake. *Id.* at 220. Applying the significant-interference test "as *Barnett Bank* did" requires comparing the *kind* of interference the state law poses to the *kinds* of interference the Court has found to fall on either side of the permissible/preempted line. *Id.* at 215.

In *Barnett Bank*, for example, the Supreme Court held that a Florida law preventing banks from selling insurance in small towns "was

preempted because the law significantly interfered with the national bank's ability to exercise a power—selling insurance—authorized by federal law." *Cantero*, 602 U.S. at 214. Federal law, *Barnett Bank* explained, "explicitly granted a national bank an authorization, permission, or power" to sell insurance "with no indication that Congress intended to subject that power to local restriction." *Id.* at 215 (quoting *Barnett Bank,* 517 U.S. at 34-35). By prohibiting the sale of insurance in small towns, the Florida law impermissibly "interfere[d] with the national bank's ability to" exercise its federal banking powers "efficiently." *Id.* at 215-16.

In reaching that conclusion, the *Barnett Bank* Court acknowledged that the federal and state laws "[did] not impose directly conflicting duties on national banks"—that is, federal law did not say, "banks must sell insurance" while state law said, "banks may not." *Id*. And the Court did not ask how many sales the bank might lose if it had to comply with the state law, or what other costs that state regulation might impose on the bank. The potential costs of compliance were not what mattered. What mattered was, as *Cantero* explained, that federal law had granted national banks a broad, unqualified power to sell insurance that the state

law "could not limit" by restricting banks' insurance sales to certain areas while barring it in small towns.  *Id.* at 215.

Similarly, in *Franklin*, where a state law prohibited banks from using the word "savings" in advertising, the trial court had "accumulated a large record devoted mainly to the merits and demerits of the New York legislation and its consequences upon banks and depositors."  347 U.S. at 376.  But the Supreme Court did not rely on that record to decide that the state law significantly interfered with the (express and incidental) federal banking powers to accept and advertise acceptance of savings deposits.  In fact, the Court gave no weight to those empirical "consequences" in deciding the legal preemption question before it.  *Id.* at 376.  Instead, the Court rested on the legal conclusion that in authorizing the "national bank to engage in a business," Congress also implicitly authorized the bank "to let the public know about it," and the state law wrongly interfered with that authority.  *Id.* at 377-78.

The Court's analysis in *Barnett Bank*, *Franklin*, and *Cantero* thus reflects that it is the *type* of interference involved that matters for NBA preemption.  Preemption does not turn on whether national banks *could* comply with both federal and state law in theory, nor on what compliance

with the state law would cost any individual bank or national banks as a whole. State laws are preempted when they limit, in the same manner as the laws the Supreme Court has held preempted, the exercise of national banking powers that Congress did not intend to subject to such state restrictions. *Barnett Bank*, 517 U.S. at 31. In other words, determining whether a state law "significantly interfere[s] with the exercise of a national banking power and thus [is] preempted" involves a qualitative inquiry into a state law's interaction with federal banking powers, not a quantitative assessment of any one law's impact on any one bank. *Cantero*, 602 U.S. at 217; *see also id.* at 219 (preemption determination focuses on "whether a state law regulating national banks falls on the permissible or preempted side of the significant-interference line").

This approach makes sense. Congress enacted the NBA to establish an independent, uniform national banking system. *See Watters*, 550 U.S. at 13-14 (observing that Congress designed the NBA to avoid "[d]iverse and duplicative" state regulation of national banking activities); *Talbott v. Bd. of Cnty. Comm'rs*, 139 U.S. 438, 443 (1891) ("[T]he character of the system implies[] an intent to create a national banking system . . . with

uniform operation.").  If NBA preemption hinged on case-specific facts about compliance costs rather than a qualitative analysis of *how* a "state law[] interfere[s] with national bank powers," *Cantero*, 602 U.S. at 220, courts could—and almost certainly would—reach different conclusions about preemption of the same laws.  Identical IOE laws might be held preempted in one court and upheld in another, with national banks that operate across the fifty states unclear about their obligations across jurisdictions.  Such a result would powerfully undermine Congress's intent to create a nationally uniform banking system.

**B.  California Civil Code § 2954.8(a) significantly interferes with a national bank's exercise of federal banking powers.**

The National Bank Act preempts California Civil Code § 2954.8(a) because that state law, and its relationship with the federal banking powers at issue, parallels the kinds of interference imposed by those state laws that the Supreme Court has found preempted and is distinct from those the Court has found permissible.

**1.  National banks have broad authority to administer mortgage escrow accounts.**

As *Cantero* emphasized, "federal law's 'grants of both enumerated and incidental powers to national banks' are 'grants of authority not

normally limited by, but rather ordinarily pre-empting, contrary state law.'" 602 U.S. at 215 (quoting *Barnett Bank*, 517 U.S. at 32). Indeed, "where Congress has not expressly conditioned the grant of [a national banking] 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies." *Barnett Bank*, 517 U.S. at 34. In *Barnett Bank*, for example, federal law gave national banks "a broad, not a limited, permission" to sell insurance, including the "added 'incidental power'" to sell insurance in small towns—with "incidental" itself a term "suggest[ing] freedom from conflicting state regulation." *Id.* at 32, 37. The Supreme Court thus presumed that the federal authority of "small town national banks . . . to sell insurance" obtained "whether or not a State" granted "similar approval." *Id.* at 37.

The same presumption should apply here. Federal law grants national banks expansive, unqualified authority to engage in mortgage lending, including by administering mortgage escrow accounts. The NBA broadly provides that "any national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate." 12 U.S.C. § 371(a). And it conditions that authority only on *federal* regulations prescribed under 12 U.S.C.

§ 1828(o) and any other "such restrictions and requirements as the [*federal* OCC] may prescribe." *Id.*

The NBA also expressly authorizes national banks to exercise "all such incidental powers as shall be necessary to carry on the business of banking." *Id.* § 24.  OCC guidance confirms—and no one here disputes—that these incidental powers include the authority to provide, establish, and service associated mortgage escrow accounts.  OCC Interpretive Letter No. 1041, 2005 WL 3629258, at *2.  Again, nothing in the NBA or in OCC guidance contemplates that such powers should be subject to local restrictions.  *Cf.* 12 C.F.R. § 34.4(a) ("A national bank may make real estate loans . . . , without regard to state law limitations concerning . . . [e]scrow accounts.").  The relevant federal laws here thus number among those that "ordinarily preempt[] contrary state law." *Cantero*, 602 U.S. at 215.

### 2. California Civil Code § 2954.8(a) burdens that broad authority in a similar manner as other preempted state laws.

California's IOE law significantly interferes with national banks' ability to exercise these broad, unqualified federal banking powers in a

manner analogous to the state laws considered in the precedents *Barnett Bank* relied on: *Franklin*, *Fidelity*, and *Easton*.

**Franklin.** The Supreme Court's decision in *Franklin National Bank v. New York*, 347 U.S. 373 (1954), is the most damning for California's IOE law. *Franklin* concerned a state-law advertising regulation that *Cantero* identified as "the paradigmatic example of significant interference." 602 U.S. at 216. As noted, the New York law "prohibited most banks 'from using the word saving or savings in their advertising or business.'" *Id.* (quoting *Franklin*, 347 U.S. at 374). "Importantly," however, as *Cantero* observed, "the New York law did not bar national banks from receiving savings deposits, 'or even' from 'advertising that fact.'" *Id.* (quoting *Franklin*, 374 U.S. at 378). It simply required that when banks advertised their deposit accounts, they did so without using the term "savings."

As *Cantero* explained, that regulation on advertising "significantly interfered" with the bank's "statutory power 'to receive savings deposits.'" *Id.* Because the bank could not advertise those accounts "'using the commonly understood description which Congress ha[d] specifically selected' to describe their activities: receiving savings deposits," the New

23

York law "interfer[ed] with the national bank's ability to [advertise] efficiently." *Id*. On that basis, it was preempted.

California Civil Code § 2954.8(a) imposes at least as significant a burden or interference on a national bank's exercise of its power to administer mortgage escrow accounts—if not more. To be sure, it does not bar national banks from entering into mortgage loans, requiring borrowers to make monthly payments into escrow, or administering such mortgage escrow accounts. But neither did the New York law in *Franklin* bar national banks from receiving deposits or advertising that fact. And what California does target is far more core to a national bank's operation than the words it uses in its advertising.

California's IOE law dictates a national bank's pricing and terms of its mortgage products. A federally chartered bank can only offer mortgage escrow accounts if it does so on the terms the state law requires, paying 2% interest to customers on escrowed funds. Section 2954.8(a) is thus no less intrusive than a law instructing a national bank that it must pay interest and what interest rate to pay on traditional savings accounts. Indeed, mortgage escrow accounts *are* a form of savings account. And not only that. Section 2954.8(a) sets the required interest

rate at a level many times more than what the market would otherwise demand for such accounts.[3]

No one could think, reading *Franklin* (or *Cantero*'s description of that case), that the codified *Barnett Bank* standard would permit such a state law. If a State cannot remove one word from a bank's options for advertising its savings accounts, it plainly cannot set the core terms of an account itself, including by requiring an above-market interest rate. Yet Section 2954.8 does exactly that. It thereby prevents national banks from efficiently exercising their mortgage lending powers just as the law in *Franklin* did.

**Fidelity**. The significant interference found in *Fidelity Federal Savings & Loan Association v. De la Cuesta,* 458 U.S. 141 (1982), further demonstrates that Section 2954.8(a) cannot stand. There, federal law authorized federal savings and loans to include and enforce due-on-sale clauses in their contracts. *Id*. at 155. "But California law 'limited' that

---

[3] *See* Br. of Amici Curiae Bank Policy Institute et al., *Bank of Am., N.A. v. Lusnak*, No. 18-212, 2018 WL 4464737, at *12 (Sept. 17, 2018) (noting that a 2% interest rate was "six times higher than the long-run average . . . by FDIC-insured U.S. depository institutions on certificates of deposit"); FDIC, National Rate on Non-Jumbo Deposits (less than $100,000): 12-Month CD (Mar. 29, 2021), https://fred.stlouisfed.org/series/CD12NRNJ.

right to circumstances where the federal savings and loan association could make a showing that enforcing the due-on-sale clause was reasonably necessary." *Cantero*, 602 U.S. at 216-17 (quoting *Fidelity*, 458 U.S. at 154-55). As in *Franklin*, "[t]he federal savings and loan association could readily comply with both the state and federal laws." *Id.* at 217. Still, "the California law was preempted because the savings and loan could not exercise a due-on-sale clause 'solely at its option.'" *Id.* (quoting *Fidelity,* 458 U.S. at 155). As *Cantero* explained, the law thus impermissibly "interfered with 'the flexiblity given' to the savings and loan by federal law." *Id.*

Like the California law in *Fidelity*, Section 2954.8(a) limits national banks' broad authority to set the pricing terms of their mortgage escrow accounts solely at their option. This state-law mandate interferes with the flexibility that federal law gives national banks in setting those terms. Under federal law, national banks may always choose to pay interest on escrow in some amount. But nothing in federal law *requires* them to do so—much less do so at varying levels determined by different States. *See Cantero*, 602 U.S. at 211; *see also supra* pp. 6-7. Such a mandate is entirely, and purposefully, absent from the detailed web of

obligations RESPA and Regulation X impose on national banks with respect to mortgage escrow accounts. *See supra* pp. 5-6.

To be sure, TILA does require national banks (and all other creditors) to establish mortgage escrow accounts for certain higher-priced mortgage loans. *See* 15 U.S.C. § 1639d(a)-(b). And where those provisions apply, TILA requires that the creditor pay interest on those accounts "if prescribed by applicable State or Federal Law." *Id.* § 1639d(g)(3). But Plaintiffs have never argued that their mortgages fit within that category. Indeed, the Bravos have affirmatively conceded that their loan was not governed by Section 1639d(g)(3).[4] And outside that category, TILA allows lenders to decide the terms of the escrow accounts they administer. *See id.* § 1639d(f)(1)-(2) (allowing other escrow accounts as "mutually agreeable to the parties to the loan" or "at the discretion of the lender or servicer").[5]

---

[4] The Bravos asserted in their summary judgment briefing that Flagstar "required them to establish [a]n escrow account as a condition of the[ir] loan" under TILA's Section 1639d(f)(2), not (g)(3). 2-ER-134. TILA's Section 1639d(f)(2) applies to mortgages "*not* covered by" Section 1639d(g)(3), and authorizes lenders to establish escrow accounts for those loans "at [their] discretion." 15 U.S.C. § 1639d(f)(2) (emphasis added).

[5] Moreover, although the issue is not directly presented here, Flagstar's view is that, even where it applies, Section 1639d(g)(3) would not require a national bank like Flagstar to pay interest on escrow under any state

In short, federal law leaves to national banks a "range of choices" about whether and at what level to pay interest on mortgage escrow funds. *Cf. Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 875 (2000). Because California's law would limit those choices to one mandate—pay interest on escrow at the rate of 2%—it impermissibly inhibits the flexibility that federal law provides. As the OCC has recognized following *Cantero*, state laws that "frustrate[] national banks' ability to effectively and efficiently discharge authorized powers and limit[] the flexibility given to them under federal law" are preempted. OCC Br. at 10, *Ill. Bankers Ass'n v. Raoul*, No. 1:24-cv-07307 (N.D. Ill. Oct. 2, 2024). Section 2954.8(a) is such a law.

**Easton**. *Barnett Bank*'s reliance on *Easton v. Iowa*, 188 U.S. 220 (1903), reinforces this point. *See Barnett Bank*, 517 U.S. at 32, 37, 42

---

law. By its own terms, Section 1639d(g)(3) recognizes that different laws apply to the different creditors the statute governs—a group that ranges from national banks to nonbank lenders governed by state law—and that those different legal schemes may, or may not, require particular lenders to pay interest on particular types of escrow accounts. The most straightforward reading of this provision is that Congress recognized that national banks would be subject to federal laws, which currently do not require paying interest on escrow, while other lenders would be subject to state laws that might. In other words, as it pertains to a national bank, a preempted state law is not "applicable."

(citing *Easton*).  In *Easton*, the Supreme Court held preempted an Iowa criminal law prohibiting bankers from accepting deposits when insolvent. *Easton*, 188 U.S. at 227.  Although federal law did not expressly prohibit the same conduct, it contained "apt provisions, sanctioned by severe penalties, which [were] intended to protect the depositors and other creditors of national banks from fraudulent banking." *Id.* at 230.  The Supreme Court held that because "Congress ha[d] provided a symmetrical and complete scheme" governing insolvency and related banking issues, that federal policy could not "be overridden by the policy of the state," and the state law was preempted. *Id.* at 232.  The same is true here.  The "delicate balance of statutory [and regulatory] objectives" struck by RESPA and Regulation Z's extensive regulations—which do not require paying interest on escrow for the loans here—would be "skewed" by applying state law to impose a requirement federal law omits. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001).

### 3. California Civil Code § 2954.8(a) does not resemble non-preempted state laws.

On the other hand, California Civil Code § 2954.8(a) is unlike the types of state laws or interference that the Supreme Court has held are permissible rather than preempted.

**Anderson.** Section 2954.8(a) is nothing like the escheat law considered in *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944). That Kentucky law required banks only "to turn over *abandoned* deposits to the State." *Cantero*, 602 U.S. at 217 (citing *Anderson*, 321 U.S. at 236) (emphasis added). The Supreme Court observed that "an inseparable incident" of a national bank's federal power to accept deposits is the "obligation to pay" those deposits "to the persons entitled to demand payment according to the law of the state where [the bank] does business." *Anderson*, 321 U.S. at 248-49. "[T]he Kentucky law simply allowed the State to 'demand payment of the accounts in the same way and to the same extent that the depositors could' after the depositors abandoned the account." *Cantero*, 602 U.S. at 217-18 (quoting *Anderson*, 321 U.S. at 249). Because the state law merely embodied a principle "as old as the common law itself," it did not "impose an undue burden on the performance of the banks' functions." *Anderson*, 321 U.S. at 248, 251. Instead, its requirement to release deposits entailed "nothing more than performance of a duty by the bank [already] imposed by the federal banking laws." *Id.* at 251-52.

30

By contrast, the state escheat law in *First National Bank of San Jose v. California*, 262 U.S. 366 (1923) allowed the State to claim deposits at a national bank that had gone "unclaimed for more than twenty years," without proof the account had been abandoned. *Cantero*, 602 U.S. at 218 (quoting *First National*, 262 U.S. 366). Because that law did not require proof of abandonment, it "attempt[ed] to qualify in an unusual way agreements between national banks and their customers." *Id.* (quoting *First National*, 262 U.S. at 370). As *Cantero* observed, this unusual qualification, in turn, "could cause customers to 'hesitate' before depositing funds at the bank—and thus interfere with the 'efficiency' of the national bank in receiving deposits." *Id.* (quoting *First National*, 262 U.S. at 369-70).

California Civil Code § 2954.8(a) is more akin to the law in *First National* than the one in *Anderson*. It modifies the terms of mortgage lending agreements between national banks and their customers by adding the requirement that the banks pay state-specified interest on escrow funds. As RESPA and Regulation X demonstrate, this requirement is not some "inseparable incident" of banks' mortgage lending powers, nor does it entail simply performing a duty federal law

31

already imposes. *Anderson*, 321 U.S. at 248. It is a new condition that state law imposes on national banks, beyond their usual federal obligations. And it is one that will impact national banks' abilities to efficiently and effectively exercise their mortgage lending powers.

***Commonwealth.*** The Kentucky law that the Supreme Court allowed to stand in *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353 (1869), also differs substantially from Section 2954.8(a). The Kentucky law taxed the shareholders of all banks, including national banks. *Id*. at 360. But Congress had, in the NBA, "expressly permitted the States to levy" such taxes. *Id*. at 363. The Supreme Court thus saw no significant interference in banks "being required to pay the tax which their stockholders owe to the State . . . , when the law of the Federal government authorizes the tax." *Id*. at 362. What is more, as *Cantero* emphasized, the Kentucky law simply "governed [banks] in 'their daily course of business,'" just like other "generally applicable state contract, property, and debt-collection laws." *Cantero*, 602 U.S. at 219 (quoting *Commonwealth*, 76 U.S. at 361-62). It "produced 'no greater interference with the functions of the bank than any other' law governing businesses," and was thus not preempted. *Id.* (quoting *Commonwealth*, 76 U.S. at

362-63). California's IOE law is not "expressly permitted" by federal law for the mortgage escrow accounts at issue. Nor is it a generally applicable law governing standard business operations. *Commonwealth,* 76 U.S. at 363. It is a banking-specific regulation of a national bank's exercise of federal banking powers.

**McClellan**. Finally, *McClellan v. Chipman*, 164 U.S. 347 (1896), likewise provides Plaintiffs no support. *McClellan* concerned a Massachusetts fraudulent-conveyance law that voided any transfer of property by any person or entity—not just banks—in cases of insolvency. 164 U.S. at 348-49. The law was another "generally applicable contract law." *Cantero*, 602 U.S. at 219. The *McClellan* Court recognized that even such a generally applicable law might act as an impermissible "restraint upon the power of a national bank within the State to make such contracts." *Cantero*, 602 U.S. at 219 (quoting *McClellan*, 164 U.S. at 358). But it held that the Massachusetts law did not do so because "[n]o function of such banks is destroyed or hampered by allowing the banks to exercise the power to take real estate, provided only they do so under the same conditions and restrictions to which all the other citizens of the state are subjected." *McClellan*, 164 U.S. at 358. California's IOE

law is different: it speaks directly to banks and to the exercise of federal banking powers in mortgage lending. And, because it restricts the latter in a way federal law does not permit, it is preempted.

## C. Sound federal banking policy confirms that conclusion.

The practical implications of applying California Civil Code § 2954.8(a) to national banks make clear that the law significantly interferes with the exercise of federal banking powers.

1. Permitting California's IOE law to apply to national banks would subject such banks, which operate across the country, to disparate state IOE requirements. Applying that confusing patchwork of state laws to national banks would sow the disuniformity that the codified *Barnett Bank* standard guards against.

It is not just California's law implicated here. At least twelve States including California require banks to pay interest on mortgage escrow funds. *See supra* at p. 6. None of these laws is identical to another. They all diverge in the amount of interest they require to be paid and for which types of residential loans. Connecticut, for example, bases the required interest rate on the deposit index, Maryland on the one-year Treasury rate, and Rhode Island on the bank's savings-account rate, while Utah

34

gives three ways to calculate the required interest. *See* Conn. Gen. Stat. § 49-2a; Md. Code Ann., Com. Law § 12-109(b)(1); R.I. Gen. Laws § 19-9-2; Utah Code Ann. § 7-17-3. Meanwhile, Maryland and New Hampshire's laws cover "any interest in residential real property," Md. Code Ann., Com. Law § 12-109(b)(1), N.H. Rev. Stat. Ann. § 383-B:3-303(a)(7)(E); while Minnesota's (like California's) covers one-to-four family homes, Minn. Stat. § 47.20, subdiv. 9(a); and New York's applies to one-to-six-family homes plus co-op apartments, N.Y. G.O.L. § 5-601. More such laws could proliferate if courts do not properly apply NBA preemption.

Congress did not "intend[] to permit such results." *First National*, 262 U.S. at 370; *see id.* (expressing concern about "varying limitations" states could enact to seize deposits). Such "inconsistent . . . state regulation," particularly when it "intrusive[ly]" limits the exercise of national bank powers, would "impair[] the national system" of banking Congress sought to create in enacting the NBA. *Watters*, 550 U.S. at 11. The NBA aimed to "erect[] . . . a [banking] system extending throughout the country, and independent . . . of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the states." *Easton*, 188 U.S. at 229. National banks are

meant to operate free of varying state regulations that restrict the exercise of their powers, and the same applies to Section 2954.8(a).

2.    The deleterious consequences for the federal banking system, moreover, cannot be contained to IOE laws.  If States can dictate the interest rates that national banks must pay on mortgage escrow accounts, there is no apparent obstacle to a State dictating interest rates on savings, certificate of deposit, or other accounts or mandating the pricing of other banking products and services.  *Cf.* Br. of the Bank Policy Institute, et al., at 3, *Cantero v. Bank of America, N.A.*, No. 21-400 (2d Cir. Oct. 25, 2024) ("This Court's decision could impact State attempts to set price controls on many other core national bank products, such as loan rates and checking account interest.").  Allowing such intrusive state regulation here would open the door to all kinds of other state regulations and restrictions Dodd-Frank's preemption standard does not permit.

As a matter of common sense, these extreme directives would have serious consequences.  "Maintaining a safe and sound [national] banking system" is mission critical for federal regulators and federal banks.  12 C.F.R. § 5.20(f)(i).  As the OCC has recognized, "the safety and soundness of banks depends in significant part on their ability to devise price

structures appropriate for their needs." OCC, *Interpretive Ruling Concerning National Bank Service Charges*, 48 Fed. Reg. 54,319 (Dec. 2, 1983). Should national banks be limited in their ability to flexibly and efficiently manage mortgage escrow accounts, a critical risk mitigation tool—indeed, if they are unable to set their own terms and pricing for such accounts—they will also be hampered in their efforts to effectively manage risk. *See id.* ("[S]tate law impediments to national bank flexibility have potentially serious implications for their continued safety and soundness").

National banks may also have to change aspects of their mortgage lending operations. Basic principles of economics and risk management dictate that if banks are required to structure their products in a certain way or pay a required interest rate to customers, banks may end up limiting who they lend to, changing the terms on which they lend, or increasing the interest rates at which they lend. The costs that Section 2954.8(a) imposes on banks are likely to be passed on to consumers and the market more generally, while banks' ability to service that market may also be impacted. Not only do those potential outcomes reflect

37

significant impairment of national banks' ability to effectively exercise their powers, but they are bad for consumers and the entire market.

## II. This Court's pre-*Cantero* decision in *Lusnak* cannot save California Civil Code § 2954.8(a).

In response to Flagstar's petition for rehearing, Plaintiffs insisted that this Court's pre-*Cantero* decision in *Lusnak* continues to control this case. But the Supreme Court vacated the panel's initial decision and remanded this case "for further consideration in light of *Cantero*." *Flagstar Bank, N.A. v. Kivett*, No. 22-349 (U.S. June 10, 2024). This Court should not avoid a faithful application of *Cantero*'s new guidance based on a decision issued six years before the Supreme Court provided it. Even if the Supreme Court's mandate permits this Court to disregard *Cantero* in that way, Ninth Circuit precedent does not. A Ninth Circuit panel must reject any prior circuit opinion that is "clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller*, 335 F.3d at 893. And *Lusnak* is exactly that.

The preemption analysis that *Lusnak* conducted is not remotely what *Cantero* requires. Absent from *Lusnak*'s analysis is any reference to *Franklin*, *Fidelity*, *Easton*, *Anderson*, *National Bank*, or *McClellan*, much less any discussion about the types of laws and interference those

38

cases addressed. *Barnett Bank* appears in *Lusnak* only as the source of the significant-interference standard, divorced from any analysis of the state law presented in that case or its similarities or differences vis-à-vis California's IOE law.

Instead of a careful analysis of the Supreme Court's precedents, *Lusnak* relied on a categorical test, based on an inapplicable federal law, that the Solicitor General rejected (agreeing with the Second Circuit in that respect), the *Cantero* plaintiffs largely abandoned (as did Plaintiffs in their merits-stage amicus brief),[6] and the Supreme Court refused to adopt. *See supra,* pp. 11-12. If *Cantero* stands for nothing else, it is that categorical tests are not permitted. Moreover, if TILA's Section 1639d established that state IOE laws were not preempted, the Supreme Court would have said so, and reversed the Second Circuit's decision in *Cantero* outright. Instead, the Court said that everyone had it wrong, vacating both the Second Circuit decision in *Cantero* and the panel's decision here and remanding both for reconsideration.

---

[6] *See* Br. of Amicus Curiae Flagstar Plaintiffs at 8, *Cantero v. Bank of America, N.A.*, No. 22-529 (Dec. 15, 2023) (arguing for a "fact-bound preemption inquiry").

Because the preemption standard the Supreme Court announced in *Cantero* is clearly irreconcilable with *Lusnak*, this Court is not bound by and should not follow *Lusnak*'s holding. *Lusnak* must be considered as "effectively overruled" and should play no role in the Court's consideration of the preemption question. *Miller*, 335 F.3d at 893.

Contrary to Plaintiffs' contention, *Close v. Sotheby's, Inc.*, 894 F.3d 1061 (9th Cir. 2018), does not suggest otherwise. In *Close*, even after the Supreme Court's intervening decisions, the "core of the first sale doctrine" at issue remained intact. *Id.* at 1074. That the Supreme Court had "described the doctrine in different words and applied it in different circumstances d[id] not make the first sale doctrine clearly irreconcilable" with existing Ninth Circuit precedent. *Id.* Nor did "isolated statements" in intervening precedent "completely undermine [the] reasoning" of the earlier Ninth Circuit decision. *Id.*

Here, there is not merely "some tension" between this Court's precedent and intervening higher authority—to the contrary, "[t]he core of" *Lusnak*'s TILA rationale is destroyed following *Cantero*. *Id.* at 1073-74 (internal citations omitted). *Cantero* "completely undermine[s] [*Lusnak*'s] reasoning." *Id.* It prohibits any categorical preemption rule

where *Lusnak* employs one. *Cantero*, 602 U.S. at 220-21. And it mandates a practical, precedent-based "comparative analysis" *Lusnak* never used. *Id.* at 220.

Indeed, Plaintiffs effectively concede that *Lusnak* lacks the correct analysis by arguing that *Cantero* does not *require* assessing the Supreme Court's preemption precedents considered in *Barnett Bank*. *See* ECF No. 74 at 10. That argument is wrong. *Cantero* could not be clearer on this point: "[C]ourts addressing preemption questions in this context *must* do as *Barnett Bank* did and likewise take account of those prior [preemption] decisions of this Court and similar precedent." *Cantero*, 602 U.S. at 215-16 (emphasis added). Because *Lusnak* did not decide preemption the way *Cantero* requires, it is overruled.

That the Supreme Court did not expressly identify *Lusnak* as abrogated in *Cantero* does not undermine this conclusion. The Court held the petition for certiorari in this case pending the *Cantero* decision because it presented the same issue, but its reasoning and facts were not argued on the merits. To be sure, the Court was aware of *Lusnak* and its rationale, as both were extensively discussed in cert.-stage briefing. And it was just as aware that the *Cantero* plaintiffs, having previously relied

on *Lusnak*, had largely abandoned its reasoning, and that the Solicitor General had affirmatively rejected it. But the Supreme Court is not in the business of regularly cataloging all the lower court cases that its decisions abrogate. What matters is not whether the Supreme Court called out *Lusnak* by name, but (1) the Court's articulation of a standard and methodology incompatible with *Lusnak*'s approach and (2) the Court's treatment of Section 1639d(g)(3)—the linchpin of *Lusnak*'s analysis—as irrelevant.

## CONCLUSION

For these reasons, this Court should hold that California Civil Code § 2954.8(a) is preempted, reverse the district court court's judgment on that ground, and remand with instructions to enter judgment for Flagstar.

Dated: February 6, 2025      Respectfully submitted,

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
T: (919) 755-6688
*jellis@mcguirewoods.com*

42

Kathryn M. Barber
Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 E Canal Street
Richmond, VA 23219
T: (804) 775-1227
*kbarber@mcguirewoods.com*
*bschmalzbach@mcguirewoods.com*

David C. Powell
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
T: (415) 844-1970
*dpowell@mcguirewoods.com*

*Counsel for Appellant Flagstar Bank,
N.A.*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with this Court's Order of December 24, 2024 because it contains 8,361 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced Century Schoolbook typeface using Microsoft Word, in 14-point size.


Dated:  February 6, 2025          */s/ Jonathan Y. Ellis*
                                  Jonathan Y. Ellis

                                  *Counsel for Appellant Flagstar Bank,*
                                  *N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2025, I electronically transmitted this document to the Clerk's Office using the CM/ECF System, which will accomplish service on all counsel of record.


Dated: February 6, 2025          */s/ Jonathan Y. Ellis*
                                 Jonathan Y. Ellis

                                 *Counsel for Appellant Flagstar Bank, N.A.*